UNITED STATES DISTRICT COURT
For the
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

FILED by ___ D.C.

MAR 03 2015

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

MARIA FERRER
        Plaintiff

CASE No. **15-CV-20877-Scola/Otazo-Reyes**

v.

BAYVIEW LOAN SERVICING, LLC, M&T BANK,
PHELAN HALLINAN DIAMOND & JONES, PLC,
TYLER K. WALKER and KELLY M. CANFIELD
        Defendant _____/

**JURY TRIAL DEMANDED**

## ORIGINAL VERIFIED COMPLAINT

**COMES NOW**, the Plaintiff, MARIA FERRER *pro se,* brings this action against the Plaintiffs BAYVIEW LOAN SERVICING LLC, M&T BANK, PHELAN, HALLINAN, DIAMOND & JONES, PLC, TYLER K. WALKER, and KELLY M. CANFIELD, and as grounds thereof would allege as follows:

### JURISDICTION

1.     This action is brought by consumer for Defendants' violations of the Fair Debt Collection Practices Act, 15 U.S.C. §1692 et seq. ("FDCPA"); Florida Consumer Collection Practices §559 (Part IV) ("FCCPA); and Telephone Consumer Protection Act 47 U.S.C. §227 et seq. (TCPA).  These laws prevent respectively, debt collectors and persons from, inter alia, engaging in abusive, deceptive, and unfair collection practices.

2.     Jurisdiction arises under the FDCPA, 15 U.S.C. §1692(k), TCPA 47 U.S.C. § 227(b)3 & (a)5,  FCCPA §559.77, and pursuant to 28 U.S.C §1331 and 28 U.S.C §1337. Under 28 U.S.C §1367(a) this court has supplemental jurisdiction on the State claim.

### VENUE

3.     Venue is proper in this district pursuant to Florida Statute §559.77(1), 28 U.S.C. §1391(b) as Plaintiff resides in this district and this cause of action occurred here.

## PARTIES

4.     Plaintiff, MARIA FERRER, is a natural person and citizen of the State of Florida, residing in Miami-Dade County and is also a "Consumer" as defined by 15 U.S.C. 1692(a)(3) and Florida Statute §559.55(2), and/or a person with standing to bring a claim under the FDCPA 15 U.S.C. 1692 et. seq., FCCPA §559.55 and TCPA 47 U.S.C. §227 et. seq., by virtue of being directly affected by the violations of these Acts.

5.     Defendant, BAYVIEW LOAN SERVICING, LLC ("BAYVIEW") is a Foreign Limited Liability Company, incorporated under the laws of the State of Florida and has a principal address of 4425 Ponce De Leon Blvd., 4th Floor Coral Gables, FL 33146 and is a "Debt Collector" as defined by 15 U.S.C. 1692(a)(6) and Florida Statute §559.55(6) and doing business in Florida that regularly collects on notes.

6.     Defendant, M&T BANK, ("M&T") is an unknown entity not authorized to do business in Florida and is a "debt collector" as defined by FDCPA 15 U.S.C. 1692(a)(6) and Florida Statute §559.55(6)  and regularly collects on notes and is located at One M&T Plaza Buffalo, NY 14203.

7.     Defendant, M&T BANK, is a "servicer" as defined in RESPA 12 U.S.C. §2605(i)(2) doing business in Florida that regularly collects on notes.

8.     Defendant, PHELAN HALLINAN DIAMOND & JONES, PLC ("PHELAN") is Florida Limited Liability Company, incorporated under the laws of the State of Florida and has a principal address of 2727 West Cypress Creek Rd Ft. Lauderdale, FL 33309 is a "Debt Collector" as defined by 15 U.S.C. 1692(a)(6) and Florida Statute 559.55(6) and doing business in Florida that regularly collects on notes.

9.      Defendant, TYLER K. WALKER, ESQ. ("WALKER") is a natural person and is employed by PHELAN HALLINAN DIAMOND & JONES, PLC and has a principal address of 2727 West Cypress Creek Rd Ft. Lauderdale, FL  33309 is a "Debt Collector" as defined by 15 U.S.C. 1692(a)(6) and Florida Statute 559.55(6) and doing business in Florida that regularly collects on notes and is acting within the scope of his employment and vicariously liable for the actions of his respective employer.

10.      Defendant,  KELLY M. CANFIELD, ESQ. ("CANFIELD") is a natural person and is employed by PHELAN HALLINAN DIAMOND & JONES, PLC and has a principal address of 2727 West Cypress Creek Rd Ft. Lauderdale, FL  33309 is a "Debt Collector" as defined by 15 U.S.C. 1692(a)(6) and Florida Statute 559.55(6) and doing business in Florida that regularly collects on notes and is acting within the scope of her employment and vicariously liable for the actions of her respective employer

11.      The BAYVIEW, M&T, PHELAN, WALKER & CANFIELD use instrumentalities of interstate commerce and/or the United States Postal Service in a business that the principal purpose of which is the collection of any debts, and/or regularly collects or attempts to collect, directly or indirectly, debts owed or due, or asserted to be owed or due another from consumers.

12.      All conditions precedent to the bringing of this action have been performed, waived or excused.

## FACTUAL ALLEGATIONS

13.      Defendants sought to collect an alleged but non-existing debt from Plaintiff arising from an alleged but non-existing debt incurred by Plaintiff for personal, family, or household purposes.

14.     The communications in question here are all related to the collection of a consumer debt.

15.     On or about January 31, 2014, Plaintiff received a letter from the alleged servicer Chase that Plaintiff's mortgage servicing would be transferred to M&T Bank effective February 15, 2014 (attached hereto as Exhibit "A").

16.     On or about February 21, 2014, Plaintiff received letter from M&T Bank in which states the following: (attached hereto as Exhibit "B"):

> "we've **enlisted (emphasis added)** *Bayview Loan Servicing, LLC ("Bayview") to assist us in working with you to explore loss mitigation and/or other payment options"*,

17.     On or about February 24, 2014, M&T mailed a "Notice of Debt" to Plaintiff (attached hereto as Exhibit "C") in which states the following:

> *If you send us a written request within thirty (30) days of this notice, we will mail you the name and address of the original creditor on your mortgage loans.*

18.     On March 8, 2014, Plaintiff mailed to Ms. Kathleen Evans, Vice President of Retail Servicing of M&T Bank a debt validation request letter via US Mail Certified Return Receipt #7012 2920 0000 7317 3284.  Letter was inadvertently dated March 8, 2013 and a Scrivener's Affidavit has been attached to the letter (attached hereto as Exhibit "D").

19.     On February 25, 2014 BAYVIEW mailed to Plaintiff a collection notice (attached hereto as Exhibit "E").  Said collection notice stated:

> *Bayview Loan Servicing, LLC is a debt collector.   This letter is an attempt to collect a debt and any information obtained will be used for that purpose.  To the extent that your obligation has been discharged or is subject to an automatic stay of bankruptcy this notice is for compliance and informational purpose only and does not constitute a demand for payment or any attempt to collect such obligation*

20. On March 8, 2014, Plaintiff mailed to Lisa Fiorello, Asset Manager of Bayview Loan Servicing, LLC a debt validation request letter via US Mail Certified Return Receipt #7012 2920 0000 7317 3191. Letter was inadvertently dated March 8, 2013 and a Scrivener's Affidavit has been attached to the letter (attached hereto as Exhibit "F").

21. Subsequent to the request for validation, BAYVIEW, M&T, PHELAN, WALKER, CANFIELD proceeded to continue collection efforts on the alleged but non-existing debt without proper validation by:

    a. BAYVIEW placed calls to Plaintiff's cell phone number of (305) 785-8303.

    b. BAYVIEW through their legal counsel, PHELAN, WALKER, CANFIELD initiated a foreclosure action against Plaintiff styled Bayview vs. Maria Ferrer Case No: 14-11817 CA (01) in the Circuit Court for the 11th Judicial Circuit in and for Miami-Dade County Florida on May 9, 2014.

    c. M&T mailed Plaintiff collection notices on 3/17/14; 4/16/14; 5/16/14; 6/16/14; 7/16/14; 8/13/14; 8/18/14; 9/16/14; 10/16/14; 11/17/14; 12/16/14; 1/16/15; and 2/17/15 (attached hereto collectively as Exhibit "G").

22. Furthermore, CANFIELD was notified that BAYVIEW lacks standing to pursue collection activity against Plaintiff due to the fact that the Endorsement in Blank is invalid, and under any definition, BAYVIEW cannot be the holder of the Note. The actions of BAYVIEW to attempt to enforce the Note and Mortgage in the mortgage foreclosure are without merit, false and misleading (attached hereto as Exhibit "H").

23. BAYVIEW, M&T, PHELAN, CANFIELD and WALKER have established a pattern and practices of engaging in illegal debt collection practices and in fact engage and use false and misleading representations to collect, or attempt to collect a debt. PHELAN,

CANFIELD and WALKER knew or should have known that their acts and the acts of their client were unlawful and contrary to the spirit of fairness.

24.     BAYVIEW and M&T failed to properly supervise their employees, agents and debt collectors.  They have taken over collections of the Plaintiff's Note and chosen to ignore the defects to the ongoing collection activity.

25.     The acts of Defendants in their attempt to collect on this debt are nonsensical to the least educated consumer, sloppy, confusing and unconscionable and lack legal basis.

26.     BAYVIEW, M&T, PHELAN, CANFIELD and WALKER have deceived the Plaintiff and engaged in a pattern and practice of unfair and deceptive collection practices.

27.     Plaintiff and BAYVIEW, M&T, PHELAN, WALKER, and CANFIELD do not have an established business relationship within the meaning of 15 U.S.C. 1692a(4).

28.     In connection with the collection of the Debt, BAYVIEW called Plaintiff's cellular phone number (305) 785-8303, on the following dates and times.

| | | | |
|---|---|---|---|
| 1) | *February 21, 2014* | *at* | *4:01 PM;* |
| 2) | *February 26, 2014* | *at* | *1:53 PM;* |
| 3) | March 6, 2014 | *at* | 1:13 PM; |
| 4) | March 10, 2014 | *at* | 8:33 AM; |
| 5) | March 13, 2014 | *at* | 8:22 AM; |
| 6) | March 17, 2014 | *at* | 12:33 PM; |
| 7) | March 20, 2014 | *at* | 11:34 AM; |
| 8) | March 24, 2014 | *at* | 10:22 AM; |
| 9) | March 24, 2014 | *at* | 10:44 AM; |
| 10) | March 24, 2014 | *at* | 12:23 AM; |
| 11) | March 27, 2014 | *at* | 8:46 AM; |
| 12) | March 27, 2014 | *at* | 2:34 P M; |
| 13) | March 31, 2014 | *at* | 10:53 AM; |
| 14) | *March 31, 2014* | *at* | *12:47 AM;* |
| 15) | *April 7, 2014* | *at* | *9:50 AM;* |
| 16) | *April 7, 2014* | *at* | *12:30 PM;* |
| 17) | April 24, 2014 | *at* | 12:18 PM; |
| 18) | *April 24, 2014* | *at* | *12:38 PM;* |
| 19) | April 28, 2014 | *at* | 11:01 AM; |
| 20) | April 28, 2014 | *at* | 11:26 AM; |

| 21) | *May 6, 2014* | *at* | *3:10 PM;* |
|---|---|---|---|
| 22) | May 9, 2014 | *at* | *1:16 PM;* |
| 23) | May 16, 2014 | *at* | 2:12 PM; |
| 24) | May 20, 2014 | *at* | *11:13 AM;* |
| 25) | June 9, 2014 | *at* | *4:46 PM;* |
| 26) | June 9, 2014 | *at* | *4:58 PM;* |
| 27) | June 16, 2014 | *at* | *2:55 PM;* |
| 28) | June 17, 2014 | *at* | *11:19 AM;* |
| 29) | June 17, 2014 | *at* | *11:34 AM;* |
| 30) | July 3, 2014 | *at* | 10:21 AM; |
| 31) | July 3, 2014 | *at* | 10:23 AM; |
| 32) | July 7, 2014 | *at* | 10:30 AM; |
| 33) | July 9, 2014 | *at* | 5:47 PM; |
| 34) | July 21, 2014 | *at* | 5:49 PM; |
| 35) | July 23, 2014 | *at* | 11:05 AM; |
| 36) | July 28, 2014 | *at* | 10:41 AM; |
| 37) | July 31, 2014 | *at* | 8:57 AM; |
| 38) | August 4, 2014 | *at* | 3:49 PM; |
| 39) | August 7, 2014 | *at* | 10:25 AM; |
| 40) | August 18, 2014 | *at* | 10:38 AM; |
| 41) | August 21, 2014 | *at* | 11:06 AM; |
| 42) | August 27, 2014 | *at* | 1:58 PM; |
| 43) | September 2, 2014 | *at* | 2:56 PM; |
| 44) | September 5, 2014 | *at* | 12:58 PM; |
| 45) | September 25, 2014 | *at* | 10:00 AM; |
| 46) | October 6, 2014 | *at* | 11:15 AM; |
| 47) | October 9, 2014 | *at* | 11:26 AM; |
| 48) | October 13, 2014 | *at* | 7:03 PM; |
| 49) | October 16, 2014 | *at* | 12:37 PM; |
| 50) | October 16, 2014 | *at* | 3:17 PM; |
| 51) | October 20, 2014 | *at* | 11:08 AM; |
| 52) | October 23, 2014 | *at* | 10:01 AM; |

29.     On the several occasions when Plaintiff would answer BAYVIEW'S calls, BAYVIEW failed to disclose that the communication was from a debt collector.

30.     Further, on the several occasions when Plaintiff would answer BAYVIEW'S calls, BAYVIEW would not say anything and there would be only dead air.

31.     Upon information and good–faith belief, the telephone calls identified above were placed to Plaintiff's cellular telephone number using an automatic telephone dialing system and/or an artificial or pre-recorded voice.

32.     BAYVIEW did not place any telephone calls to Plaintiff for emergency purposes.

33.     BAYVIEW did not have Plaintiff's prior express consent to make any telephone calls to Plaintiff's cellular telephone numbers.

34.     Upon information and belief, BAYVIEW placed the telephone calls to Plaintiff identified above voluntarily.

35.     Upon information and belief, BAYVIEW placed the telephone calls to Plaintiff identified above under its own free will.

36.     Upon information and belief, BAYVIEW had knowledge that it was using an automatic telephone dialing system to place each of the telephone calls identified above

37.     Upon information and belief, BAYVIEW intended to use an automatic telephone dialing system to place each of the telephone calls identified above.

38.     Upon information and belief, BAYVIEW maintains business records that show all call it placed to Plaintiff's cellular telephone number.

## COUNT I
## VIOLATION OF FEDERAL DEBT COLLECTIONS PRACTICES ACT
## 15 U.S.C. 1692 *et. seq.*

39.     Plaintiff realleges and incorporates by reference paragraph 1 through 38.

40.     Plaintiff is a consumer within the meaning of the FDCPA, 15 U.S.C. §1692a(3).

41.     The Defendants are engaged in a collection of a "debt" as defined by §1692a(5).

42.     BAYVIEW, M&T, PHELAN HALLINAN, WALKER and CANFIELD are in violation of FDCPA, 15 U.S.C. 1692a.  The Defendants engaged in "communication" in the collection of a "debt" as defined by §1692a(5):

43.     Plaintiff seeks a declaration that BAYVIEW, M&T, PHELAN, WALKER and CANFIELD practices are in violation of the FDCPA 15 U.S.C. §1692 et. seq.

44.     As consequence of the acts of the Defendants, Plaintiff is entitled to statutory and actual relief for the acts of BAYVIEW, M&T, PHELAN, WALKER and CANFIELD.

45.     M&T violated 15 U.S.C. §1692d by sending collection notices (attached hereto collectively as Exhibit "G") to Plaintiff in which states that *"When your loan is delinquent you risk the loss of your property to foreclosure"* and detail the past due amounts due and owing on alleged but not-existing debt.  This statement is intended to oppress, harass, and/or abuse the less sophisticated consumer.

46.     BAYVIEW, M&T PHELAN HALLINAN, WALKER and CANFIELD violated 15 U.S.C. §1692e(2) by continuing to collect on an alleged but non-existing debt after being notified that the legal status of the alleged but non-existing debt is invalid.

47.     BAYVIEW, M&T, PHELAN HALLINAN, WALKER and CANFIELD violated 15 U.S.C. §1692e(10) By continuing to collect on an alleged but non-existing debt using false and misleading representations.

48.     M&T violated 15 U.S.C. §1692e(11) by failing to state in the 13 collection notices (attached hereto collectively as Exhibit "G") received by Plaintiff that *"this is an attempt to collect a debt and any information will be used for that purpose"*.

49.     BAYVIEW, violated 15 U.S.C. §1692e(14) [The use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization]. M&T in its correspondence dated February 21, 2014 it indicated that

*"we've enlisted Bayview Loan Servicing, LLC ("Bayview") to assist us in working with you to explore loss mitigation and/or other payment options" (emphasis added).* In future correspondence sent by M&T more particularly letter dated June 16, 2014 that is made part of Exhibit "G" and subsequent correspondence to Plaintiff, M&T states *"As a person having an ownership interest in the property" (emphasis added).* Bayview in its foreclosure complaint claims to have ownership of the Note and Mortgage while M&T through its correspondence claim ownership. It is unclear based on the above statements who is the real owner of the alleged but non-existing debt.

50.     BAYVIEW, violated 15 U.S.C. §1692g(a)(1)(2)(3)(4)(5) by attempting to collect a debt. BAYVIEW is considered a debt collector as defined in 15 U.S.C. 1692a(5). As such BAYVIEW failed to comply with the requirements of 15 U.S.C. §1692g(a) and its subparts.

51.     BAYVIEW, M&T, PHELAN, WALKER and CANFIELD violated 15 U.S.C. §1692g(b) by failing to validate the alleged but non-existing debt after Plaintiff requested validation and the continued collection efforts on an invalidated alleged but non-existing debt.

52.     M&T violated 15 U.S.C. §1692g(b) by sending Plaintiff 13 collection notices in an attempt to collect on an alleged but non-existing debt after Plaintiff requested validation of an alleged but not-existing debt and validation was not provided.

**WHEREFORE,** Plaintiff request that this Court enter judgment in Plaintiff's favor and against Defendant's BAYVIEW, M&T, PHELAN HALLINAN, WALKER and CANFIELD for each violation of the FDCPA as described herein under 15 U.S.C. 1692d; 15 U.S.C. 1692e(2); 15 U.S.C. 1692e(10); 15 U.S.C. 1692e(11), 15 U.S.C. 1692e(14); 15 U.S.C.

1692g(a)(1)(2)(3)(4)(5); 15 U.S.C. 1692g(b).    (1) Statutory pursuant to 15 U.S.C.. §1692k(a)(2); (2) Awarding Plaintiff reasonable attorneys' fees and costs incurred in this action; (3) Award Plaintiff any pre-judgment and post-judgment interest as may be allowed by Law; and (4)  Such other or further relief as the Court deems proper.

**COUNT II**
**VIOLATIONS OF FLORIDA CONSUMER COLLECTION PRACTICES ACT**
**(FCCPA), FLORIDA STATUTES §559 (Part VI)**

53.     Plaintiff repeats and re-alleges and incorporates by reference paragraph 1 through 38.

58.     Defendants are in violation of FCCPA §559.55(5).  The Defendant engaged in "communication" in the collection of a "debt" as defined by §559.55(5):

61.     BAYVIEW, M&T, PHELAN HALLINAN, WALKER and CANFIELD violated FCCPA §559.72(9) by attempting to collect a alleged but non-existing debt or threaten to enforce an alleged but non-existing debt when such person knows that the alleged but non-existing debt is not legitimate or assert the existence of some other legal right when such person knows that the right does not exist.

**WHEREFORE,** Plaintiff request that this Court enter judgment in Plaintiff's favor and against Defendant's BAYVIEW, M&T, PHELAN HALLINAN, WALKER and CANFIELD for violation of FCCPA §559.72(9). (1) Statutory pursuant to FCCPA §559.77(2); (2) Awarding Plaintiff reasonable attorneys' fees and costs incurred in this action; (3) Award Plaintiff any pre-judgment and post-judgment interest as may be allowed by Law; and (4)  Such other or further relief as the Court deems proper.

## COUNT III

### VIOLATION OF TELEPHONE CONSUMER PROTECTION ACT
### 47 U.S.C. §227 et seq.

63.     Plaintiff alleges and incorporates the information in paragraphs 1 through 38.

64.     BAYVIEW has demonstrated willful or knowing non-compliance with 47 U.S.C. §227(b)(1)(A) by using an automatic telephone dialing system to call the Plaintiff's number, which is assigned to a cellular telephone service.

65.     BAYVIEW has committed 52 separate violations of 47 U.S.C. §227(b)(1)(A) and Plaintiff is entitled to damages of $1500 per violation pursuant to 47 U.S.C. §227(b)(3)(B).

66.     BAYVIEW has demonstrated willful or knowing non-compliance with 47 U.S.C. §227(b)(1)(A).  The last 51 calls are subject to treble damages pursuant to 47 U.S.C. §227(b)(3) as they were intentional.  An unintentional call carries a damage amount of $500; an intentional call carries a damage amount of $1,500 per violation.

67.     BAYVIEW has demonstrated willful or knowing non-compliance with 47 U.S.C. §227(b)(1)(A) by calling the Plaintiff's number, which is assigned to a cellular telephone service. The Plaintiff has never given BAYVIEW permission to call Plaintiffs cell phone.  Plaintiff is entitled to damages of $1500 per violation pursuant to 47 U.S.C. §227(b)(3)(B).  Plaintiff and BAYVIEW do not have an established business relationship within the meaning of 47 U.S.C. §227.

68.     BAYVIEW has demonstrated willful or knowing non-compliance with 47 U.S.C. §227(b)(1)(A) by continuing to call Plaintiff 48 times after receiving letter from

Plaintiff indicating that any further communication with Plaintiff must be done in writing disregarding and violating of 47 U.S.C. §227(b)(1)(A)(iii).

WHEREFORE, Plaintiff request that this Court enter judgment in Plaintiff's favor and against Defendant's BAYVIEW for: (1)   Awarding Plaintiff Statutory damages, pursuant to 47 U.S.C. §227(b)(3)(B), in the amount of $500.00 per violation; (2) Awarding Plaintiff statutory damages, pursuant to 47 U.S.C. §227(b)(3)(C) in the amount of $1,500 per violation; (3) Awarding Plaintiff actual damages, pursuant to 47 U.S.C. §227(b)(3)(B); (4) Awarding Plaintiff reasonable attorneys' fees and costs incurred in this action; (5) Award Plaintiff any pre-judgment and post-judgment interest as may be allowed by Law; and (6) Such other or further relief as the Court deems proper.

**Under penalties of perjury, I declare that I have read the foregoing complaint and the facts stated in it are true to the best of my information and belief.**

_____

Maria Ferrer

### TRIAL BY JURY

69.   Plaintiff is entitled to and hereby demands a trial by jury.

Signed this 3rd day of March, 2015.

Respectfully submitted,

Maria Ferrer, *Pro Se*
19827 NW 85th Avenue
Miami, Florida 33015
Telephone: (305) 785-8303
Facsimile: (305) 454-8360
Service: ferrer.maria123@gmail.com

By: _____
Maria Ferrer, *Pro Se*

# EXHIBIT

# "A"

**Chase**
P.O. Box 183210
Columbus, OH 43218-3210



**Notice of Assignment, Sale or Transfer of Servicing Rights**

1/31/2014



000591 - 1 of 3 NSP0GMC5-Z1 CH1BOC.A 000000000000
MARIA FERRER
19827 NW 85TH AVE
HIALEAH, FL 33015-5982

**Chase loan number: 0634577126**

Dear MARIA FERRER,

We're writing to let you know that the servicing of your mortgage loan will transfer from Chase to M & T Bank(M&T) on 2/15/2014.

The servicing of your mortgage loan includes:

- Collecting and processing your payments
- Sending account statements and annual tax forms
- Notifying you of account-related issues and updates

This transfer doesn't affect any of the terms of your loan, other than the terms directly related to the servicing of your loan.

**What this means to you**

On or after 2/15/2014:

- Your account number will change. M&T will send you a letter with your new account number.
- You will send your mortgage payments to your new servicer.
- You will contact your new servicer for any questions about your account.

Over, Please


EQUAL HOUSING LENDER ©2013 JPMorgan Chase & Co. JPMorgan Chase Bank, N.A.

11.2013CR23818
AS083

**Payments and contact information**

| | Before 2/15/2014 | On or after 2/15/2014 |
|---|---|---|
| **Send payments* to:** | Chase P.O. Box 78420 Phoenix, AZ 85062-8116 | M & T Bank P.O. Box 62182 Baltimore, MD 21264-2182 |
| **Contact for questions:** | Chase Customer Service Center 1-800-848-9136 1-800-582-0542 TTY Mon–Fri 8 a.m. to 12 a.m. ET Saturday 8 a.m. to 8 p.m. ET | M & T Bank Customer Service 1-866-462-1156 Mon-Fri 8:30 a.m. to 8:00 p.m. ET |
| **Send written correspondence to:** | Chase Attn: Customer Support Mail Code: OH4-7302 P.O. Box 24696 Columbus, OH 43224-0696 | Regular mail: M & T Bank Attn: Customer Service P.O. Box 1288 Buffalo, NY 14240 |

Chase will no longer accept payments after the loan is transferred on 2/15/2014. From that day on, please send your payments to M&T.

If your monthly payment is automatically deducted from your bank account through automatic mortgage payments, this service will be canceled as of the effective date. You can call your new servicer and ask if they offer a similar service.

M&T will send you a transfer letter with additional information within 15 days after the effective transfer date. If you have any questions before 2/15/2014, please call us at one of the telephone numbers below.

Sincerely,

Chase
1-800-848-9136
1-800-582-0542 TTY
www.chase.com

**Please see the additional information and frequently asked questions on the next pages.**

11.2013CR23818

# EXHIBIT

## "B"

 **M&T Bank**

Understanding what's important®

February 21, 2014

76253-000108-001
Maria Ferrer
19827 NW 85th Ave
Hialeah, FL 33015

RE:  Mortgage No. 0091672667

Dear Mortgagor(s):

I am writing to you regarding the above referenced mortgage. As you know, M&T Bank ("M&T") is servicing your mortgage loan. This means, among other things, that your payments are sent to M&T.

As you have recently fallen behind in your mortgage payments, requested loss mitigation assistance, or your loan will be maturing, we've enlisted Bayview Loan Servicing, LLC ("Bayview") to assist us in working with you to explore loss mitigation and/or other payment options. Bayview will be contacting you shortly to begin exploring options that may be available to you.

M&T is still the servicer of your loan. This means that you should direct any questions related to items such as your escrow account, taxes, insurance, and year-end statements to M&T. This also means that you will continue to receive billing statements from M&T.

If you have any questions related to loss mitigation or other payment assistance, please direct those questions to Bayview at 1-866-709-3400.

Sincerely,

M&T Bank

M&T Bank is attempting to collect a debt and any information obtained will be used for that purpose. If you are in bankruptcy or received a bankruptcy discharge of this debt, this communication is not an attempt to collect the debt against you personally, but strictly for informational purposes only.

CLO21

750-2004-1007F

# EXHIBIT

# 

 **M&T Bank**

2/24/2014

4-750-76224-0008084-002-01-000-000-000-000


MARIA FERRER
19827 NW 85TH AVE
HIALEAH   FL 33015

Re:  Mortgage No. 0091672667
Property Address: 19827 NW 85 AVE
                  MIAMI LAKES FL 33015
Name of Creditor to whom the debt is owed: FEDERAL HOME LN MTG CORP

Dear Customer:

M&T Bank(MTB), the servicer of the loan described above, is sending you this notice that as of the date of this letter, the amount of the debt in connection with this loan is $385,623.83 (including principal, accrued interest, late charges and other fees if applicable).

The amount of the debt shown above may increase as a result of interest, late charges and other amounts that may accrue after the date of this letter.

Unless you notify us within thirty (30) days after the receipt of this notice that you dispute the validity of this debt, or any portion of it, we will assume the debt is valid. If you notify us in writing within this thirty (30) day period that the debt or any portion is disputed, we will obtain verification of the debt and mail a copy of the verification to you.

If you send us a written request within thirty (30) days of this notice, we will mail you the name and address of the original creditor on your mortgage loan.

If you pay the amount shown above, an adjustment may be necessary after we receive your payment and we will inform you before depositing your payment. The amount of the debt specified above is also not the amount needed to cure the default and bring your loan current, which will be less than the total amount needed to pay the debt in full. For further information, please write the undersigned or call me at 1-800-724-2224.

P.O. Box 1288, Buffalo, NY 14240 716-626-7010 800-724-2224
Mortgage account information, just a click away. www.mtb.com

If your legal obligation was previously discharged in Bankruptcy this paragraph applies to you: Nothing in this letter is to be construed as an attempt to collect a debt against you personally or an attempt to revive personal liability on any discharged debt. References to "debt" elsewhere in this letter should be read as references to amounts secured by the Mortgage or Deed of Trust. Although you cannot be held personally responsible for making the payments, M&T Bank continues to have the right to foreclose on the security real property if payments are not made or other conditions in the Mortgage or Deed of Trust are not met.

Unless you have received a discharge order of this debt from a bankruptcy court, please be advised this is an attempt to collect a debt and any information will be used for that purpose.

We would like to help you avoid foreclosure and are interested in working with you to come up with a solution in resolving the default on your Mortgage or Deed of Trust. Please contact us at 1-800-724-2224 to discuss various options that may be available to you.


Sincerely,

*Kathleen O. Evans*

Kathleen Evans
Vice President, Retail Servicing

# EXHIBIT

# "D"

*Maria Ferrer*

*19827 NW 85 Avenue*
*Miami, FL  33015*

**VIA CERTIFIED RETURN RECEIPT**
**#7012 2920 0000 7317 3284**

March 8, 2013

Ms. Kathleen Evans
Vice President, Retail Servicing
M&T Bank
P.O. Box 1288
Buffalo, NY  14240

      RE:    Loan #0091672667
              Property Address:  19827 NW 85 Ave Miami, FL 33015

Dear Ms. Evans,

Thank you for your recent correspondence.  This is not a refusal to pay, but a notice that your claim is disputed.

This is a request for validation made pursuant to the Fair Debt Collection Practices Act. Please complete and return the attached disclosure request form.

Please be advised that I am not requesting a "verification" that you have my mailing address, I am requesting a "validation" that is, competent evidence that I have some contractual obligation to pay you.

You should also be aware that sending unsubstantiated demands for payment through the United States Mail System might constitute mail fraud under federal and state law.

Your failure to satisfy this request within the requirements of the Fair Debt Collection Practices Act will be construed as your absolute waiver of any and all claims against me, and your tacit agreement to compensate me for costs and attorneys fees.

Sincerely,

Maria Ferrer

## CREDITOR DISCLOSURE STATEMENT

Name and Address of Collector (assignee): _____

_____

Name and Address of Debtor: _____

_____

Account Number(s): _____

What are the terms of assignment for this account? You may attach a facsimile of any records relating to such terms.

_____

_____

Have any insurance claims been made by any creditor been made by any creditor or assignee regarding this account? Yes /no

Has the purported balance of this account been used in any tax deduction claim? Yes / no

Please list the particular products or services sold by the collector to the debtor and the dollar amount of each:

_____

_____

Upon failure or refusal of collector to validate this collection action, collector agrees to waive all claims against the debtor named herein and pay debtor for all costs and attorney fees involved in defending this collection action.

X_____          _____
Authorized signature for Collector          Date

Please return this completed form and attach all assignment or other transfer agreements that would establish your right to collect this debt. Your claim cannot be considered if any portion of this form is not completed and returned with the required documents. This is a request for validation made pursuant to the Fair Debt Collection Practices Act. If you do not respond as required by this law, your claim will not be considered and you may be liable for damages for continued collection efforts.

## SCRIVENER'S AFFIDAVIT

STATE OF FLORIDA      )
                              ) ss
COUNTY OF MIAMI-DADE   )

BEFORE ME the undersigned authority, personally appeared Maria Ferrer, who being by me first duly sworn, deposes and says:

1.     My name is Maria Ferrer ("Affiant") and I am over eighteen (18) years of age.

2.     The Affiant declares that there was a clerical error made on the letter addressed to Ms. Kathleen Evans, Vice President Retail Servicing M&T Bank dated March 8, 2013.

3.     The date on the letter should have been March 8, 2014 as indicated by United States Postal Service Receipt # 7012 2920 0000 7317 3284 dated March 8, 2014 attached hereto and made part of this Affidavit.

I hereby affirm to the best of my knowledge and belief, that the information herein is true, correct and complete.

Execute this _3_ day of March, 2015.

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
MARIA FERRER

STATE OF FLORIDA      )
                              ) ss
COUNTY OF MIAMI-DADE   )

Sworn to and subscribed before me this _3_ day of March 2015, by Maria Ferrer, who is personally known to me or who has provided a Florida driver's license as identification.

JONATHAN ARGUELLO
MY COMMISSION # EE560800
EXPIRES February 05, 2017
(407) 398-0153   FloridaNotaryService.com

Notary Public -- State of Florida
Printed Name: _____
(Seal)

**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

BUFFALO, NY 14240

| | | |
|---|---|---|
| Postage | $ $0.49 | 0301 |
| Certified Fee | $3.30 | 07 |
| Return Receipt Fee (Endorsement Required) | $2.70 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $ $6.49 | 03/08/2014 |

7012 2920 0000 7317 3284

Sent To
KATHLEEN EVANS - M&T BANK
Street, Apt. No.; or PO Box No. P.O. Box 1288
City, State, ZIP+4
BUFFALO, NY 14240-1288

PS Form 3800, August 2006                    See Reverse for Instructions

---

**SENDER:** *COMPLETE THIS SECTION*

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

KATHLEEN EVANS
M&T BANK
P.O. BOX 1288
BUFFALO, NY 14240-1288

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X _____   ☐ Agent
                     ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

MAR 1 1 2014

3. Service Type
   ☑ Certified Mail®      ☐ Priority Mail Express™
   ☐ Registered           ☑ Return Receipt for Merchandise
   ☐ Insured Mail         ☐ Collect on Delivery

4. Restricted Delivery? *(Extra Fee)*   ☐ Yes

2. Article Number
(Transfer from service label)    7012 2920 0000 7317 3284

PS Form 3811, July 2013          Domestic Return Receipt

# EXHIBIT

# "E"



Bayview Loan Servicing, LLC
4425 Ponce de Leon Blvd., 5th Floor
Coral Gables, FL  33146

2/25/2014

M FERRER
19827 NW 85TH AVE
HIALEAH, FL 330155982

Loan Number:  0091672667          Property Address:     19827NW85 AVE
                                                        MIAMI LAKES, FL 330155982

Dear Customer:

Bayview Loan Servicing, LLC is acting as agent for your servicer, M&T Bank. Hi, my name is
Lisa Fiorello. I am a member of the Bayview Loan Servicing Asset Management Team. Due to the
status of your account your loan has been assigned to me. Your account may have been referred to an attorney
for legal action, and additional fees and charges may be accruing. Your credit standing could also suffer as a
result of any legal action, including foreclosure.

Together we may be able to come to an alternative solution to your current situation. I cannot assist you without
your cooperation. Please call me immediately at my toll free number listed below to discuss possible options
that may be available. Thank you for your time.

Sincerely,

Lisa Fiorello

Lisa Fiorello, Asset Manager

Bayview Loan Servicing, LLC
Phone Number: 8772032788 Monday - Friday 9:00 a.m. - 6:00 p.m., ET
Fax Number: (305)260-1429

Bayview Loan Servicing, LLC is a debt collector. This letter is an attempt to collect a debt and any information
obtained will be used for that purpose. To the extent that your obligation has been discharged or is subject to an
automatic stay of bankruptcy this notice is for compliance and informational purposes only and does not constitute a
demand for payment or any attempt to collect such obligation.

**The following mailing address must be used for all Error Notices & Information Requests: Bayview Loan
Servicing, LLC, Customer Support, 4425 Ponce de Leon Boulevard, 5th Floor, Coral Gables, FL 33146.**

AM009 MT_Introduction BAM V 1.1 Loan No.: {loanNumber}

# EXHIBIT

# "F"

*Maria Ferrer*
*19827 NW 85 Avenue*
*Miami, FL 33015*

**VIA CERTIFIED RETURN RECEIPT**
**#7012 2920 0000 7317 3291**

March 8, 2013

Ms. Lisa Fiorello
Asset Manager
Bayview Loan Servicing, LLC
4425 Ponce de Leon Blvd 5th Flr
Coral Gables, FL  33146

     **RE:**   **Loan #0091672667**
           **Property Address:  19827 NW 85 Ave Miami, FL 33015**

Dear Ms. Fiorello,

Thank you for your recent correspondence.  This is not a refusal to pay, but a notice that your claim is disputed.

This is a request for validation made pursuant to the Fair Debt Collection Practices Act. Please complete and return the attached disclosure request form.

Please be advised that I am not requesting a "verification" that you have my mailing address, I am requesting a "validation" that is, competent evidence that I have some contractual obligation to pay you.

You should also be aware that sending unsubstantiated demands for payment through the United States Mail System might constitute mail fraud under federal and state law.

Your failure to satisfy this request within the requirements of the Fair Debt Collection Practices Act will be construed as your absolute waiver of any and all claims against me, and your tacit agreement to compensate me for costs and attorneys fees.

Sincerely,

Maria Ferrer

## CREDITOR DISCLOSURE STATEMENT

Name and Address of Collector (assignee): _____

_____

Name and Address of Debtor: _____

_____

Account Number(s): _____

What are the terms of assignment for this account? You may attach a facsimile of any records relating to such terms.

_____

_____

Have any insurance claims been made by any creditor been made by any creditor or assignee regarding this account? Yes /no

Has the purported balance of this account been used in any tax deduction claim? Yes / no

Please list the particular products or services sold by the collector to the debtor and the dollar amount of each:

_____

_____

Upon failure or refusal of collector to validate this collection action, collector agrees to waive all claims against the debtor named herein and pay debtor for all costs and attorney fees involved in defending this collection action.

X_____      _____
Authorized signature for Collector          Date

Please return this completed form and attach all assignment or other transfer agreements that would establish your right to collect this debt. Your claim cannot be considered if any portion of this form is not completed and returned with the required documents. This is a request for validation made pursuant to the Fair Debt Collection Practices Act. If you do not respond as required by this law, your claim will not be considered and you may be liable for damages for continued collection efforts.

## SCRIVENER'S AFFIDAVIT

STATE OF FLORIDA   )
          ) ss
COUNTY OF MIAMI-DADE )

  BEFORE ME the undersigned authority, personally appeared Maria Ferrer, who being by me first duly sworn, deposes and says:

  1.  My name is Maria Ferrer ("Affiant") and I am over eighteen (18) years of age.

  2.  The Affiant declares that there was a clerical error made on the Letter addressed Ms. Lisa Fiorello Asset Manager of Bayview Loan Servicing, LLC which was dated March 8, 2013.

  3.  The date on the letter should have been March 8, 2014 as indicated by United States Postal Service Receipt #7012 2920 0000 7317 3291 dated March 8, 2014 attached hereto and made part of this Affidavit.

  I hereby affirm to the best of my knowledge and belief, that the information herein is true, correct and complete.

  Execute this 3 day of March, 2015.

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
MARIA FERRER

STATE OF FLORIDA   )
          ) ss
COUNTY OF MIAMI-DADE )

Sworn to and subscribed before me this 3 day of March, 2015, by Maria Ferrer, who is personally known to me or who has provided a Florida driver's license as identification.

JONATHAN ARGUELLO
MY COMMISSION # EE800606
EXPIRES February 05, 2017
(407) 398-0153 FloridaNotaryService.com

Notary Public - State of Florida
Printed Name_____
(Seal)

**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| Postage | $ | $0.49 |
| Certified Fee | | $3.30 |
| Return Receipt Fee (Endorsement Required) | | $2.70 |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 |
| Total Postage & Fees | $ | $6.49 |

Postmark Here

03/08/2014

7012 2920 0000 7317 3291

Sent To LISA FIORELLO - BAYVIEW LN SERV
Street, Apt. No.; or PO Box No. 4425 PONCE DE LEON BLVD 5th FL
City, State, ZIP+4 CORAL GABLES, FL 33146

PS Form 3800, August 2006          See Reverse for Instructions

---

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

LISA FIORELLO
ASSET MANAGER
BAYVIEW LOAN SERVICING, LLC
4425 PONCE DE LEON BLVD
5th FLOOR
CORAL GABLES, FL 33146

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X _____
☐ Agent
☐ Addressee

B. Received by *(Printed Name)*   C. Date of Delivery
                                   3/11

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☑ Certified Mail®     ☐ Priority Mail Express™
☐ Registered          ☑ Return Receipt for Merchandise
☐ Insured Mail        ☐ Collect on Delivery

4. Restricted Delivery? *(Extra Fee)*   ☐ Yes

2. Article Number
*(Transfer from service label)*   7012 2920 0000 7317 3291

PS Form 3811, July 2013          Domestic Return Receipt

# EXHIBIT

# "G"

 **M&T Bank**

03/17/2014

3-750-77055-0111110-023-2-000-010-000-000



MARIA FERRER
19827 NW 85TH AVE
HIALEAH FL 33015-5982

Account Number:    0091672667

**Our records indicate we have not received your most recent mortgage payments.** As of 03/17/14 you are 1,416 days delinquent on your mortgage loan.

When your loan is delinquent you risk the loss of your property to foreclosure and additional fees related thereto, including but not limited to property evaluations, inspections, court costs, and attorneys fees.

If you are experiencing difficulty in repaying your mortgage you may obtain a list of HUD approved housing counseling agencies by calling 1-800-569-4287 or consulting http://www.hud.gov.

### Recent Account History*

- Payment Due 10/01/13:   Payment of $2,901.69 remains due and payable
- Payment Due 11/01/13:   Payment of $2,901.69 remains due and payable
- Payment Due 12/01/13:   Payment of $2,901.69 remains due and payable
- Payment Due 01/01/14:   Payment of $2,901.69 remains due and payable
- Payment Due 02/01/14:   Payment of $2,901.69 remains due and payable
- Payment Due 03/01/14:   Payment of $2,901.69 remains due and payable
- Current payment due 04/01/14: $2,901.69
- Outstanding Fees/Charges: $2,128.50

    **Total amount needed to bring loan current: $107,416.65***

*Your mortgage account is in foreclosure status and may be incurring additional fees. Please contact 1-800-724-1633 or the foreclosure attorney/trustee for an accurate amount due to bring the loan current and cancel the current foreclosure action.

If you are in bankruptcy or received a bankruptcy discharge of this debt, this communication is not an attempt to collect the debt against you personally, but is notice of a possible enforcement of the lien against the collateral property.

 **M&T Bank**

04/16/2014

0-750-78278-0043029-009-2-000-010-000-000



MARIA FERRER
19827 NW 85TH AVE
HIALEAH FL 33015-5982

Account Number:   0091672667

**Our records indicate we have not received your most recent mortgage payments.** As of 04/16/14 you are 1,446 days delinquent on your mortgage loan.

When your loan is delinquent you risk the loss of your property to foreclosure and additional fees related thereto, including but not limited to property evaluations, inspections, court costs, and attorneys fees.

If you are experiencing difficulty in repaying your mortgage you may obtain a list of HUD approved housing counseling agencies by calling 1-800-569-4287 or consulting http://www.hud.gov.

### Recent Account History*

- Payment Due 11/01/13:  Payment of $2,901.69 remains due and payable

- Payment Due 12/01/13:  Payment of $2,901.69 remains due and payable

- Payment Due 01/01/14:  Payment of $2,901.69 remains due and payable

- Payment Due 02/01/14:  Payment of $2,901.69 remains due and payable

- Payment Due 03/01/14:  Payment of $2,901.69 remains due and payable

- Payment Due 04/01/14:  Payment of $2,901.69 remains due and payable

- Current payment due 05/01/14: $2,901.69

- Outstanding Fees/Charges: $2,236.08

  **Total amount needed to bring loan current: $110,425.92***

*Your mortgage account is in foreclosure status and may be incurring additional fees. Please contact 1-800-724-1633 or the foreclosure attorney/trustee for an accurate amount due to bring the loan current and cancel the current foreclosure action.

If you are in bankruptcy or received a bankruptcy discharge of this debt, this communication is not an attempt to collect the debt against you personally, but is notice of a possible enforcement of the lien against the collateral property.

 **M&T Bank**

05/16/2014

0-750-79534-0034052-007-2-000-010-000-000



MARIA FERRER
19827 NW 85TH AVE
HIALEAH FL 33015-5982

Account Number:     0091672667

**To the extent your original obligation was discharged, or is subject to an automatic stay of bankruptcy under Title 11 of the United States Code, this statement is for compliance and/or informational purposes only and does not constitute an attempt to collect a debt or to impose personal liability for such obligation. However, M&T Bank retains rights under its security instrument, including the right to foreclose its lien.**

**Our records indicate we have not received your most recent mortgage payments.** As of 05/16/14 you are 1,476 days delinquent on your mortgage loan.

When your loan is delinquent you risk the loss of your property to foreclosure and additional fees related thereto, including but not limited to property evaluations, inspections, court costs, and attorneys fees.

If you are experiencing difficulty in repaying your mortgage you may obtain a list of HUD approved housing counseling agencies by calling 1-800-569-4287 or consulting http://www.hud.gov.

## Recent Account History*

- Payment Due 12/01/13:   Payment of $2,901.69 remains due and payable

- Payment Due 01/01/14:   Payment of $2,901.69 remains due and payable

- Payment Due 02/01/14:   Payment of $2,901.69 remains due and payable

- Payment Due 03/01/14:   Payment of $2,901.69 remains due and payable

- Payment Due 04/01/14:   Payment of $2,901.69 remains due and payable

- Payment Due 05/01/14:   Payment of $2,901.69 remains due and payable

- Current payment due 06/01/14: $2,901.69

- Outstanding Fees/Charges: $4,576.32

     **Total amount needed to bring loan current: $115,667.85***

*Your mortgage account is in foreclosure status and may be incurring additional fees. Please contact 1-800-724-1633 or the foreclosure attorney/trustee for an accurate amount due to bring the loan current and cancel the current foreclosure action.

 **M&T Bank**

06/16/2014

7-750-80689-0031507-007-2-000-010-000-000



MARIA FERRER
19827 NW 85TH AVE
HIALEAH FL 33015-5982

Account Number:     0091672667

**To the extent your original obligation was discharged, or is subject to an automatic stay of bankruptcy under Title 11 of the United States Code, this statement is for compliance and/or informational purposes only and does not constitute an attempt to collect a debt or to impose personal liability for such obligation. However, M&T Bank retains rights under its security instrument, including the right to foreclose its lien.**

**Our records indicate we have not received the most recent payments due on the above mortgage account.** As of 06/16/14 the payments are 1,507 days delinquent on the mortgage loan account.

As a person having an ownership interest in the property, if the mortgage loan account becomes delinquent you risk the loss of your property to foreclosure and additional fees related thereto, including but not limited to property evaluations, inspections, court costs, and attorneys fees, all of which are added to the mortgage loan account.

If there is any difficulty in repaying the mortgage loan account, you may call 1-800-569-4287 or consult http://www.hud.gov to obtain a list of HUD approved housing counseling agencies.

## Recent Account History**

- Payment due 01/01/14: Payment of $2,901.69 remains outstanding

- Payment due 02/01/14: Payment of $2,901.69 remains outstanding

- Payment due 03/01/14: Payment of $2,901.69 remains outstanding

- Payment due 04/01/14: Payment of $2,901.69 remains outstanding

- Payment due 05/01/14: Payment of $2,901.69 remains outstanding

- Payment due 06/01/14: Payment of $2,901.69 remains outstanding

- Current mortgage account payment due 07/01/14: $2,901.69

- Outstanding Fees/Charges: $4,683.90

   **Total amount needed to bring mortgage loan account current: $118,677.45***

**The above mortgage account is in foreclosure status and may be incurring additional fees. To protect any ownership interest you may have in the property secured by the mortgage account, you may contact 1-800-724-1633 or the foreclosure attorney/trustee for an accurate amount due to bring the loan current and cancel the current foreclosure action.

 **M&T Bank**

07/16/2014

3-750-81832-0029313-006-2-000-010-000-000



MARIA FERRER
19827 NW 85TH AVE
HIALEAH FL 33015-5982

Account Number:    0091672667

**To the extent your original obligation was discharged, or is subject to an automatic stay of bankruptcy under Title 11 of the United States Code, this statement is for compliance and/or informational purposes only and does not constitute an attempt to collect a debt or to impose personal liability for such obligation. However, M&T Bank retains rights under its security instrument, including the right to foreclose its lien.**

**Our records indicate we have not received the most recent payments due on the above mortgage account.**
Your loan became delinquent on 05/02/2010.  As of 07/16/14 the payments are 1,537 days delinquent on the mortgage loan account.

As a person having an ownership interest in the property, if the mortgage loan account becomes delinquent you risk the loss of your property to foreclosure and additional fees related thereto, including but not limited to property evaluations, inspections, court costs, and attorneys fees, all of which are added to the mortgage loan account.

If there is any difficulty in repaying the mortgage loan account, you may call 1-800-569-4287 or consult http://www.hud.gov to obtain a list of HUD approved housing counseling agencies.

## Recent Account History**

- Payment due 02/01/14: Payment of $2,901.69 remains outstanding

- Payment due 03/01/14: Payment of $2,901.69 remains outstanding

- Payment due 04/01/14: Payment of $2,901.69 remains outstanding

- Payment due 05/01/14: Payment of $2,901.69 remains outstanding

- Payment due 06/01/14: Payment of $2,901.69 remains outstanding

- Payment due 07/01/14: Payment of $2,901.69 remains outstanding


- Current mortgage account payment due 08/01/14: $2,901.69

- Outstanding Fees/Charges: $5,363.98

   **Total amount needed to bring mortgage loan account current: $122,259.22****

**The above mortgage account is in foreclosure status and may be incurring additional fees. To protect any ownership interest you may have in the property secured by the mortgage account, you may contact 1-800-724-1633 or the foreclosure attorney/trustee for an accurate amount due to bring the loan current and cancel the current foreclosure action.

## M&T Bank

08/13/2014

3-750-83009-0000588-001-2-000-010-000-000



MARIA FERRER
19827 NW 85TH AVE
HIALEAH FL 33015-5982

Account Number:     0091672667

**To the extent your original obligation was discharged, or is subject to an automatic stay of bankruptcy under Title 11 of the United States Code, this statement is for compliance and/or informational purposes only and does not constitute an attempt to collect a debt or to impose personal liability for such obligation. However, M&T Bank retains rights under its security instrument, including the right to foreclose its lien.**

**Our records indicate we have not received the most recent payments due on the above mortgage account.** Your loan became delinquent on 06/02/2010.  As of 08/13/14 the payments are 1,534 days delinquent on the mortgage loan account.

As a person having an ownership interest in the property, if the mortgage loan account becomes delinquent you risk the loss of your property to foreclosure and additional fees related thereto, including but not limited to property evaluations, inspections, court costs, and attorneys fees, all of which are added to the mortgage loan account.

If there is any difficulty in repaying the mortgage loan account, you may call 1-800-569-4287 or consult http://www.hud.gov to obtain a list of HUD approved housing counseling agencies.

## Recent Account History**

- Payment due 03/01/14: Payment of $2,901.69 remains outstanding

- Payment due 04/01/14: Payment of $2,901.69 remains outstanding

- Payment due 05/01/14: Payment of $2,901.69 remains outstanding

- Payment due 06/01/14: Payment of $2,901.69 remains outstanding

- Payment due 07/01/14: Payment of $2,901.69 remains outstanding

- Payment due 08/01/14: Payment of $2,901.69 remains outstanding


- Current mortgage account payment due 09/01/14: $2,901.69

- Outstanding Fees/Charges: $5,727.98

    **Total amount needed to bring mortgage loan account current: $123,653.30****


**The above mortgage account is in foreclosure status and may be incurring additional fees. To protect any ownership interest you may have in the property secured by the mortgage account, you may contact 1-800-724-1633 or the foreclosure attorney/trustee for an accurate amount due to bring the loan current and cancel the current foreclosure action.

 **M&T Bank**

08/18/2014

5-750-83191-0038203-008-2-000-010-000-000



MARIA FERRER
19827 NW 85TH AVE
HIALEAH FL 33015-5982

Account Number:     0091672667

**To the extent your original obligation was discharged, or is subject to an automatic stay of bankruptcy under Title 11 of the United States Code, this statement is for compliance and/or informational purposes only and does not constitute an attempt to collect a debt or to impose personal liability for such obligation. However, M&T Bank retains rights under its security instrument, including the right to foreclose its lien.**

**Our records indicate we have not received the most recent payments due on the above mortgage account.** Your loan became delinquent on 06/02/2010.  As of 08/18/14 the payments are 1,539 days delinquent on the mortgage loan account.

As a person having an ownership interest in the property, if the mortgage loan account becomes delinquent you risk the loss of your property to foreclosure and additional fees related thereto, including but not limited to property evaluations, inspections, court costs, and attorneys fees, all of which are added to the mortgage loan account.

If there is any difficulty in repaying the mortgage loan account, you may call 1-800-569-4287 or consult http://www.hud.gov to obtain a list of HUD approved housing counseling agencies.

## Recent Account History**

- Payment due 03/01/14: Payment of $2,901.69 remains outstanding

- Payment due 04/01/14: Payment of $2,901.69 remains outstanding

- Payment due 05/01/14: Payment of $2,901.69 remains outstanding

- Payment due 06/01/14: Payment of $2,901.69 remains outstanding

- Payment due 07/01/14: Payment of $2,901.69 remains outstanding

- Payment due 08/01/14: Payment of $2,901.69 remains outstanding

- Current mortgage account payment due 09/01/14: $2,901.69

- Outstanding Fees/Charges: $5,853.66

  **Total amount needed to bring mortgage loan account current: $123,778.98****

**The above mortgage account is in foreclosure status and may be incurring additional fees. To protect any ownership interest you may have in the property secured by the mortgage account, you may contact 1-800-724-1633 or the foreclosure attorney/trustee for an accurate amount due to bring the loan current and cancel the current foreclosure action.

 **M&T Bank**

09/16/2014

1-750-84292-0038145-008-2-000-010-000-000

MARIA FERRER
19827 NW 85TH AVE
HIALEAH FL 33015-5982

Account Number:     0091672667

**To the extent your original obligation was discharged, or is subject to an automatic stay of bankruptcy under Title 11 of the United States Code, this statement is for compliance and/or informational purposes only and does not constitute an attempt to collect a debt or to impose personal liability for such obligation. However, M&T Bank retains rights under its security instrument, including the right to foreclose its lien.**

**Our records indicate we have not received the most recent payments due on the above mortgage account.** Your loan became delinquent on 06/02/2010. As of 09/16/14 the payments are 1,568 days delinquent on the mortgage loan account.

As a person having an ownership interest in the property, if the mortgage loan account becomes delinquent you risk the loss of your property to foreclosure and additional fees related thereto, including but not limited to property evaluations, inspections, court costs, and attorneys fees, all of which are added to the mortgage loan account.

If there is any difficulty in repaying the mortgage loan account, you may call 1-800-569-4287 or consult http://www.hud.gov to obtain a list of HUD approved housing counseling agencies.

## Recent Account History**

- Payment due 04/01/14: Payment of $2,901.69 remains outstanding

- Payment due 05/01/14: Payment of $2,901.69 remains outstanding

- Payment due 06/01/14: Payment of $2,901.69 remains outstanding

- Payment due 07/01/14: Payment of $2,901.69 remains outstanding

- Payment due 08/01/14: Payment of $2,901.69 remains outstanding

- Payment due 09/01/14: Payment of $2,901.69 remains outstanding

- Current mortgage account payment due 10/01/14: $2,901.69

- Outstanding Fees/Charges: $5,947.24

    **Total amount needed to bring mortgage loan account current: $126,774.25****

**The above mortgage account is in foreclosure status and may be incurring additional fees. To protect any ownership interest you may have in the property secured by the mortgage account, you may contact 1-800-724-1633 or the foreclosure attorney/trustee for an accurate amount due to bring the loan current and cancel the current foreclosure action.

 **M&T Bank**

10/16/2014

0-750-85484-0097743-020-2-000-010-000-000
MARIA FERRER
19827 NW 85TH AVE
HIALEAH FL 33015-5982

Account Number:     0091672667

**To the extent your original obligation was discharged, or is subject to an automatic stay of bankruptcy under Title 11 of the United States Code, this statement is for compliance and/or informational purposes only and does not constitute an attempt to collect a debt or to impose personal liability for such obligation. However, M&T Bank retains rights under its security instrument, including the right to foreclose its lien.**

**Our records indicate we have not received the most recent payments due on the above mortgage account.** Your loan became delinquent on 06/02/2010.  As of 10/16/14 the payments are 1,598 days delinquent on the mortgage loan account.

As a person having an ownership interest in the property, if the mortgage loan account becomes delinquent you risk the loss of your property to foreclosure and additional fees related thereto, including but not limited to property evaluations, inspections, court costs, and attorneys fees, all of which are added to the mortgage loan account.

If there is any difficulty in repaying the mortgage loan account, you may call 1-800-569-4287 or consult http://www.hud.gov to obtain a list of HUD approved housing counseling agencies.

## Recent Account History**

- Payment due 05/01/14: Payment of $2,901.69 remains outstanding

- Payment due 06/01/14: Payment of $2,901.69 remains outstanding

- Payment due 07/01/14: Payment of $2,901.69 remains outstanding

- Payment due 08/01/14: Payment of $2,901.69 remains outstanding

- Payment due 09/01/14: Payment of $2,901.69 remains outstanding

- Payment due 10/01/14: Payment of $2,901.69 remains outstanding


- Current mortgage account payment due 11/01/14: $2,901.69

- Outstanding Fees/Charges: $6,054.82

   **Total amount needed to bring mortgage loan account current: $129,783.52****

**The above mortgage account is in foreclosure status and may be incurring additional fees. To protect any ownership interest you may have in the property secured by the mortgage account, you may contact 1-800-724-1633 or the foreclosure attorney/trustee for an accurate amount due to bring the loan current and cancel the current foreclosure action.

 **M&T Bank**

11/17/2014

2-750-86639-0083501-017-2-000-010-000-000

MARIA FERRER
19827 NW 85TH AVE
HIALEAH FL 33015-5982

Account Number:     0091672667

**To the extent your original obligation was discharged, or is subject to an automatic stay of bankruptcy under Title 11 of the United States Code, this statement is for compliance and/or informational purposes only and does not constitute an attempt to collect a debt or to impose personal liability for such obligation. However, M&T Bank retains rights under its security instrument, including the right to foreclose its lien.**

**Our records indicate we have not received the most recent payments due on the above mortgage account.**
Your loan became delinquent on 06/02/2010.  As of 11/17/14 the payments are 1,630 days delinquent on the mortgage loan account.

As a person having an ownership interest in the property, if the mortgage loan account becomes delinquent you risk the loss of your property to foreclosure and additional fees related thereto, including but not limited to property evaluations, inspections, court costs, and attorneys fees, all of which are added to the mortgage loan account.

If there is any difficulty in repaying the mortgage loan account, you may call 1-800-569-4287 or consult http://www.hud.gov to obtain a list of HUD approved housing counseling agencies.

## Recent Account History**

- Payment due 06/01/14: Payment of $2,901.69 remains outstanding

- Payment due 07/01/14: Payment of $2,901.69 remains outstanding

- Payment due 08/01/14: Payment of $2,901.69 remains outstanding

- Payment due 09/01/14: Payment of $2,901.69 remains outstanding

- Payment due 10/01/14: Payment of $2,901.69 remains outstanding

- Payment due 11/01/14: Payment of $2,901.69 remains outstanding

<br>

- Current mortgage account payment due 12/01/14: $2,901.69

- Outstanding Fees/Charges: $6,118.82

    **Total amount needed to bring mortgage loan account current: $132,749.21****

**The above mortgage account is in foreclosure status and may be incurring additional fees. To protect any ownership interest you may have in the property secured by the mortgage account, you may contact 1-800-724-1633 or the foreclosure attorney/trustee for an accurate amount due to bring the loan current and cancel the current foreclosure action.

 **M&T Bank**

12/16/2014

4-750-87722-0090482-019-3-000-010-000-000

MARIA FERRER
19827 NW 85TH AVE
HIALEAH FL 33015-5982

Account Number:        0091672667

**To the extent your original obligation was discharged, or is subject to an automatic stay of bankruptcy under Title 11 of the United States Code, this statement is for compliance and/or informational purposes only and does not constitute an attempt to collect a debt or to impose personal liability for such obligation. However, M&T Bank retains rights under its security instrument, including the right to foreclose its lien.**

**Our records indicate we have not received the most recent payments due on the above mortgage account.**
Your loan became delinquent on 06/02/2010.  As of 12/16/14 the payments are 1,659 days delinquent on the mortgage loan account.

As a person having an ownership interest in the property, if the mortgage loan account becomes delinquent you risk the loss of your property to foreclosure and additional fees related thereto, including but not limited to property evaluations, inspections, court costs, and attorneys fees, all of which are added to the mortgage loan account.

If there is any difficulty in repaying the mortgage loan account, you may call 1-800-569-4287 or consult http://www.hud.gov to obtain a list of HUD approved housing counseling agencies.

## Recent Account History**

- Payment due 07/01/14: Payment of $2,901.69 remains outstanding

- Payment due 08/01/14: Payment of $2,901.69 remains outstanding

- Payment due 09/01/14: Payment of $2,901.69 remains outstanding

- Payment due 10/01/14: Payment of $2,901.69 remains outstanding

- Payment due 11/01/14: Payment of $2,901.69 remains outstanding

- Payment due 12/01/14: Payment of $2,901.69 remains outstanding


- Current mortgage account payment due 01/01/15: $2,901.69

- Outstanding Fees/Charges: $6,132.82

    **Total amount needed to bring mortgage loan account current: $135,664.90****


**The above mortgage account is in foreclosure status and may be incurring additional fees. To protect any ownership interest you may have in the property secured by the mortgage account, you may contact 1-800-724-1633 or the foreclosure attorney/trustee for an accurate amount due to bring the loan current and cancel the current foreclosure action.

 **M&T Bank**

01/16/2015

7-750-88856-0094701-019-2-010-110-000-000

MARIA FERRER
19827 NW 85TH AVE
HIALEAH FL 33015-5982

Account Number:     0091672667

**To the extent your original obligation was discharged, or is subject to an automatic stay of bankruptcy under Title 11 of the United States Code, this statement is for compliance and/or informational purposes only and does not constitute an attempt to collect a debt or to impose personal liability for such obligation. However, M&T Bank retains rights under its security instrument, including the right to foreclose its lien.**

**Our records indicate we have not received the most recent payments due on the above mortgage account.** Your loan became delinquent on 06/02/2010.  As of 01/16/15 the payments are 1,690 days delinquent on the mortgage loan account.

As a person having an ownership interest in the property, if the mortgage loan account becomes delinquent you risk the loss of your property to foreclosure and additional fees related thereto, including but not limited to property evaluations, inspections, court costs, and attorneys fees, all of which are added to the mortgage loan account.

If there is any difficulty in repaying the mortgage loan account, you may call 1-800-569-4287 or consult http://www.hud.gov to obtain a list of HUD approved housing counseling agencies.

## Recent Account History**

- Payment due 08/01/14: Payment of $2,901.69 remains outstanding

- Payment due 09/01/14: Payment of $2,901.69 remains outstanding

- Payment due 10/01/14: Payment of $2,901.69 remains outstanding

- Payment due 11/01/14: Payment of $2,901.69 remains outstanding

- Payment due 12/01/14: Payment of $2,901.69 remains outstanding

- Payment due 01/01/15: Payment of $2,901.69 remains outstanding


- Current mortgage account payment due 02/01/15: $2,901.69

- Outstanding Fees/Charges: $6,496.82

  **Total amount needed to bring mortgage loan account current: $138,930.59****


**The above mortgage account is in foreclosure status and may be incurring additional fees. To protect any ownership interest you may have in the property secured by the mortgage account, you may contact 1-800-724-1633 or the foreclosure attorney/trustee for an accurate amount due to bring the loan current and cancel the current foreclosure action.

 **M&T Bank**

02/17/2015

1-750-90020-0101342-021-2-000-010-000-000

MARIA FERRER
19827 NW 85TH AVE
HIALEAH FL 33015-5982

Account Number:       0091672667

**To the extent your original obligation was discharged, or is subject to an automatic stay of bankruptcy under Title 11 of the United States Code, this statement is for compliance and/or informational purposes only and does not constitute an attempt to collect a debt or to impose personal liability for such obligation. However, M&T Bank retains rights under its security instrument, including the right to foreclose its lien.**

**Our records indicate we have not received the most recent payments due on the above mortgage account.** Your loan became delinquent on 06/02/2010.  As of 02/17/15 the payments are 1,722 days delinquent on the mortgage loan account.

As a person having an ownership interest in the property, if the mortgage loan account becomes delinquent you risk the loss of your property to foreclosure and additional fees related thereto, including but not limited to property evaluations, inspections, court costs, and attorneys fees, all of which are added to the mortgage loan account.

If there is any difficulty in repaying the mortgage loan account, you may call 1-800-569-4287 or consult http://www.hud.gov to obtain a list of HUD approved housing counseling agencies.

## Recent Account History**

- Payment due 09/01/14: Payment of $2,901.69 remains outstanding

- Payment due 10/01/14: Payment of $2,901.69 remains outstanding

- Payment due 11/01/14: Payment of $2,901.69 remains outstanding

- Payment due 12/01/14: Payment of $2,901.69 remains outstanding

- Payment due 01/01/15: Payment of $2,901.69 remains outstanding

- Payment due 02/01/15: Payment of $2,901.69 remains outstanding


- Current mortgage account payment due 03/01/15: $2,901.69

- Outstanding Fees/Charges: $7,555.82

  **Total amount needed to bring mortgage loan account current: $142,891.28****


**The above mortgage account is in foreclosure status and may be incurring additional fees. To protect any ownership interest you may have in the property secured by the mortgage account, you may contact 1-800-724-1633 or the foreclosure attorney/trustee for an accurate amount due to bring the loan current and cancel the current foreclosure action.

# EXHIBIT

# "H"

*Maria Ferrer*

*19827 NW 85 Avenue*
*Miami, FL 33015*

**CERTIFIED MAIL, RETURN RECIEPT REQUESTED**
**7013 0600 0000 2659 3958**

October 6, 2014

Kelly M. Canfield, Esq.,
Phelan Hallinan, PLC,
2727 West Cypress Creek Road
Ft. Lauderdale, Florida 33309

Case Name: *Bayview Loan Servicing, LLC v. Ferrer*
Case No.: Case No.: 14-011817-CA-01

SAFE HARBOR LETTER PURSUANT TO s.57.105, FLORIDA STATUTES

Dear Ms. Canfield:

Pursuant to s.57.105(4), Florida Statutes, please accept this as a Safe Harbor Letter thereunder and demand for you and/or your client to withdraw the Complaint for the reasons set forth in the attached/unfiled Motion to Strike Sham Pleadings. We would ask that you withdraw the Complaint within 21 days of the date of this letter as set forth in s.57.105.

If the Complaint is not withdrawn within that time frame, we will file the attached motion and will seek all appropriate sanctions.

I look forward to resolving this matter.

Very truly yours,

Maria Ferrer

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Case No.: 14-011817-CA-01

BAYVIEW LOAN SERVICING, LLC,

      Plaintiff,

vs.

MARIA FERRER, etc., et.al.,

      Defendant.

_____/

## DEFENDANTS' VERIFIED MOTION TO STRIKE PLAINTIFF'S COMPLAINT TO FORECLOSE MORTGAGE AS SHAM PLEADING PURSUANT TO RULE 1.150(a)(b)

COMES NOW, the Defendant, MARIA FERRER (hereinafter referred to as the "Defendant" or "Borrower") *pro se,* and on her own behalf, and hereby moves this Honorable Court pursuant to Rule 1.150(a)(b), *Florida Rules of Civil Procedure* for an Order striking Plaintiff's Complaint to Foreclose Mortgage as Sham Pleading and for an Order dismissing the case with prejudice a sham:

### LEGAL AUTHORITY

1.     Rule 1.150(a), Florida Rules of Civil Procedure also authorizes the trial court to strike "any pleading or part thereof filed by another party [deemed] to be a sham" after "taking evidence of the respective parties, and if the motion is sustained, the pleading to which the motion is directed shall be stricken."

2.     A pleading (or any part thereof) should be stricken under Rule 1.150(a) if it is so undoubtable false as to not be the subject to a genuine issue of fact. *See, Meadows v. Edwards,* 82 So.2d 733, 734-35 (Fla. 1955). In that regard, the motion to strike is to be

Bayview Loan Servicing, LLC v. Maria Ferrer, *etc. et. al.*,
Case No.: 140011817-CA-01

tested by the trial court under the same standards as motion for summary judgment. *Id*. There must be substantial evidence to support the challenged pleading by the party against whom the motion to strike is filed. *Id*. The judge of trial court is to determine if there is an issue to be tried on the challenged pleadings. *Id*.

<u>FACTS</u>

3.      On or about February 9, 2006 the Homeowners executed a "Florida Fixed Rate Note – Single Family –Fannie Mae/Freddie Mac Uniform Instrument (hereinafter referred to as the "Note") and a Florida – Single Family – Fannie Mae/Freddie Mac Uniform Instrument (hereinafter referred to as the "Mortgage") in favor of Home Loan Center, Inc. d/b/a Lending Tree Loans (hereinafter referred to as the "Lender").

4.      The Note specifically states in Section 1 – *Borrower's Promise to Pay* – "I understand that Lender may transfer this Note.  Lender or anyone who takes this Note *by transfer* and who is *entitled to receive payments under this Note* is called the "Note Holder." [Emphasis added].

5.      The Mortgage specifically named Mortgage Electronic Registration System, Inc. (hereinafter referred to as "MERS") as the nominee for the Lender and the mortgagee under the Mortgage.

6.      The Plaintiff, BAYVIEW LOAN SERVICING, LLC, (hereinafter referred to as the "Claimant") filed a foreclosure action against the Defendant regarding the aforesaid Note and Mortgage regarding premises located at 19827 NW 85th Avenue, Miami, Florida 33015 (hereinafter referred to as the "Subject Mortgage") on or about May 9, 2014 (hereinafter referred to as the "Filing Date").

Bayview Loan Servicing, LLC v. Maria Ferrer, *etc. et. al.,*
Case No.: 140011817-CA-01

7.     The Complaint, in pertinent part alleged that, "The [Claimant] is in physical possession of the Note endorsed in blank which is the subject of this action, and therefore is the holder of that Note."

8.     The signature page of the Complaint contained a verification clause by Leticia Sanchez (hereinafter referred to as the "Verifier") who only identified herself as an "Sr. Document Coordinator" for the Plaintiff, verifying that the above allegation is true and correct to the best of her knowledge and belief.

9.     The Note that was attached to the Complaint had an undated specific endorsement from the Lender to Washington Mutual Bank, FA (hereinafter referred to as the "Specific Endorsement") and what purports to be an undated endorsement in blank by Washington Mutual Bank, FA (hereinafter referred to as the "Endorsement in Blank"). The Endorsement in Blank appears to be a stamped endorsement rather than a live or "wet" signature and was allegedly authorized by Cynthia Riley as the Vice President of Washington Mutual Bank, FA.

10.     The deposition of Cynthia Riley was taken in a case styed *JPMorgan Chase Bank, N.A. vs. Eduardo Orozco, etc., et.al.,* Case No.: 09-29997 CA (11), In the Circuit Court for the 11th Judicial Circuit, in and for Miami-Dade County, Florida on January 15, 2013, wherein she conceded that she was not even employed by Washington Mutual Bank, FA during this relevant time period and could have not endorsed nor authorized her stamped signature to endorse the Note in the case at bar.

ARGUMENT

11.     Florida Statutes § 671.201(21) defines a "holder" of a negotiable instrument as follows under the Uniform Commercial Code that was adopted by the State of Florida:

Page **3** of **5**

Bayview Loan Servicing, LLC v. Maria Ferrer, *etc. et. al.,*
Case No.: 140011817-CA-01

"The person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession."  Under this definition, assuming the endorsements on the Note are valid an authorized, the Claimant would arguably have standing to enforce the Note and Mortgage through foreclosure proceedings.

12.     However, Florida Statute § 102(2)(a) of the Uniform Commercial Code specifically states that, "the effect of provisions of this code may be varied by agreement." As such, the Lender and the Borrower intentionally changed how a "holder" of the Note would be defined so that it requires actual proof of a transfer of the Note by the Lender (or any interim holder/owner) to the Claimant coupled with the right of the Claimant to receive payments under the Note.

13.     Plaintiff lacks standing due to the fact that the Endorsement in Blank is invalid, and under any definition, the Plaintiff cannot be the holder of the Note.  The actions of the Claimant to attempt to enforce the Note and Mortgage in this action is without merit under the circumstances and the filing of the Complaint is falsified or fraudulent.

14.     Accordingly, Plaintiff's representations to this court and to the Defendant were false and known to be false at the time the assignments were executed.

15.     Based on these standing issues, extremely questionable assignments, this action should be dismissed with prejudice.

**WHEREFORE** Defendant prays that this Court dismiss this action with prejudice, and for an award of appropriate sanctions under s.57.017 against any party signing or verifying the Complaint.

Bayview Loan Servicing, LLC v. Maria Ferrer, *etc. et. al.,*
Case No.: 140011817-CA-01

Under penalties of perjury, I declare that I have read the foregoing motion to quash and the facts stated in it are true to the best of my information and belief.

_____
Maria Ferrer

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the above pleading, motion, notice or written discovery request has been served by Electronic Mail to: Kelly M. Canfield, Esq., Phelan Hallinan, PLC, *Attorneys for Plaintiff*, 2727 West Cypress Creek Road, Ft. Lauderdale, Florida 33309 (FLService@PhelanHallinan.com), Edward Meloni, Esq., The Meloni Law Firm, *Attorneys for the Association* (meloniservice@gmail.com), JPMorgan Chase Bank, N.A., 1111 Polaris Parkway, Columbus, Ohio, 43240, Board of County Commisioners, 111 NW 1st Street, Suite 220, Miami, Florida 33128, and Cach, LLC, 4320 S. Monoco St., 2nd Floor, Denver, Colorado 80237 this 6th day of November, 2014.

Respectfully submitted,

Maria Ferrer, *Pro Se*
19827 NW 85th Avenue
Miami, Florida 33015
Telephone: (305) 785-8303
Facsimile: (305) 454-8360
Service: ferrer.maria123@gmail.com

By: _____
Maria Ferrer, *Pro Se*

**U.S. Postal Service** ™
**CERTIFIED MAIL**™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ | $1.19 | 0301 |
| Certified Fee | $3.30 | 07 |
| Return Receipt Fee (Endorsement Required) | $2.70 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $ | $7.19 | 10/06/2014 |

Sent To *Kelly M. Canfield, Esq*    *Phelan Hallinan PL*
Street, Apt. No.; or PO Box No. *2727 W. Cypress Creek Rd*
City, State, ZIP+4 *Ft. Lauderdale, FL 33309*

PS Form 3800, August 2006        See Reverse for Instructions

7013 0600 0000 2659 3958

---

**SENDER:** *COMPLETE THIS SECTION*

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

*Kelly M. Canfield, Esq*
*Phelan Hallinan, PLC*
*2727 W. Cypress Creek Rd.*
*Ft. Lauderdale, FL 33309*

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____   ☐ Agent   ☐ Addressee

B. Received by ( Printed Name)   C. Date of Delivery
*D Broussard*   OCT 8 2014

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☒ Certified Mail®   ☐ Priority Mail Express™
☐ Registered   ☒ Return Receipt for Merchandise
☐ Insured Mail   ☐ Collect on Delivery

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)    7013 0600 0000 2659 3958

PS Form 3811, July 2013        Domestic Return Receipt

Page 1

```
 1            IN THE CIRCUIT COURT, 11TH JUDICIAL CIRCUIT
                IN AND FOR MIAMI-DADE COUNTY, FLORIDA
 2
 3                    CASE NO.:  09-29997 CA (11)
 4
      JP MORGAN CHASE BANK, N.A.,
 5
              Plaintiff,
 6
      vs.
 7
      EDUARDO OROZCO, et al.,
 8
              Defendants.
 9     _____
10
                          DEPOSITION OF
11                         CINDY RILEY
12
13
          DATE TAKEN:    January 15, 2013
14
          TIME:          10:00 a.m. - 12:23 p.m.
15
          PLACE:         345 East Forsyth Street
16                       Jacksonville, Florida  32202
17
18
19    Examination of the witness taken before:
20
            Samantha Cordova, FPR, Notary Public
21          Hedquist & Associates Reporters, Inc.
                 345 East Forsyth Street
22            Jacksonville, Florida  32202
23
24
25
              Hedquist & Associates Reporters, Inc.
```

Page 2

1    APPEARANCES FOR THE PLAINTIFF

2

3    ROLAND E. SCHWARTZ, Esquire

4      GrayRobinson
    401 East Las Olas Boulevard

5      Suite 1850
   Fort Lauderdale, Florida  33301

6

7

8   APPEARANCES FOR THE DEFENDANTS

9

10    MICHAEL J. WRUBEL, Esquire

11   Michael Jay Wrubel, P.A.
   4801 South University Drive

12     Suite 251
    Davie, Florida  33328

13

14

   APPEARANCES FOR CINDY RILEY

15

16

    JONATHAN WEISS, Esquire

17

  Simpson, Thacher & Bartlett, LLP

18   1999 Avenue of the Stars
     29th Floor

19  Los Angeles, California  900067

20

21

    ALSO PRESENT

22

   Eduardo Orozco, Defendant

23

24

25

Page 3

1                         I N D E X

2                   E X A M I N A T I O N S

   WITNESS                                        Page

3      CYNTHIA RILEY                                4

4      DIRECT EXAMINATION BY MR. WRUBEL             4

5      CROSS-EXAMINATION BY MR. SCHWARTZ           77

6


7                       E X H I B I T S

8  FOR IDENTIFICATION                              Page

9          Defendants' Exhibit 1                   69

10         Plaintiff's Exhibit 1                    83

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1      MR. SCHWARTZ:  Hi.  My name is Roland Schwartz.

2    I'm with the law firm of GrayRobinson.  We represent

3    Chase.  We also represent Ms. Riley as an employee

4    of the bank.  There was a request by the borrower to

5    record -- audio record this deposition, which was

6    refused.  And the borrower will not be recording

7    this deposition.

8              CYNTHIA RILEY,

9  acknowledged having been duly sworn to tell the truth

10  and testified upon her oath as follows:

11      THE WITNESS:  Yes.

12            DIRECT EXAMINATION

13  BY MR. WRUBEL:

14    Q    Okay.  Could you state your name for the

15  record, please?

16    A    Cynthia Riley.

17    Q    And by whom are you employed?

18    A    JP Morgan Chase.

19    Q    Okay.  And how long have you been employed by

20  them?

21    A    I've been with Chase or Chase affiliates for

22  25 years.

23    Q    Okay.  And when you say Chase affiliates, I

24  take it you're referring to banks that were acquired

25  or --

Page 5

1    A    Right.

2    Q    -- institutions that were acquired?

3    A    Correct.

4    Q    All right.  Before we get into your work

5  history, have you ever given a deposition before?

6    A    Yes.

7    Q    Okay.  Have you ever given a deposition with

8  reference to your work with either JP Morgan, WaMu, or

9  any of the predecessors?

10    A    Yes.

11    Q    How many times have you given a deposition so

12  far?

13    A    Twice.

14    Q    Twice.

15    A    I think twice.

16    Q    And when were they?

17    A    I can't be sure of when they were.

18    Q    To the best of your ability.

19    A    I would want to say the last year sometime.

20    Q    Okay.  And I take it one of them was --

21    A    Maybe two years ago.

22    Q    One of them was in Tavares?

23    A    Yes.

24    Q    Okay.  And the other one was where?

25    A    New York.

Page 6

```
 1      Q     In New York?

 2      A     (Nods head.)

 3      Q     Okay.  Do you know what the name of that case

 4   was?

 5      A     Don't recall.

 6      Q     Okay.  Do you recall when you gave the

 7   deposition?

 8      A     I -- I'm guessing -- I don't really know for

 9   sure.

10      Q     Okay.  In any case, this will be your third

11   deposition with reference to this subject matter?

12      A     Correct.

13      Q     All right.  And with reference to your

14   education, how far did you go?

15      A     College.  I went through college.

16            (Brief interruption.)

17            THE WITNESS:  I'm sorry.  My phone is obviously

18      on.

19            MR. WRUBEL:  Take your time.

20            THE WITNESS:  Took care of that.  Thank you.

21            MR. WRUBEL:  No worries.

22            THE WITNESS:  My apologies.

23            MR. WRUBEL:  Things like that happen all the

24      time.

25            THE WITNESS:  Nobody ever calls me.  Okay.
```

Page 7

1    BY MR. WRUBEL:

2        Q    Okay.  You were mentioning you went to college.

3        A    Yes.

4        Q    Where'd you go?

5        A    University of Colorado.

6        Q    And what did you major in?

7        A    Business administration.

8        Q    And did you get a degree in business

9    administration?

10       A    Yes, I did.

11       Q    Did you do any post-college work?

12       A    Some.  Couple of years.

13       Q    Couple years.  Where?

14       A    University of Colorado.

15       Q    In what capacity did you do post-graduate?

16       A    I started out a master's program and left that

17   for a job.

18       Q    Okay.  And what were you trying to get a

19   master's in?

20       A    Accounting.

21       Q    And from the language you're using, I take it

22   that you did not get a master's degree?

23       A    I did not.

24       Q    But you took courses towards it?

25       A    I took some courses in the master's program.

Page 8

1      Q     Okay.  Anything else besides accounting that

2  you took courses in master's area?

3      A     No.

4      Q     All right.  Once you -- you said you left

5  because of a job?

6      A     Yes.

7      Q     And what job was that?

8      A     I went to work for Hand Miller & Associates.

9      Q     In what capacity?

10     A     At the time they were called Landman Oil and

11  Gas Industry.

12     Q     Can you spell that, please, Laman?

13     A     Landman.

14     Q     Oh, Landman.

15     A     One word.

16     Q     All right.  So they were in the gas industry?

17     A     They were a contractor providing services to

18  gas industries, yes.

19     Q     And how did you assist them?

20     A     I went out and researched legal records for

21  mineral ownership.

22     Q     And how long did you have that job for?

23     A     Year or two.

24     Q     Okay.  Did you do anything else for them

25  besides research legal records?

Page 9

```
 1      A    No.

 2      Q    Okay.  Where did you work after that?

 3      A    That's a long time ago.

 4      Q    Approximately.  Okay.  Well, we know that you

 5   go back 25 years in the banking industry from what

 6   you've told us so far.

 7      A    I think that's when I went to work.

 8           MR. SCHWARTZ:  Don't guess if you don't know.

 9      A    Yeah.  I don't know the order anymore.

10      Q    Okay.  Without knowing the order, can you tell

11   me where -- if you had any other jobs before you entered

12   the banking industry?

13      A    I worked at JP -- JC- --

14      Q    JCPenny's?

15      A    Penny's.

16      Q    Okay.

17      A    Yes.  I worked at JCPenny's for a little while.

18      Q    In what capacity?

19      A    Sales.

20      Q    And do you know approximately how long you

21   worked for JCPenny?

22      A    Maybe a year.

23      Q    Okay.  And did you have any other jobs before

24   you got into the banking industry?

25      A    Just the normal ones, you know, growing up.  Is
```

Page 10

```
 1    that what you're interested in?

 2        Q    I'll tell you what --

 3        A    Sixteen-year-old I was a bus girl.

 4        Q    I'm going to let you go for precollege.  We

 5    don't need to know that.

 6        A    Okay.  All right.

 7        Q    Just simply post college.  Anything else before

 8    you got into the banking industry?

 9        A    No, not that I can think of.

10        Q    Okay.  Before we get into your banking

11    history --

12        A    Excuse me.  I was in the insurance.  I was

13    account executive for a health insurance company right

14    after college, Peak Health.

15        Q    Peak, P-e-a-k?

16        A    Uh-huh.

17        Q    And as an account executive, what were your

18    duties?

19        A    Sales.

20        Q    And was that in Colorado also?

21        A    That was in Colorado.

22        Q    What city?

23        A    Colorado Springs.

24        Q    What about for Hand Miller & Associates?  Where

25    was that located?
```

Page 11

1    A    That was in Denver, Denver, Colorado.

2    Q    And JP -- JCPenny?

3    A    That was Stockton, California.  That would be

4  the third in the list.

5    Q    Got it.  So we're getting some clarity here.

6         Without telling me what was said, did you

7  prepare for this deposition with anybody?

8    A    I met with Roland and Jonathan yesterday.

9    Q    All right.  And other than meeting with them

10  yesterday, did you meet with anybody?  Was that the

11  first time?

12    A    It was.

13    Q    In preparation for this deposition.

14    A    The first time we met for this deposition, yes.

15    Q    All right.  And approximately how much time did

16  you spend preparing?

17    A    Two hours.

18    Q    Okay.  Did you review any of the documents with

19  reference to Mr. Orozco in your preparation?

20    A    I saw the note.

21    Q    Okay.

22    A    And that's it.

23    Q    All right.  Okay.  Back to your work history.

24  You say that you go back 25 years.  Who was your first

25  job with, if you recall?

Page 12

1       A     American Savings Bank.

2       Q     And where were they located?

3       A     Stockton, California.

4       Q     In what capacity did you start working for

5    them?

6       A     I was in the records area where files were

7    moved in and out of records.

8       Q     And what did you do with regards to the

9    records, if anything?

10      A     I was a supervisor.  I supervised a team of

11   people responsible for tracking files as they were

12   shipped in, as they came in and shipped out.

13      Q     Okay.  And as a supervisor of the team, what

14   types of things would they do?

15      A     They looked at images that came through from

16   the files to make sure that they were quality checked

17   and jacketed them.

18      Q     Right.

19      A     Meaning they cut them, put them into jackets.

20   In terms of the shipping, we would write transmittals of

21   files in boxes and ship them to secure storage.

22      Q     When the files came in, would you make copies

23   of notes and things of that nature and copies of the

24   loan?

25      A     No.

Page 13

1      Q      Would there be any records made of the notes as

2      they came in?

3      A      That was not an area I was involved in.  I

4      really can't speak to that.

5      Q      Okay.  So as far as taking care of the files,

6      what would your team do?

7             MR. SCHWARTZ:  I'll object as to relevance,

8          but go ahead.

9      Q      Go ahead.

10     A      They were the credit files.  And they simply --

11     our job was to box them and send them to shipping after

12     the images had been verified and jacketed.

13     Q      Okay.  What images are you referring to?

14     A      Of the loan files.

15     Q      All right.  And so images would be made

16     elsewhere and you would check to make sure that they

17     were accurate?

18            MR. SCHWARTZ:  We make a standing objection as

19         to what specifically she did at that bank so I don't

20         have to interrupt you.

21            MR. WRUBEL:  That's fine.

22     A      Yes.  The files were imaged somewhere.  They

23     came in and rolled the film.  Those rolls of films were

24     reviewed, cut, and jacketed for each borrower.

25     BY MR. WRUBEL:

Page 14

1    Q    Right.

2    A    And then once that was done, then the credit

3    file is boxed up and shipped out.

4    Q    Okay.  And just so I can be clear, when you say

5    films, are we talking microfilm?

6    A    Yes.

7    Q    And so there would be a microfilm of the note

8    as it came in?

9    A    I don't know if the note was in that or not.

10   Q    I understand.  But it would be loan documents

11   that would be filmed?

12   A    Credit file was -- we dealt with the credit

13   file, and that's what was imaged and that we worked

14   with.

15   Q    All right.  And when you're referring to the

16   credit file, what would normally be in that?

17   A    Everything except the letter.

18   Q    Okay.  But I need to know what everything is.

19   A    Underwriting documents, your -- your loan

20   application, tax forms.

21   Q    Okay.  In other words, records that were

22   provided by the borrower or forms that they filled out

23   in the process of getting the loan?

24   A    Correct.

25   Q    Anything else besides those types of documents?

Page 15

1       A     Generally what's in a credit file.

2       Q     Okay.  And I apologize.  I'm just not an expert

3    in this area.

4       A     That's all right.

5       Q     So you're going to have to tell me as we go

6    through this.

7             And how long did you supervise these teams that

8    were doing this work for American Savings?

9       A     Year, year and a half.

10      Q     Okay.  And where were you working at that time?

11      A     Stockton, California.

12      Q     Was that the headquarters of American Savings

13   at the time?

14      A     Yes, it was.

15      Q     All right.  And you mentioned that we go back

16   25 years.  So are we talking about approximately 1987,

17   in that area, 1988?

18      A     Yes.

19      Q     Okay.  What did you do after the year and a

20   half of supervising the team that were reviewing credit

21   files and checking credit files?

22      A     I moved into a group of trainers and became a

23   trainer.

24      Q     All right.  So you actually trained other

25   individuals?

Page 16

```
 1      A     Yes.

 2      Q     In what capacities?

 3      A     We were responsible for training of any

 4   employee at American Savings Bank, so...

 5      Q     Regardless of their responsibilities?

 6      A     Right.  We wrote training material from

 7   procedures, things like that.  And then we trained new

 8   employees.

 9      Q     Were you the head of that team as well?

10      A     No.

11      Q     Who was, if you recall?

12      A     Karen Moran.

13      Q     Good memory.

14            And how long did you do training for?

15      A     Maybe a year, year and a half.

16      Q     Okay.  What did you do after you did the

17   training?

18      A     Went to a supervisor in customer service.

19      Q     And what does that job entail?

20      A     That's a call center.  Borrowers calls in, and

21   the team would respond to the questions.

22      Q     For customers?

23      A     Yes.

24      Q     Okay.  How long did you do that for

25   approximately?
```

Page 17

1      A      Couple years.

2      Q      And you're still with American Savings at this

3   point?

4      A      Yes.

5      Q      Okay.  Was American Savings acquired by

6   anybody?

7      A      Later Washington Mutual, yes.

8      Q      What was the next thing that you did for

9   American Savings after you supervised in the customer

10  service center?

11     A      Tax and insurance supervisor.

12     Q      And what does that entail?

13     A      Making sure the tax escrow account, making sure

14  taxes get paid, forced order insurance, dealing with

15  correspondence regarding forced order insurance --

16     Q      Okay.

17     A      -- tracking, placement.

18     Q      And were you doing the physical work, or were

19  you again supervising?

20     A      I'm supervising.  It is work.

21     Q      Pardon me?

22     A      That's work as well.

23     Q      I understand.  We all understand that.

24            And how long did you supervise in the tax and

25  insurance area?

Page 18

```
 1        A    Probably a couple years.

 2        Q    What was your next position with American

 3   Savings?

 4        A    Purchase servicing.

 5        Q    What does purchase servicing do?

 6        A    It was a -- a team of individuals that

 7   coordinated the service transfers and bringing them on

 8   board to the servicing systems.

 9        Q    Okay.  When we're talking about service

10   transfers, are we talking about loans that are being

11   serviced by American Savings?

12        A    No.  We're talking about loans serviced by

13   somebody else that American Savings bought the servicing

14   and that American Savings was going to service.

15        Q    So American Savings was doing the servicing

16   work?

17        A    After it was moved on board, yes.

18        Q    Right.

19        A    My job as purchase servicer was to get those

20   loans on board, yes.

21        Q    All right.  And so you would go to other

22   entities to purchase the servicing rights to the loans;

23   am I understanding you correctly?

24        A    I did not.  The bank did that activity where

25   they purchase a servicing of loans and then moved it
```

Page 19

1    over to mark in savings for servicing.

2        Q    Okay.  And your responsibilities would be?

3        A    When the deal was -- was arranged and done, all

4    of the due diligence was done.  My job was coordination

5    of all the departments and the information that had to

6    come in order to make that transfer happen.

7        Q    Okay.  And what types of departments are we

8    talking about that had to be brought on board?

9        A    Every department is affected, so your

10   foreclosures, collections, modifications, payments,

11   customer service.  Every loan servicing department is

12   generally affected by a purchase.

13       Q    Okay.  And, again, just so I'm clear on your

14   responsibilities, they were to make sure that the

15   records were transferred over to you so you could

16   effectively take care of the servicing obligations?

17       A    That's correct.  It could be the records, yes.

18   It's data records.  It could be files.  Uh-huh.

19       Q    All right.  So there'd be physical files that

20   were brought on board as well?

21       A    Yes.

22       Q    What types of physical files would be brought

23   on board?

24       A    The credit file.

25       Q    Okay.

Page 20

1     A     Collateral files could be part of the deal.

2     Q     And what would be in the collateral files?

3           MR. SCHWARTZ:  Object as to relevance, again,

4     but go ahead.

5     A     Notes, sometimes title policies, deeds.

6     Q     And when notes were brought on board, would

7     they be stored in a central location?

8           MR. WEISS:  Objection to the form of the

9     question.

10    Q     You can answer.

11    A     If they go to a vault.

12    Q     Okay.  And did American Savings have more than

13    one vault that they would go to?

14    A     At that time, no.

15    Q     And where was the vault located?

16    A     In the basement.

17    Q     In Stockton?

18    A     In Stockton.

19    Q     What types of entities was American Savings

20    purchasing servicing rights from?

21    A     I can't really speak to that.  I don't know

22    that.

23    Q     You didn't know where they were coming from,

24    the loans?

25    A     I would know -- at the time I would know the

Page 21

1    servicer we were getting the loans from.

2        Q     Okay.

3        A     Whether -- when you ask the entities, I don't

4    know if you're -- is that asking who owned the loans?   I

5    don't know.   I only know that we would service transfer

6    loans in, and at that time I would have known the

7    companies that we were getting them from.

8        Q     Okay.   I may be confused.   But just so I'm

9    clear on this, would you all be getting the servicing

10   rights from other servicers or from entities that had

11   just freshly issued the loans or both?

12       A     We did both.

13       Q     Okay.   And how long did you do the purchasing

14   of the --

15           MR. WEISS:   I'm going to object, Mike.   We've

16       spent 20 minutes talking about her job

17       responsibilities for a job 25 years ago.   If you

18       want to get to something that's relevant, let's do

19       that, but at this pace we're going to be here all

20       day.

21           MR. SCHWARTZ:   I'll join in that objection.   I

22       mean, I already have a standing objection as to

23       relevance.   We're talking about American Savings

24       Bank, has nothing to do with this case whatsoever.

25       Obviously I can't instruct her not to answer at this

Page 22

1      point; but at some point, you know, if we continue

2      for the next 20 minutes about irrelevant stuff,

3      we'll consider it.  Go ahead.

4           MR. WRUBEL:  It's up to you.

5  BY MR. WRUBEL:

6      Q    How long did you do purchasing and servicing

7  for?

8      A    I want to say a number of years in that that

9  job would evolve.

10     Q    Okay.

11     A    As -- so I want to say it was probably several

12 years.

13     Q    Okay.  And when you say the job evolved, did

14 the responsibilities change?  Is that what you're

15 referring to?

16     A    Departments changed or grew, absorbed into

17 other departments, things like that.

18     Q    Okay.  And what did you do after the purchasing

19 and servicing?

20     A    Purchase and servicing is more title.  That was

21 really a department and a function that I was then

22 involved in up until November of 2006 then.

23     Q    Okay.  And I take it you're saying that your

24 responsibilities remained in servicing until November of

25 2006?

Page 23

1      A     In servicing, that's correct, yes.

2      Q     Okay.   What other responsibilities did you have

3  that we haven't talked about in servicing?

4      A     That's -- that's pretty much the history.   I

5  was in that department.

6      Q     Okay.

7      A     I grew with them.   I did have other

8  responsibilities.

9      Q     That's what I'm trying to understand.   I'd like

10  to know what your history of your responsibilities were

11  in servicing.

12      A     All right.

13            MR. WEISS:   Object to the form of the question.

14      Vague and ambiguous as to the time period.

15      Q     Okay.   Let's take our time, then.

16      A     Okay.

17      Q     We'll take our time, then.   We'll do it

18  chronologically.   Please advise me how your servicing

19  responsibilities evolved from a chronological

20  standpoint.

21      A     Oh, I stayed in a department.   It was -- became

22  secondary delivery operations.   The purchase of

23  servicing and movement of whole loan sales and so on

24  occurred in that department, along with -- and that's

25  what my -- my functions were, related to that.

Page 24

1          Then I took on, in Stockton, the note review

2    unit and team and was also involved in special projects

3    outside of those functions.

4          Q    Okay.   What were your responsibilities with

5    regards to the movement of home loan sales?

6          A    Whole loan sales.

7          Q    Whole loan.   I'm sorry.   What does whole loan

8    sales mean?

9          A    The loan file is sold along with the servicing.

10   Again, the -- the files would be collected.   The

11   collateral would be collected and shipped to servicers,

12   purchasers of that.

13         Q    Okay.   And we're saying whole loans -- whole

14   loans were sold.   I presume you're saying that the notes

15   as well as the servicing rights were sold?

16         A    Yes.

17              MR. SCHWARTZ:   Object.   Calls for a legal

18         conclusion.   Go ahead.

19         A    Yes.

20         Q    And these were loans that were originated by

21   American Savings or -- or WaMu?

22         A    It could have been a combination of originated

23   or not originated by American Savings.

24         Q    Okay.   And I think you understand when I say

25   WaMu we're referring to Washington Mutual?

Page 25

1    A    Yes.

2    Q    And you also indicated that you were involved

3  in Stockton with note review?

4    A    Yes.

5    Q    And what were your responsibilities with regard

6  to note review?

7    A    I supervised the unit that did note review.

8    Q    And what were their responsibilities with

9  regards to note review?

10   A    They would ensure that the data that came on

11 the note matched what was on our servicing systems.

12   Q    Do you know who would input that data?

13   A    The data was not inputted.  It came from our

14 originations systems and were fed to our servicing

15 systems.

16   Q    Okay.  And, I mean, what I'm trying to

17 understand is was it fed electronically, or was there

18 paper data?

19   A    We got electronic data.

20   Q    Okay.  And --

21   A    And we had the note.

22   Q    And do you know who inputted the electronic

23 data?

24   A    The origination centers.

25   Q    Okay.  And back when you first took over these

Page 26

1   responsibilities, was American Savings located in

2   anywhere besides California?

3        A    I --

4             MR. SCHWARTZ:  If you know.

5        Q    If you know.

6        A    If we're -- if it's American Savings was

7   California only, I -- I don't remember when Washington

8   Mutual would have taken over, and I don't remember when

9   that -- it was seamless to me.  I had the same job

10  functions.

11       Q    Okay.

12       A    So I can't answer that.  I don't know if that

13  was Washington Mutual or American Savings at that

14  particular time.

15       Q    Okay.  I take it what you're saying, then, is

16  when it was American Savings alone, that was only in

17  California; but when WaMu acquired American Savings, it

18  became multi- --

19            MR. WEISS:  Objection.  Misstated her prior

20       testimony.  I think she said she didn't know for

21       sure.

22       A    I -- I don't know for sure that American

23  Savings was only in California.

24       Q    Okay.

25       A    I know for sure that Washington Mutual was

Page 27

1    bigger than California.

2        Q    Got you.

3        A    Okay.

4        Q    And you've indicated you don't know when

5    Washington Mutual acquired American Savings?

6        A    No.

7        Q    I don't want you to guess, but do you have any

8    range or idea?

9            MR. SCHWARTZ:  Asked and answered.  Go ahead.

10       A    I really don't.

11       Q    Okay.

12       A    '89.  I don't know.

13           MR. SCHWARTZ:  Don't guess.

14           THE WITNESS:  Okay.  Thank you.

15   BY MR. WRUBEL:

16       Q    All right.  With reference to the notes that

17   were originated, they would be brought to Stockton?

18           MR. WEISS:  Object to the form.  Vague and

19       ambiguous.

20       A    Yes.

21       Q    Okay.  And let me rephrase the question.  How

22   did -- how were the notes originated that came to

23   Stockton, California, with American Savings?

24       A    I don't understand the question.  Say that

25   again, please.

Page 28

1      Q     What entities would originate the notes that

2   would come to Stockton, California, that you would

3   review?

4      A     American Savings.

5      Q     Okay.   Anybody besides American Savings

6   initially?

7            MR. WEISS:   Object to the form.

8      A     I can't -- I don't know for sure.   My unit

9   reviewed American Savings.

10     Q     Okay.   And what things would they review with

11   regards to the notes and the loans?

12     A     The data in the notes, the term, maturity date,

13   borrower name, address, that it's all correct, matching

14   the system.

15     Q     Okay.   Anything that your team would do besides

16   making sure that all the information matched?

17     A     And -- in Stockton?

18     Q     Yes.

19     A     The notes were endorsed, and they were shipped

20   to the custodian.

21     Q     Okay.   And where was the custodian located?

22     A     In the same building.

23     Q     All right.   And when you say that the notes

24   were endorsed, are we going -- approximately what year

25   are we going back to approximately, if you know?

Page 29

1    A    Prior to 2004.

2    Q    Do you know how long before 2004?

3    A    No.

4        MR. WEISS:  Object to the form.  Are you asking

5    her for what period of time were notes endorsed, or

6    are you asking her --

7        MR. WRUBEL:  I'm trying to -- I'm trying to

8    ascertain at what point in time they began endorsing

9    notes when they came into the Stockton facility.

10       MR. WEISS:  Who's they?

11       MR. WRUBEL:  Her team.

12       MR. WEISS:  So you're asking her when she

13   worked in note review, when did people start

14   endorsing notes?

15       MR. WRUBEL:  Effectively yes.

16   A    I don't think that's one and the same.  I

17   did -- I was the supervisor for that unit sometime 2002

18   I would say.

19   BY MR. WRUBEL:

20   Q    Okay.

21   A    We were endorsing the notes at that time.

22   Q    All right.  So you're saying back in 2002 your

23   team that was reviewing the data were also endorsing the

24   notes?

25   A    Yes.

Page 30

1      Q    All right.  And do you know if notes were

2    endorsed before 2002 when they came into your --

3      A    I would only be guessing.

4      Q    Okay.  And -- but you are certain that in 2002

5    notes that were being reviewed for data were also being

6    endorsed when they came through your unit --

7      A    Correct.

8      Q    -- as supervisor?

9      A    Correct.

10     Q    Okay.  And how were the notes endorsed?

11     A    They were endorsed with an endorsement stamp.

12     Q    Okay.  And whose signature would be on the

13   endorsement stamp?

14     A    Jess Alamanza.

15     Q    Can you spell that, please?

16     A    A-l-a-m-a-n-z-a.

17     Q    Okay.  And were these blank endorsements, or

18   were they specific endorsements?

19          MR. WEISS:  Object to the form of the question.

20          MR. SCHWARTZ:  I'll join.  It's irrelevant.  Go

21     ahead.

22     A    That was a blank endorsement.

23   BY MR. WRUBEL:

24     Q    Okay.  And you indicated that it was placed

25   there with a stamp?

```
 1      A    Yes.

 2      Q    Okay.  Jess Alamanza was whom?

 3      A    My boss.

 4      Q    Okay.  And what was his position?

 5      A    VP secondary delivery operations.

 6      Q    And was there more than one stamp that was

 7  being used?

 8      A    No.

 9      Q    Do you know how many people were using that

10  stamp?

11      A    I don't remember specifically.

12      Q    Okay.  Do you recall approximately how many

13  people were in the team that you supervised?

14           MR. SCHWARTZ:  I'll object, again.  Relevance.

15      Thirty minutes now we have not talked about

16      Ms. Riley's endorsement or signature.  It's been

17      30 minutes.

18           MR. WRUBEL:  That's fine.

19  BY MR. WRUBEL:

20      Q    You can answer.

21      A    Ten to twelve.

22      Q    And, to your knowledge, would all 10 to 12 be

23  using the endorsement stamp?

24      A    I don't remember if we had 10 to 12 doing the

25  endorsements at that time.
```

Page 32

1       Q     Okay.  And the time we're talking about is in

2    2002?

3       A     It is while I supervised that unit.

4       Q     And the time that you supervised that unit was

5    what period of time?

6       A     I'm saying it should be around 2002, 2004 to

7    then.

8       Q     Do you recall the names of anybody in that team

9    that was using the Jess Alamanza stamp?

10      A     No.

11      Q     And you indicated that once the notes were

12   endorsed they'd be sent to the custodian?

13      A     Correct.

14      Q     All right.  And I take it the custodian would

15   place the notes in the vault?

16      A     That's correct.

17      Q     Did the custodian have any other

18   responsibilities, to your knowledge?

19            MR. SCHWARTZ:  Don't guess.

20      A     I -- I don't know what their responsibilities

21   would be.

22      Q     Okay.  Were you yourself endorsing any of

23   the -- any of the notes?

24            MR. WEISS:  Object to the form of the question.

25      Q     You can answer.

Page 33

1   A    I was not endorsing those notes, no.

2   Q    Okay.  And you weren't using the Jess Alamanza

3   stamp to endorse the notes either personally?

4   A    I was not.

5   Q    Okay.  While you were in Stockton -- by the

6   way, how long were you in Stockton till?

7   A    2004.

8   Q    Do you know what month?

9   A    June.

10  Q    So until June 2004 the only endorsement stamp

11  that was used in the Stockton area was the Jess Alamanza

12  stamp?

13       MR. SCHWARTZ:  Form.  Leading.

14  A    The Jess Alamanza stamp was used in Stockton

15  prior to that.  Uh-huh.

16  Q    Okay.  Did you ever have a stamp that was used

17  in the Stockton area?

18  A    No.

19  Q    What happened in June 2004?

20       MR. WEISS:  Object to the form of the question.

21  Vague and ambiguous.

22       MR. SCHWARTZ:  I'll join.  Many things happened

23  in 2004, but go ahead.

24  A    I moved to Jacksonville, Florida.

25  BY MR. WRUBEL:

Page 34

1    Q     Okay.  As far as moving, were you requested to

2  make the move?

3    A     Yes.

4    Q     By whom?

5    A     My manager.

6    Q     And who was your manager?

7    A     Brenda Brendle.

8    Q     I'm sorry?

9    A     Brenda Brendle.

10   Q     And do you know what her title was?

11   A     Vice president, first vice president.

12   Q     Of -- at that time I presume it's WaMu?

13   A     Yes.

14   Q     Okay.  And do you know if she's still with

15  JP Morgan?

16   A     She is not.

17   Q     Do you know where she is at this time?

18   A     She's -- she's in Jacksonville.

19   Q     Do you know if she's working for anyone?

20   A     She's working.

21   Q     For whom?

22   A     I can't think of their name right now.

23   Q     Okay.  Is it a bank or credit agency or --

24   A     It's a mortgage company.

25   Q     Okay.  And so you've indicated that Ms. Brendle

Page 35

1    requested that you be transferred?

2         A    I was offered a relocation package.

3         Q    Okay.  Was Stockton closing or --

4         A    Yes, Stockton closed.

5         Q    Okay.  And when did Stockton close?

6         A    January 2004, that -- that's when we were

7    notified that they were going to be shutting down.

8         Q    Okay.  And when did they actually shut down?

9         A    Later 2004 I would...

10        Q    And what was the relocation offer that was made

11   to you by Ms. Brendle?

12             MR. SCHWARTZ:  Object.  Proprietary

13        information.

14             MR. WEISS:  Object to the form of the question.

15        Object on --

16             MR. SCHWARTZ:  Confidential.

17             MR. WEISS:  -- privacy grounds.

18             MR. SCHWARTZ:  Exactly.  Join.

19   BY MR. WRUBEL:

20        Q    Were you told what your duties would be with

21   respect to your relocation?

22        A    I was promoted and --

23        Q    Okay.

24        A    -- and took over the responsibilities of

25   secondary delivery operations in Jacksonville.

Page 36

1      Q    When you say you were promoted, can you tell me

2   what part of the promotion was?  I mean, was it title?

3   Was it money?

4           MR. WEISS:  Object to the form of the question.

5      Objection on privacy grounds.

6           MR. SCHWARTZ:  Privacy.  Proprietary

7      information.  Confidential.  Go ahead.

8      A    I was promoted to a vice president and became

9   the department manager for secondary delivery operations

10   in Jacksonville, Florida.

11   BY MR. WRUBEL:

12      Q    And when did this promotion become effective?

13      A    Effective date I don't know.

14      Q    Okay.  Do you know if it was while you're still

15   in Stockton, California, or Jacksonville?

16      A    I was making a transition between January and

17   June of 2004.  I was offered that job, travelled back

18   and forth, and moved here in June 2004.

19      Q    And would June of 2004 or couple months before

20   then be the first time that you were ever a vice

21   president with the bank?

22      A    Correct.

23      Q    Are you still a vice president with the bank?

24      A    I am not.

25      Q    When did you cease being a vice president with

Page 37

1   the bank?

2       A    2008.

3       Q    Do you know what month?

4       A    January I would guess.

5            MR. SCHWARTZ:  Don't guess.

6       A    January 2008.

7       Q    As a vice president did you have greater

8   authority than you had before they made you vice

9   president?

10           MR. WEISS:  Object to the form of the question.

11      Vague and ambiguous.

12           MR. SCHWARTZ:  Join.

13  BY MR. WRUBEL:

14      Q    You can answer.

15      A    I was managing a department as a vice president

16  versus leading a team.  Responsibilities were different.

17      Q    Okay.  Briefly can you tell me what the

18  difference is between managing a team and leading a

19  team?

20      A    Managing a department and leading a team?

21      Q    Yes, please.

22      A    The team is one piece of the department.  The

23  department encompassed other responsibilities --

24      Q    Okay.

25      A    -- than my responsibility in note review as it

Page 38

1    was as a team leader.

2        Q    Okay.  I recognize that it may vary.  But when

3    you're managing a department, approximately how many

4    employees would be under your supervision?

5            MR. WEISS:  Object to the form of the question.

6        Vague and ambiguous.

7            MR. SCHWARTZ:  Overly broad as to what time

8        we're talking about.

9        A    Thirty -- thirty to forty people.

10   BY MR. WRUBEL:

11       Q    Okay.  Did you manage any other departments

12   besides secondary delivery?

13       A    No.

14       Q    Okay.  And how long did you manage secondary

15   delivery for?

16       A    Till 11 of 2006.

17       Q    And I take it you're saying you managed

18   secondary delivery approximately from June of 2004 to

19   November of 2006?

20       A    Correct.

21       Q    And during that period of time you had

22   approximately 30 to 40 employees under your supervision?

23       A    Yes.

24       Q    And tell us please what is secondary delivery?

25       A    Secondary delivery operations, it was the name

Page 39

1   of the department.

2        Q     Okay.

3        A     Secondary -- sorry.  It's the name of the

4   department, but we delivered on the deals that were made

5   by secondary marketing.

6        Q     Okay.  And when you say you delivered on the

7   deals that were made in secondary marketing, are we

8   talking about the fact that notes were sold to other

9   entities from American Savings?

10            MR. WEISS:  Object to the form of the question.

11       Q     You can answer.

12       A     That, yes.

13       Q     And other things?

14       A     Loans sold to Freddie and Fannie.

15       Q     Do you know what percentage of Washington

16  Mutual's loans were sold to Fannie and Freddie between

17  June of 2004 and November of 2006?

18            MR. WEISS:  Objection.  Object to the form of

19       the question.  You're asking her what percentage of

20       WaMu originated loans were sold to Fannie and

21       Freddie?  How is she possibly going to be able to

22       answer that question?

23            MR. WRUBEL:  I don't know.  If she can't answer

24       it, she can't answer that.

25       A     I don't know that percentage.

Page 40

1        MR. SCHWARTZ:  My issue is it's been 40 minutes
2    now.  We haven't spoken about the note or the --
3        MR. WRUBEL:  I don't care that we haven't
4    spoken about the note.  I've got a right to take a
5    deposition, and I'm going to take it.
6        MR. WEISS:  You have a right to take a
7    deposition.
8        MR. WRUBEL:  I don't care about 30, 40 minutes.
9    And you guys can keep interrupting if you want, but
10   we're 30, 40 minutes.  And if this takes all day,
11   it's going to take all day.
12       MR. SCHWARTZ:  Well --
13       MR. WRUBEL:  But I absolutely have a right to
14   get background and everything that I'm getting.
15       MR. SCHWARTZ:  Background -- background is one
16   thing, and I didn't object as to background.  But
17   when you started talking about what specifically was
18   done at American Savings by whom, what relevance
19   does it have to this case?  I'm just struggling with
20   that.
21       MR. WRUBEL:  I'm trying to learn what her
22   background was.  All right.  We're beyond that.  So
23   if you want to keep talking about that and wasting
24   time, then you can object to it.
25       MR. SCHWARTZ:  No, I won't, but --

Page 41

1          MR. WRUBEL:  We're --

2          MR. SCHWARTZ:  -- I have a right to object, and

3     I will.

4          MR. WRUBEL:  -- into the note.  We're into the

5     note.  We're into endorsements.  And I intend to

6     thoroughly explore the area.

7          MR. SCHWARTZ:  I told you what my objection is.

8     Go ahead.

9          MR. WRUBEL:  Okay.

10     A    Was there a question?

11     BY MR. WRUBEL:

12     Q    Yes.  I'll rephrase the question.  You were

13     passing loans to the secondary market, and you've

14     indicated that Freddie and Fannie included some of

15     the --

16          MR. WEISS:  Object to the form of the question.

17     Vague and ambiguous as respects passing loans.

18     A    We -- we sold loans for Freddie and Fannie.

19     The actual percentage I have -- I do not know.  The bulk

20     of our work was sold to Freddie and Fannie.

21     Q    Okay.  And that's where my question goes.  As

22     far as the bulk of your work going to Freddie and

23     Fannie, were there also private investors besides

24     Freddie and Fannie that were buying loans in the

25     secondary market?

Page 42

1      A     Yes.

2      Q     Okay.  And those entities would be entities

3   such as?

4      A     Lehman comes to mind, Ocwen comes to mind,

5   Bayview.

6      Q     Deutsche Bank, Goldman Sachs.

7      A     GMC.  I don't remember Deutsche Bank.  I

8   don't -- I don't know Sachs.

9      Q     Okay.  All right.  And my question to you is

10   with regards to Washington Mutual, if you know:  Of all

11   the loans that were being sold on the secondary

12   delivery, you said that the bulk of them went to Fannie

13   and Freddie; is that correct?

14          MR. WEISS:  Object --

15          MR. SCHWARTZ:  Form.

16          MR. WEISS:  -- to the form of the question.

17      You're asking her about when she was working in the

18      secondary delivery operations department from June

19      2004 until November of 2006 if she knew that the

20      bulk of the loans that came in through that

21      department went to Fannie and Freddie.

22          MR. WRUBEL:  That's what she testified to.

23          MR. WEISS:  I just want to be clear, she's not

24      talking about WaMu originated the loan --

25          MR. WRUBEL:  No.

Page 43

1          MR. WEISS:  -- generally.

2          MR. WRUBEL:  No.  I'm just talking about --

3          MR. WEISS:  That's the way you asked the

4     question.

5     A     The bulk of the loans were sold to Freddie and

6     Fannie.

7     BY MR. WRUBEL:

8     Q     And when you say the bulk of the loans,

9     approximately what percentage are you talking about?

10     A     I can't speak to percentage.  I don't know

11     that.

12     Q     All right.  When you say the bulk, you know if

13     we're talking more than 50 percent or less than 50

14     percent?

15          MR. SCHWARTZ:  Form.  Speculative.  Asked and

16     answered.  Go ahead.

17     A     I don't know that.

18     Q     Okay.  Did you review any screens with regards

19     to Mr. Orozco's loan before --

20          MR. SCHWARTZ:  Form.

21     Q     -- coming into this deposition?

22          MR. SCHWARTZ:  Vague and ambiguous.  Go ahead.

23     A     Are you -- if I personally?

24     Q     Yeah.  Yes.

25     A     No, I did not.

Page 44

1     Q    All right.  And you understand when I say

2  screen, I'm talking about computer screens?

3     A    Yes.

4     Q    Okay.  And you indicated you personally did not

5  for this deposition; correct?

6     A    I did not review that note personally to a

7  screen.

8     Q    Okay.  You only reviewed the note?

9     A    I didn't review the note.

10         MR. WEISS:  Objection.  Are you talking about

11     contemporaneously with the origination of the loan,

12     or are you talking about since then?

13         MR. SCHWARTZ:  Yeah.  I'm confused.  Are you

14     talking in preparation for deposition?  Can you put

15     some time frame on it?

16         MR. WRUBEL:  I asked -- if you want her to read

17     it back -- the question was --

18         MR. SCHWARTZ:  Yeah, please, because I'm

19     confused.

20         MR. WRUBEL:  Well, the question was --

21         THE WITNESS:  I'm confused now.

22         MR. WRUBEL:  The question was before -- I mean,

23     you guys can keep interrupting, but the question was

24     for the deposition.  And if you want her to read it

25     back, she can.

Page 45

1          MR. SCHWARTZ:  Oh, she already answered that at

2      the beginning of the --

3      A     In the beginning I saw the note.  Yesterday I

4  did not review it.

5  BY MR. WRUBEL:

6      Q     Okay.  And I asked about screens.  And I did

7  not ask about screen before.

8          MR. WRUBEL:  But if you guys want to keep

9      interrupting, just go ahead.

10          MR. WEISS:  Mike --

11          MR. WRUBEL:  We can take this deposition as

12      long as we want.

13          MR. WEISS:  It's not about interrupting.  You

14      can read back the record if you want.  What you said

15      was very unclear.  You asked if she'd seen any

16      screens in connection with the note.  We made

17      objections as to form because it was vague and

18      ambiguous.  You later asked a follow-on question

19      where you said in preparation for this deposition.

20          MR. WRUBEL:  Yeah.

21          MR. WEISS:  It's absolutely unclear if you were

22      talking about contemporaneously with the origination

23      with the loan if she viewed any screens that

24      reflected any information about the note or if in

25      the context of preparing for deposition she viewed a

Page 46

1      screen that reflected any information about this

2      note.  So let's make it clear.

3           MR. WRUBEL:  Well, the record speaks for

4      itself.

5           MR. WEISS:  That's right.  It's absolutely

6      unclear.

7           MR. SCHWARTZ:  And we've objected, so go ahead.

8  BY MR. WRUBEL:

9      Q    All right.  With regards to your work here in

10 Jacksonville between June of 2004 and November of 2006,

11 what types of things would you supervise being done in

12 order for loans to be sold to the secondary market?

13          MR. WEISS:  Object to the form of the question.

14     A    The unit -- I managed one of the units related

15 to the notes that -- the notes comes in the door.  It's

16 reviewed for accuracy and moved to the custodian.  It's

17 endorsed and moved to the custodian.  That was one of

18 the units in secondary delivery operations.

19     Q    Is there a name for that unit?

20     A    The note review unit.

21     Q    Okay.  Were there other things that were done?

22     A    Done to what?

23     Q    In order to process the loans so they could be

24 sold on a secondary market.

25     A    We cured loans that -- something was wrong with

Page 47

1    the note, for example.  We cured that.

2        Q    Okay.

3        A    I had a unit that would find a cure for that.

4        Q    And when you say cure, can you elaborate on

5    what you mean?

6        A    The borrower may not have signed.  They signed

7    the note different from the typed name on the note.

8    That would be corrected.

9        Q    Okay.

10       A    Is an example.

11       Q    Any other examples?

12       A    Not coming to mind.

13       Q    What other things were done in order to process

14   the loan so that they could be sold on the secondary

15   market that you would supervise or manage?

16       A    That would be the answer to that question.  We

17   did the note review.  We ensured the accuracy and sent

18   them to the custodian.

19       Q    Okay.  And would anything be done to the notes

20   while they were in your unit or in your department?

21       A    Anything --

22            MR. SCHWARTZ:  Form.  Asked and answered.

23       A    -- else?

24            MR. SCHWARTZ:  Go ahead.

25       Q    Yes.

Page 48

1    A    They were reviewed.  They were reviewed.  They
2  were checked to the system for accuracy.  They were
3  moved to the custodian.  And they were endorsed.
4    Q    Okay.  So they were endorsed when they were in
5  your department as well?
6    A    That's correct.
7    Q    Okay.  And who were they endorsed by?
8    A    It was a facsimile signature stamp that was
9  used for the endorsements on the note.
10   Q    Okay.  But who would be the ones that would be
11 using the facsimile stamp?
12   A    My staff.
13   Q    All right.  And how many people were in your
14 staff that were endorsing notes?
15   A    Ten to twelve.
16   Q    Do you remember the names of any of those
17 people?
18   A    Not particularly that were endorsing the notes,
19 no.
20   Q    Okay.  What was the name of the -- the name of
21 the unit if I were to try to acquire the names of the
22 people that were in this unit?
23   A    Note review unit.
24   Q    Okay.  And would all 10 to 12 people that were
25 in the note review unit have authority -- or strike

Page 49

1    that.

2           Would all 10 to 12 people that were in the unit

3    be using that facsimile stamp?

4           MR. WEISS:   Object to the form of the question.

5       Vague and ambiguous.

6       A    They certainly could in doing their job would

7    use that stamp.   That's right.

8       Q    Okay.

9       A    They were a note reviewer.   They would use that

10   stamp in their note review process.

11      Q    All right.   And I -- you're saying that stamp.

12   There's only one stamp?

13      A    No.   There was multiple stamps, nine to ten

14   stamps.

15      Q    And the stamps had your name on it?

16      A    Yes, my signature.

17      Q    Do you know when the stamps were made?

18      A    Not exactly.

19      Q    I take it would have been sometime after

20   June 2004?

21      A    Sometime in that range, yes.   I don't know that

22   it was after June 2004.

23      Q    Okay.   And with regards to the stamp, did you

24   provide a signature for the stamps?

25      A    Yes, I did.

Page 50

1      Q    Did you provide more than one signature for the

2    stamps?

3      A    I don't remember that process, whether I signed

4    multiple times or once.  I don't know what the creator

5    of stamps needs.

6      Q    Do you know if the stamps were secured when

7    they were not being used?

8      A    We had full procedures around the security of

9    those stamps, and they were in a secured location

10    requiring card access only by the collateral note review

11    people.

12      Q    And when you say that you had full security and

13    procedures, can you elaborate on what those were?

14      A    The procedures, they were in a locked cabinet.

15    The lead manager of that unit would unlock the cabinets.

16    In the morning the stamps would be checked out on a log.

17    They would be used as the representative needed to do

18    during the day.  At the end of the night they were

19    checked back in and logged back in to the secured

20    cabinet.  And, again, the room that the note review

21    occurred in was a secured access only.

22      Q    Was there more than one lead manager to this

23    team?

24      A    I had a manager over that team.  She had a

25    lead.

Page 51

1    Q    Okay.  And what -- who is that manager?

2    A    Pat Eyles.

3    Q    Can you spell the last name, please?

4    A    E-y-l-e-s.

5    Q    And is Pat male or female?

6    A    Female.

7    Q    Is she still with JP Morgan?

8    A    Yes.

9    Q    Here in Jacksonville?

10   A    Yes.

11   Q    And you've indicated that there was a secure

12   room where the note review would take place; is that

13   correct?

14   A    Yes.

15   Q    Can you elaborate on what -- how that was set

16   up?

17   A    It's a partitioned off area, work area, that we

18   were in, and the doors to that were secured.  You had to

19   have special card access to get in.

20   Q    Again, was this a blank -- strike that.

21        With regards to the endorsement stamp, was it a

22   blank endorsement?

23   A    Yes, it was.

24   Q    To your knowledge, were the stamps always the

25   same as far as the facsimile signature of yours?

Page 52

1          MR. WEISS:  Object to the form of the question.

2          MR. SCHWARTZ:  I join.  What time period are we

3     talking about?

4          MR. WRUBEL:  We're always talking about from

5     June -- June 2004 to November of 2006 right now.

6     A     The stamps -- I don't know if they were always

7     the same.  The facsimile signature, I don't have any

8     reason to think that they wouldn't have been the same on

9     a facsimile signature stamp.

10    BY MR. WRUBEL:

11    Q     Okay.  Excuse me one sec.

12          With regards to the notes once they were

13    endorsed, where would they go after they left that room?

14    A     To the custodian.

15    Q     And do you know what the custodian would do

16    with the notes?

17    A     Put them in the vault.

18    Q     Okay.  And was there more than one vault that

19    they would be put in?

20    A     The notes that came through Jacksonville,

21    Florida, they were -- there were different custodial

22    vaults at that time.

23    Q     Right.

24    A     Our notes went -- continued to go to Stockton.

25    Q     Okay.

Page 53

1     A    Until Stockton was shipped out, and I don't

2    remember when that was.

3     Q    Okay.  So I think what you're telling me is

4    that Stockton did continue to function for a short

5    period of time after you left.

6     A    Yes.

7     Q    And when you first came to Jacksonville, were

8    the notes always shipped back to Stockton initially?

9     A    Yes.

10    Q    Okay.  And then were there other locations

11   where the notes were shipped to?

12    A    There was a location in Vernon Hills.

13    Q    Vernon Hills where?  What state?

14    A    In Illinois.

15    Q    And during what period of time were they

16   shipped to Vernon Hills, Illinois, if you know?

17    A    I don't know.

18    Q    Were they shipped anywhere else besides Vernon

19   Hills and Stockton?

20    A    I can't be certain of that.

21    Q    Okay.  Were there any other vaults that WaMu

22   had besides in Vernon Hills and Stockton?

23    A    A vault was built in Florence, South Carolina.

24    Q    You know when that was built?

25    A    No, not exactly.

```
                                                    Page 54
 1       Q    Approximately?

 2       A    I would --

 3            MR. SCHWARTZ:  Don't guess.

 4       Q    I mean, are we talking in the 1990s?  Was it in

 5    2000, 2005?

 6       A    2008.  I don't know that it was in 2008.  Let's

 7    be clear.  I don't know that it was 2008.

 8       Q    Okay.  It was not in the 1990s?

 9       A    It was not in 1990s.

10       Q    I'd like to just go back to the endorsements a

11    little bit.  You'd indicated that there were nine to ten

12    stamps that were made; is that correct?

13       A    Correct.

14       Q    All right.  And, to the best of your knowledge,

15    were they all made at the same time approximately?

16       A    Yes.

17       Q    Okay.  So they all came back in from whoever

18    made them to WaMu at the same time, to your knowledge?

19       A    Yes.

20       Q    Do you know who made them?

21       A    No.

22       Q    Okay.  And you've indicated that you have no

23    reason to think that the signatures were different on

24    any of the stamps; correct?

25            MR. WEISS:  Object to the form of the question.
```

Page 55

1    Q    You can answer.

2         MR. WEISS:  Objection.  She testified that she

3    didn't know how the process exactly worked with

4    respect to getting the signature from her sample

5    signatures that she provided to the stamp.  She

6    testified that she didn't know if -- what the

7    process was that captured her --

8         MR. WRUBEL:  Mr. Weiss, just object to the

9    form.  You don't have to coach the witness any

10   further.  She testified --

11        MR. WEISS:  I'm not coaching the witness.

12        MR. WRUBEL:  And I'm instructing you not --

13        MR. WEISS:  I'm not coaching the witness.

14        MR. WRUBEL:  I'm telling you --

15        MR. WEISS:  I'm trying to clarify a question.

16        MR. WRUBEL:  You don't need to clarify,

17   Mr. Weiss.

18        MR. WEISS:  The testimony that --

19        MR. WRUBEL:  I don't want you coaching the

20   witness.

21        THE REPORTER:  One at a time, please.

22        MR. WRUBEL:  You got an objection to the form?

23        MR. WEISS:  I've made my objection for the

24   record.  I've stated it for the record.

25   BY MR. WRUBEL:

Page 56

1     Q    Now, as I was saying, you indicated earlier you

2     had no reason -- these are your words:  You have no

3     reason to think that the signatures were different on

4     any of the stamps; is that correct?

5     A    What I said was exactly that I don't know what

6     the process was to make those stamps, whether or not I

7     signed several times and they took one of those

8     signatures or not.  I don't know what that process was.

9     Q    Okay.  But as far as you know you never saw any

10    differences with regards to the signatures on the

11    stamps?

12         MR. WEISS:  Objection.  Object to the form of

13    the question.

14    Q    You can answer.

15    A    I never inspected the stamps to ensure that the

16    signatures were all exactly the same.

17    Q    Okay.  All right.  Now, you've indicated that

18    the notes were initially shipped to Stockton and then to

19    Vernon Hills?

20         MR. WEISS:  Objection.  Misstates prior

21    testimony.

22    A    We were -- we shipped the notes to the

23    custodian.

24    Q    Okay.

25    A    And at the time frames from when that custodian

Page 57

1    was in Stockton or Vernon Hills I can't speak to that.

2         Q    Okay.  Did you ship to any other custodians in

3    any locations other than Vernon Hills and Stockton?

4              MR. SCHWARTZ:  Asked and answered.  Form.  Go

5         ahead.

6         A    I just don't know at what time frames we were

7    shipping to some place other than those two.

8         Q    Okay.  Did there come a point in time that you

9    shipped to Florence, South Carolina?

10        A    When the vault was built -- I don't know if

11   that -- I can't answer that.

12             MR. SCHWARTZ:  If you don't know, say you don't

13        know.

14        A    I left the department.

15        Q    Okay.  When did you leave the department?

16        A    In November of 2006.

17             MR. SCHWARTZ:  You need a break?

18             THE WITNESS:  I think that would be nice if we

19        did.

20             MR. SCHWARTZ:  You mind if she takes a break?

21             MR. WRUBEL:  No.

22             (Break taken.)

23   BY MR. WRUBEL:

24        Q    You've indicated that it was your team that did

25   the endorsements of the stamps in Jacksonville.  Did you

1    yourself ever endorse any of the notes?

2         A    No.

3         Q    Never?

4         A    I never put an endorsement stamp on the notes.

5         Q    Okay.  How many notes a day were coming into

6    the Jacksonville area, if you know, approximately?

7         A    2- to 3,000.

8         Q    Assuming you only had 10, not 12, just if we

9    can get through the question, am I correct then that

10   your team would be each reviewing approximately 200 to

11   300 notes a day?

12        MR. SCHWARTZ:  Form.  Speculating.  Go ahead.

13        A    That sounds reasonable.

14        Q    And they would be checking the notes and the

15   data for the loans -- strike that.

16             Each individual that was on the team would be

17   checking the notes as well as the data with regards to

18   the loans approximately 2- to 300 a day?

19        A    They compared the data -- certain data on the

20   note to what was on the system.

21        Q    Would they be comparing any other data besides

22   the data on the note to the system when they would go

23   through the system?

24        A    Other data like what?

25        Q    Information from the mortgage perhaps.

Page 59

1    A    They have a note.  The notes is all they had.

2    Q    That was the only information?

3    A    Yeah, note review.

4    Q    Okay.  I'm curious.  Being the supervisor or

5  the manager of the unit -- you've indicated that the

6  team leader was Pat Eyles; correct?

7    A    Yes.

8    Q    Okay.  Would they have ever come to you with

9  problems with regards to the note review unit?

10   A    Problems like what?

11   Q    I don't know.  I mean, I'm just kind of curious

12  as to what type of things you would be managing with

13  regards to the unit during this two-year period.

14   A    Productivity is what we managed to.

15   Q    Okay.

16   A    We tracked how well each individual did

17  their -- did their job.

18   Q    Okay.  So your responsibilities were basically

19  to make sure the unit was working efficiently?

20       MR. WEISS:  Object to the form of the question.

21   A    I oversaw that unit, that we were following the

22  procedures that we did our quality checks on, the

23  results of those quality checks, and personnel.

24   Q    Okay.  Did you ever find that there were

25  problems with regards to the quality of the work that

Page 60

1    the unit did from time to time?

2        A    Yes.

3        Q    What types of problems were they having?

4        A    When we did a QC check, we might see that they

5    didn't properly check a -- a data element or that it

6    needed a correction.  It could be that they -- live

7    signature versus a copy signature on a note.

8        Q    Okay.  And when you say QC, I take it you're

9    referring to quality control?

10       A    Correct.

11       Q    Okay.  Who would be the individual or

12   individuals who would be doing the review of the work?

13       A    The lead or the manager of the unit.

14       Q    Okay.  And in the case of the note review unit,

15   that would have been Pat Eyles?

16       A    Pat or her lead.

17       Q    Who was her lead?

18       A    Karen Woodward.

19       Q    Can you spell Woodward, please?

20       A    Woodward, W-o-o-d-w-a-r-d.

21       Q    To your knowledge, is she still with JP Morgan?

22       A    Yes.

23       Q    Here in Jacksonville?

24       A    Yes.

25       Q    Okay.  With respect to your responsibilities,

Page 61

1   what happened in November of 2006?  What changed?

2           MR. WEISS:  Object to the form of the question.

3       Vague and ambiguous.

4       A    The department was closed and moved to the --

5       the Florence, South Carolina, office.

6       Q    And when you say the department, we're talking

7       about which department?

8       A    Secondary delivery operations.

9       Q    Did you move to Florence, South Carolina, also?

10      A    No.

11      Q    Where did you stay?

12      A    Jacksonville.

13      Q    Okay.  I'm going to go back just before we come

14      into this area.  No, we can go to this area.  What

15      responsibilities did you take on after June 2006,

16      immediately thereafter?

17      A    After June of 2000- --

18      Q    I'm sorry.  November of 2006.

19      A    I did project management work for about

20      12 months.

21      Q    What type of project management?

22      A    At that time we were moving -- the project that

23      I was involved with was helping to move the custodial

24      vault from Stockton to Florence, South Carolina.

25      Q    I'm a little bit confused.  I thought Stockton

Page 62

1    closed somewhere between 2004?

2        A    No.

3        Q    It continued to operate?

4        A    Yes.

5        Q    Okay.  When did the Stockton plant close down?

6        A    That's what I can't be specific about.  The

7    custodial vault was still there when I moved to

8    Jacksonville.

9        Q    And, to your knowledge, you continued to ship

10   notes back to Stockton and Vernon Hills during the

11   period -- although you're not exactly sure when it

12   ended, somewhere between the period of June 2004 and

13   November of 2006?

14            MR. SCHWARTZ:  Form.  Compound question.  Go

15       ahead.

16       A    Yes.  We would have been shipping to the

17   custodial vault in one of those two locations.

18       Q    And come November of 2006 you got involved with

19   the project of doing exactly what?

20       A    I project managed for about the next 12 months.

21   One of the projects was the movement of the vault from

22   Stockton to Florence, South Carolina.

23       Q    What types of things would you have to do

24   during this period of time to oversee or help move the

25   vault from Stockton to Florence, South Carolina?

Page 63

1    A    I coordinated, you know, meetings, meetings and

2    the activities.  Generally we'd have a weekly meeting of

3    what needed to be done, progress.  A building was built.

4    So I helped on the project management side.

5    Q    Okay.  And during this period of time you've

6    indicated that the secondary...

7    A    Delivery operations.

8    Q    Thank you.  Secondary delivery operations was

9    shut down in November of 2006?

10    A    Jacksonville -- secondary delivery operations

11    was shut down in Jacksonville.  The Florence, South

12    Carolina, office was a -- part of it was a -- we had

13    secondary delivery operations in two locations.  That

14    location continued.  The Jacksonville office shut down.

15    Q    Okay.  And I take it you're saying that

16    Florence, South Carolina, secondary delivery operations

17    picked up around November of 2006, December 2006?

18    A    No, that's not correct.  They were in parallel

19    with Jacksonville --

20    Q    Okay.

21    A    -- for sometime --

22    Q    Okay.

23    A    -- prior.

24    Q    All right.  So they started up before November

25    of 2006?

Page 64

1      A     Yeah.

2      Q     When I say they, I'm referring to Florence,

3    South Carolina.

4      A     They were in existence before November of 2006.

5      Q     Okay.  Do you know approximately how long

6    before November of 2006, approximately?

7      A     They were in existence prior to 2004.

8      Q     Okay.  Did they have a vault there before 2004?

9      A     Yes.

10           MR. SCHWARTZ:  Form.

11     Q     And there I'm referring to Florence, South

12   Carolina.

13     A     Yes.

14     Q     Okay.  Are you clear that Jacksonville's

15   operation, as far as secondary delivery operations,

16   closed down in November of 2006?

17           MR. WEISS:  Object to the form of the question.

18     A     We were laid off the end of that year.

19     Q     Okay.  And so is your answer yes, there was --

20   strike that.

21           Is it your answer that there were no secondary

22   delivery operations going on in Jacksonville by the end

23   of 2006?

24     A     Correct.

25     Q     And when you say you were laid off, you were

1    laid off from that department.  You continued to work

2    for JP Morgan; correct?

3            MR. SCHWARTZ:  Form.

4        A    I was laid off and subsequently got a job back

5    with JP Morgan in January.

6        Q    January of what year?

7        A    2009.

8        Q    And when were you laid off?

9        A    It had to have been 11, November.

10       Q    Okay.  When you came back in January 2009, what

11   did you do?

12       A    I went to work in MIS, management information

13   systems, in the default division.

14       Q    And I take it you no longer had the title of

15   vice president?

16       A    That's correct.

17       Q    And would I be correct in -- strike that.

18            With regards to defaults and management

19   information systems, what were your responsibilities

20   there?

21       A    Management information systems, I provided

22   information to the auditing agencies.

23       Q    What types of auditing -- auditing entities are

24   we talking about?

25       A    Moody's, S&P, Fitch.

Page 66

1    Q    Did MIS provide any information to anyone

2    besides Moody's, S&P, Fitch?  Was the --

3    A    I'm sure they did.

4    Q    Was the information used for other purposes, I

5    guess is my question?

6    A    Other purposes like what?

7    Q    I don't know.  But, I mean, you're saying that

8    the name of the unit was management information systems.

9    Was it strictly for auditing purposes?

10    A    Wait a minute.  I was speaking of my

11    responsibilities at MIS.

12    Q    Okay.

13    A    And your question is those responsibilities?

14    Q    Right.

15    A    Okay.  My responsibilities, I provided data for

16    the auditing.

17    Q    Okay.  And I take it you're implying that

18    management information system was used for other

19    purposes, but that was not your responsibility?

20         MR. SCHWARTZ:  Form.

21         MR. WEISS:  Object to the form of the question.

22    A    That was one function in MIS.

23    BY MR. WRUBEL:

24    Q    Okay.  What were the other functions?

25    A    They provide reporting to all the departments.

Page 67

1      Q     And how long did you provide the information

2   for auditing purposes?

3            MR. WEISS:  Object to the form.  Vague and

4        ambiguous.

5      A     I'm still at MIS with other responsibilities.

6      Q     Okay.  What types of responsibilities do you

7   have now?

8      A     I'm doing reporting for our borrowers' systems

9   groups.

10     Q     What are you referring to as borrowers' systems

11  groups?  I'm not sure I understand the term.

12     A     Customers that call in looking for assistance.

13     Q     Okay.  And you also mentioned that you were

14  involved with defaults when you came back on board?

15     A     Originally MIS was a default under the default

16  umbrella.

17     Q     Is it still under the default umbrella?

18           MR. SCHWARTZ:  If you don't --

19     A     I don't know.

20     Q     Okay.  When you said originally, I thought

21  things may have changed.

22           Have you worked in any other units besides MIS

23  since you came back in 2009?

24     A     No.  Any other departments --

25     Q     Yes.

Page 68

1       A     -- at MIS?  No.

2       Q     Were there any other projects that you worked

3   on besides helping transfer everything to the Florence,

4   South Carolina, vault?

5       A     Yes.

6       Q     During that 12-month period that you referred

7   to after November of 2006.

8       A     Yes, there were other projects that I worked

9   on.

10      Q     Okay.  What other types of projects?

11      A     They were like a Z state -- I want to call

12  it -- where you're -- process improvement.

13      Q     Process?

14      A     Improvement.

15      Q     Okay.  What does that entail?

16      A     We looked at -- we helped implement projects in

17  departments where they saw improvements and needed to

18  make changes.

19      Q     Any other projects besides project improvements

20  and working on the vault during that 12-month period?

21      A     No.  Unh-unh.

22      Q     Okay.  And at the end of that 12-month period

23  that's when you were laid off?

24      A     That was -- I was laid off and went to the job

25  in MIS.

Page 69

1    Q    Okay.

2    A    I applied and got a new job in MIS, yes.

3    Q    Okay.  Did you ever supervise any of the

4  employees in Florence, South Carolina?

5    A    I did not.

6    Q    And none of them were under your authority?

7         MR. WEISS:  Object to the form of the question.

8         MR. SCHWARTZ:  Join.

9  BY MR. WRUBEL:

10    Q    None of the employees in Florence, South

11  Carolina, were ever under your direction?

12    A    They were not.

13    Q    Or your supervision?

14    A    They were not.

15         MR. WRUBEL:  I take it you have seen this note?

16         MR. SCHWARTZ:  Which one is it?  I don't know.

17         MR. WRUBEL:  It's the only one relevant to this

18    litigation.

19         Mark this as Defense Exhibit 1.

20         (Defendants' Exhibit 1 was marked for

21    identification.)

22  BY MR. WRUBEL:

23    Q    Ms. Riley, I'm showing you what's been marked

24  as Defense Exhibit 1.  And I'll ask you if you've ever

25  seen a copy or -- of this document.

```
                                              Page 70

 1      A     Yesterday.

 2      Q     That was the first time?

 3      A     I believe so.

 4      Q     Okay.  And with reference to the endorsement,

 5   which is on the last page, does that appear to be your

 6   signature?

 7      A     Yes, my signature.

 8      Q     Okay.  And does that appear to be similar to

 9   the facsimile stamps that were used during your time

10   when you managed the -- the secondary delivery unit?

11            MR. WEISS:  Object to the form of the question.

12            MR. SCHWARTZ:  I'll join.  Calls for

13      speculation.  Lacks predicate.  Lacks foundation.

14      Go ahead.

15      A     Say the question, again.  Would you, please?

16   BY MR. WRUBEL:

17      Q     I'll be glad to.  Does the signature that

18   appears there appear similar to the -- to the facsimile

19   stamps that were used during your tenure between June of

20   2004 and November of 2006?

21      A     This is my signature, yes.

22      Q     Okay.  And does your signature vary materially

23   at any time?

24            MR. SCHWARTZ:  Objection.  Calls for

25      speculation.
```

Page 71

 1          MR. WRUBEL:  You can just say form.

 2          MR. SCHWARTZ:  Lack of predicate.  Lack of

 3      foundation.

 4          MR. WRUBEL:  You can say form.

 5      A    My signature's certainly over time made

 6  changes.

 7  BY MR. WRUBEL:

 8      Q    Okay.

 9          MR. WRUBEL:  I'd like to take a break for a

10      couple of minutes.

11          (Break taken.)

12  BY MR. WRUBEL:

13      Q    Ms. Riley, I don't know if you're aware of it

14  or not, but some of the attorneys moved for a protective

15  order before we took this deposition.  Is there any

16  reason that you're concerned about any of the testimony

17  that you've provided here that may be confidential, or

18  do you have other concerns with regard to your

19  testimony?

20      A    Well, I'm not sure about the protective order

21  that you're talking about, but yes, I have concerns on

22  where it ends up and where it's going.

23      Q    Okay.

24      A    Yes.

25      Q    Okay.  And can you elaborate on what your

Page 72

1    concerns are?

2         A    Well, I've seen things on the Internet that has

3    gone way beyond, that has -- frankly, there's phrases in

4    there that are threatening.  Going to run me down, run

5    me out of breath.  That sounds pretty threatening.  So

6    yes, I have concerns about where this kind of

7    information ends up.

8         Q    Okay.  Is there any other concerns that you

9    have besides that it may end up on the Internet that

10   you're aware of or that you --

11        A    You're saying it may end up on the Internet?

12        Q    It won't.  It won't.  I can assure you it

13   won't.

14        A    Okay.  I have no concerns about what I told you

15   today.

16        Q    Right.

17        A    I have -- I can't speak to specific dates that

18   you've asked about.

19        Q    Right.

20        A    But what we've -- I've told you what I know.

21        Q    No.  No.  And just so you're clear on it, there

22   already is a protective order in place which says that

23   it's not to go on the Internet.  So I just want you to

24   be aware of that and seems to be -- but you're saying

25   other than that you really don't have any other concerns

Page 73

1    with any of the other --

2                MR. SCHWARTZ:  Form.

3        A    I don't have concerns about what I said today.

4        Q    Okay.

5                MR. WEISS:  Objection to the form of the

6        question.  Just to clarify, I'm -- you're asking her

7        if -- she seems to be responding to, Do you have any

8        concerns what you've testified about?  You're asking

9        her, Do you have any concerns about this deposition?

10               MR. WRUBEL:  I'm asking her both.

11               MR. SCHWARTZ:  Let's be clear.  She's not a

12       lawyer.  The legal concerns are not under her

13       purview.

14               MR. WRUBEL:  I understand.

15               MR. SCHWARTZ:  She's talking about the facts.

16               MR. WRUBEL:  Right.  She's concerned from her

17       own personal standpoint about it going on the

18       Internet, and I'm assuring her it will not.

19               MR. WEISS:  So are you asking -- but are you

20       asking her does she have any other concerns about it

21       being publicly disseminated?

22               MR. WRUBEL:  I've asked her what I've asked

23       her.  That's it.

24               MR. SCHWARTZ:  All right.

25               MR. WEISS:  All right.

Page 74

1    BY MR. WRUBEL:

2        Q    There's issue as to whether or not you were

3    actually subpoenaed for today or not.  If this matter

4    goes to trial, and it's set in March, I would like to be

5    able to subpoena you to come to trial.  Now, I presume

6    that you don't want to be harassed with a subpoena, but

7    I want to be in a position where I can serve you.  Is

8    there a place where I can serve you with a subpoena, or

9    would you be willing to indicate that the attorneys at

10   GrayRobinson can accept a subpoena for you?

11           MR. SCHWARTZ:  Any subpoenas that are

12       appropriate under the Florida law and applicable to

13       Ms. Riley can be served on me.

14           MR. WRUBEL:  Okay.  That takes care of that.

15           MR. SCHWARTZ:  And we reserve all rights to

16       object to any improprieties as related to the

17       subpoenas.

18           MR. WRUBEL:  Improprieties such as?

19           MR. SCHWARTZ:  To the extent your subpoena form

20       or substance is improper, I reserve the right to

21       object, but you can serve me, yes.

22           MR. WRUBEL:  Okay.  For her.

23           MR. SCHWARTZ:  Yes.

24           MR. WEISS:  Let's just clarify.  He's saying

25       for purposes of an address, service address?

Page 75

1          MR. WRUBEL:  No.

2          MR. WEISS:  He said care of Roland Schwartz?

3          MR. WRUBEL:  Right.

4          MR. WEISS:  Whether or not, you know, it's

5     within the subpoena power of the court.  He's not --

6          MR. SCHWARTZ:  That's what I said.

7          MR. WEISS:  He's not waiving the formality --

8          MR. SCHWARTZ:  That's why I said for purposes

9     of the address serve subpoenas on me.  To the extent

10    that there's an impropriety with respect to the

11    subpoena, we reserve the right to object.  But

12    that's a legal issue, obviously.

13         MR. WRUBEL:  Obviously.

14         MR. SCHWARTZ:  But no, you don't need to go to

15    her house to serve her.

16         MR. WRUBEL:  You're authorized to accept for

17    her.

18         MR. SCHWARTZ:  Correct.

19         MR. WRUBEL:  That's all I need.

20         MR. SCHWARTZ:  Okay.  But reserve the rights to

21    still object once -- once I'm served.

22         MR. WEISS:  You're not stipulating --

23         MR. SCHWARTZ:  Correct.

24         MR. WEISS -- that --

25         MR. SCHWARTZ:  Right.

```
                                                    Page 76
 1             MR. WEISS:  -- that's service --

 2             MR. SCHWARTZ:  Right.

 3             MR. WEISS:  -- or anything from you.

 4             MR. WRUBEL:  I understand.

 5             MR. SCHWARTZ:  Can be addressed to me, and then

 6        we'll take it from there.

 7             MR. WRUBEL:  Okay.

 8   BY MR. WRUBEL:

 9        Q     For the record, what is the address that you

10   work at?

11        A     7757 Bayberry.

12        Q     7757?

13        A     Bayberry Road.

14        Q     And I take it that's part of Jacksonville

15   proper?

16        A     Yes, it is.

17        Q     Does -- Jacksonville proper is the whole county

18   still?

19        A     I don't think it is.

20        Q     I don't know.  I just remember years ago they

21   did it that way.

22             MR. WRUBEL:  I got nothing else.  You got

23        anything?

24             MR. OROZCO:  No.

25             MR. SCHWARTZ:  Let's take five minutes, and
```

1      then we'll have some questions.

2                     CROSS-EXAMINATION

3  BY MR. SCHWARTZ:

4      Q    Ms. Riley, there was some testimony about the

5  fact that you did not directly supervise the employees

6  in South Carolina.  Remember that testimony?

7      A    Yes.

8      Q    Okay.  You do know some of the supervisors who

9  oversaw the South Carolina operations, don't you?

10     A    Yes.  We worked together for some time.

11     Q    In Jacksonville?

12     A    No.  They were in Florence.  I was in

13 Jacksonville.

14     Q    Isn't it true that along with some of those

15 supervisors you were involved in developing and

16 implementing note endorsement procedures?

17     A    Yes.  We had procedures on both sides that were

18 developed and put together and followed.

19     Q    And some of the supervisors that were involved

20 in developing those endorsement procedures with you were

21 tasked with overseeing those same procedures in South

22 Carolina?

23     A    That's correct.

24          MR. WRUBEL:  Objection to the form.

25     Q    Who oversaw the procedures of endorsing notes

1    in South Carolina?

2        A     My counterparts.

3        Q     What were they tasked with?

4            MR. WRUBEL:  Objection to the form.

5        Q     Go ahead.

6        A     Their functions would be the same as mine.

7    There was dual operations in Jacksonville and South

8    Carolina.

9        Q     Okay.  You know for a fact that those

10   endorsement procedures stayed the same --

11           MR. WRUBEL:  Objection.

12       Q     -- once the operations were moved to South

13   Carolina?

14           MR. WRUBEL:  Objection to the form.

15       A     Yes.  I helped move those procedures to South

16   Carolina, and they had the dual operations already in

17   effect.

18       Q     You also testified that you provide -- while

19   you were in Jacksonville from 2004 to 2006 you provided

20   a few sample signatures from which stamps were made; is

21   that fair?

22       A     Yes.

23       Q     Okay.  Let's just --

24           MR. WRUBEL:   Objection to the form of the last

25       question.

Page 79

1          MR. SCHWARTZ:  You need to object before I ask

2      the question, but that's fine -- before she answers

3      actually, not before I ask the question.

4          MR. WRUBEL:  It's all right.

5  BY MR. SCHWARTZ:

6      Q    Were you involved in any way, shape, or form in

7  actually manufacturing the stamps?

8      A    No.

9      Q    Do you know which sample signatures were picked

10  for what stamp?

11          MR. WRUBEL:  Objection to the form.

12     A    No.

13     Q    You also testified you were not endorsing notes

14  yourself with a stamp; is that accurate?

15     A    That's correct.  I was not.

16     Q    Do you know for sure that one sample signature

17  was picked for all of the stamps that were made?

18     A    I don't know.

19     Q    So can you be sure that all of the stamps were

20  assigned the same sample signature?

21          MR. WRUBEL:  Objection to the form.

22     A    I don't know that I can be sure of that.  I can

23  be sure it's my signature.

24     Q    Also while in Jacksonville from 2004 to 2006

25  did you endorse notes by hand, yes or no?

Page 80

1        A     Yes.

2        Q     Let's go back to Stockton before 2004.  Was

3   there a stamp made with your name to endorse notes while

4   at -- while in Stockton?

5        A     There was a stamp with my name on it, yes,

6   without a signature.

7        Q     Was there -- and you would, then, sign

8   endorsements by hand while in Stockton?

9        A     I would have to sign.

10       Q     Was there one version of the stamp made while

11  in Stockton or more?

12       A     There could -- there were other versions in

13  Stockton.  There were other versions of the stamp, yes.

14       Q     How -- how were the versions different?

15       A     In the case there would be Cindy Riley on a

16  stamp, and in another case it would be Cynthia A. Riley.

17       Q     In both cases it was you?

18       A     It was me.

19       Q     And you would sign that by hand?

20       A     And I would -- there were occasions where I

21  signed by hand, yes.

22       Q     Were you authorized by your employer to sign

23  notes by hand?

24             MR. WRUBEL:  Objection.  Form.

25       A     Yes, I had authorization.

```
                                              Page 81
 1       Q    Did you authorize other people to use stamps
 2   with your name on it?
 3       A    Yes.
 4            MR. WRUBEL:  Objection.  Form.
 5       Q    Did your employer authorize you to allow other
 6   name -- stamp your name on notes?
 7            MR. WRUBEL:  Objection.  Form.
 8       A    I don't understand the question actually.
 9       Q    The whole process of stamping the name on
10   notes, did that come from your supervisor?
11            MR. WRUBEL:  Objection.  Form.
12       A    Yes.  It was the procedures that we used, and
13   there was authorization.
14       Q    Was there any secrecy or fraud about it?
15       A    No.
16            MR. WRUBEL:  Objection.  Form.
17       Q    Was it all in the open?
18            MR. WRUBEL:  Objection.  Form.
19       A    It was all in the open.
20       Q    Your employers received communication from
21   supervisors as far as policies and procedures --
22            MR. WRUBEL:  Objection.  Form.
23       Q    -- as far as what policies and procedures to
24   follow?
25       A    Yes.
```

Page 82

1    Q    And they followed those policies and

2   procedures?

3    A    Absolutely.

4         MR. WRUBEL:  Objection.  Form.

5    Q    Is it -- the Exhibit 1 that was presented to

6   you during this deposition, is that your signature on

7   the note?

8    A    Yes, it is.

9         MR. SCHWARTZ:  You go ahead.  I'll think.

10        MR. WEISS:  Okay.

11        MR. WRUBEL:  I'm going to object to you asking

12        any questions, Mr. Weiss.  You're not a party to

13        this litigation.

14        MR. WEISS:  Okay.

15        MR. SCHWARTZ:  We can take a two-minute break.

16        I mean, we can short-circuit this, but that's no

17        problem.

18        (Break taken.)

19   BY MR. SCHWARTZ:

20    Q    Ms. Riley, when you were in Jacksonville from

21   2004 to 2006, as a matter of business practice how soon

22   would notes get endorsed after the deed of closing?

23        MR. WRUBEL:  Objection.  Form.

24    A    The notes after closing occurred were shipped

25   into our office, and we would go through the note review

Page 83

1   process, endorse them, send them to the custodian.  And

2   that would just be a matter of days.

3       Q    So the endorsement would be placed on the note

4   within days after closing as a matter of business

5   practice?

6       A    Yes.

7            MR. WRUBEL:  Objection to the form.

8            MR. SCHWARTZ:  This is what I'll show Ms. Riley

9       next (tenders document).

10           MR. WRUBEL:  I'd like a chance to review it

11      before you show her.

12           MR. SCHWARTZ:  Fine.

13           MR. WRUBEL:  Okay.

14           MR. SCHWARTZ:  Okay.  We'll call this -- what

15      are we doing, numbers or letters?  We'll call this

16      Plaintiff's Exhibit 1 to the deposition.  It says A,

17      so we'll just change it.

18           Do you want to mark it before I ask questions?

19           (Plaintiff's Exhibit 1 was marked for

20      identification.)

21   BY MR. SCHWARTZ:

22      Q    Ms. Riley, on top of what's been marked as

23   Plaintiff's Exhibit 1 on top of Page 1 it has a

24   reference to foreclosure hamlet.

25      A    Yes.

Page 84

1    Q    Have you heard of foreclosure hamlet before?

2    A    I have, yes.

3    Q    How so?

4    A    In -- on the Internet with association with my

5    name.

6    Q    Do you recognize this as a printout from that

7    website?

8    A    It appears to be, absolutely.

9    Q    If you go to Page 6 of this exhibit, the

10   comment in the middle of the page that's dated June 10th

11   of 2010, do you see that?

12   A    Yes.

13   Q    At 12:56 p.m.?

14   A    Yes.

15   Q    In the middle of that paragraph that starts

16   with, Riley is not one of the corporate executives, you

17   see that?

18   A    Yes.

19   Q    She's just a low-level secretary now being used

20   to take away homes.  I've been quietly watching her for

21   over seven months.  Then down below it says, They're

22   trying to hide her, but for how long?  She's on the run.

23   Let's run her down and run her out of breath.

24        Does this provide you with a feeling of safety

25   and security?

Page 85

1      A      Absolutely not.

2      Q      Do you feel like you're being hunted and

3  watched by someone out there?

4      A      Yes.

5      Q      When you said that you had no concerns with

6  what you said today during your deposition, did you mean

7  you had no reservations how you did your job at

8  Washington Mutual?

9              MR. WRUBEL:  Objection to the form.

10     A      I have no reservations about my job at

11 Washington Mutual and what I did, correct.

12     Q      And instead your reservation comes from people

13 like this, misconstruing what you did and putting it in

14 a threatening fashion; is that correct?

15             MR. WRUBEL:  Objection to the form.

16     A      Absolutely what's on here is -- is very

17 threatening.

18     Q      On the same chain in this exhibit, which is a

19 blog chain, on Page 2, do you see -- the first entry at

20 6:24 p.m., do you see the name of Eduardo Orozco in the

21 same chain?

22     A      Yes.

23     Q      Is that the borrower in this case?

24     A      Yes.

25     Q      In fact, is that the gentleman sitting in front

1    of you today?

2         A    Yes.

3         Q    Do you have reservations about people

4    misconstruing what you did and making it a matter of

5    public report?

6              MR. WRUBEL:  Objection to the form.

7         Q    Go ahead.

8         A    Absolutely, yes.

9         Q    Do you get unanimous calls today?

10        A    I get unanimous calls.  Yes, I do.

11        Q    When was the most recent call?

12        A    I had a call just last week.  Somebody calling

13   up asking where 7757 was located.

14        Q    What did you say?

15        A    I asked who was calling.  They would not

16   identify themselves initially.  Then they'd claim to be

17   60 Minutes and -- and that they were looking to find the

18   location.  And I -- I did not help them with that, and

19   the call was ended.

20        Q    Have you had people calling you and telling you

21   that your career's going to go down the toilet?

22             MR. WRUBEL:  Objection to form.

23        A    I've had a number of calls, and that was one of

24   them where it was -- he kept calling back, and he called

25   back several times.  Finally he left a message that

Page 87

1   said, This is what's going to happen with your career,

2   and it's going down the toilet, yes.  That's happened as

3   well.

4        Q    Does this seem -- these calls, these

5   threatening, unanimous call, is there any end in

6   sight --

7             MR. WRUBEL:  Objection to the form.

8        Q    -- as far as you know?

9        A    It doesn't seem like it, no

10       Q    Have they decreased over time in frequency?

11            MR. WRUBEL:  Objection to the form.

12       A    No.  They've -- actually I've been getting more

13   recently.

14       Q    Are they pleasant?

15       A    No.  I generally screen the calls now.

16            MR. WRUBEL:  Form.

17       A    If I don't recognize the area code on the phone

18   or the phone number, I let it go to message.

19       Q    Do you want them to stop?

20       A    Of course I do.

21            MR. WRUBEL:  Form.

22       Q    Would you wish what's in Exhibit -- in

23   Plaintiff's Exhibit 1 upon somebody?

24       A    Absolutely not.

25       Q    Did you do anything wrong?

Page 88

1           MR. WRUBEL:  Objection to form.

2      A    I did not do anything wrong.

3      Q    Do you know if someone used your stamp without

4  authority?

5           MR. WRUBEL:  Objection to the form.

6      Q    Go ahead.

7      A    I don't believe anybody used my stamp without

8  authority.

9      Q    And if you knew about it, you would have not

10  authorized it; right?

11          MR. WRUBEL:  Objection.

12     A    It would not be authorized in any manner.

13     Q    All you did was follow the process, didn't you?

14          MR. WRUBEL:  Same.  Form.

15     A    I followed the procedures in the department.

16          MR. SCHWARTZ:  By the way, not that we're

17     stipulating to your objection.  Jonathan couldn't

18     testify.  But I would like to know what that

19     objection is for the record so that we can preserve

20     it for the Judge, if necessary.

21          MR. WRUBEL:  He's not a party to the

22     litigation.  There's no reason for him to be, you

23     know, asking questions.  If he wants to protect her

24     with regards to the questions that I ask, that's

25     fine.  But as far as him being involved in this

Page 89

1     litigation, I see no reason for it.

2          MR. SCHWARTZ:  Thanks for stating that on the

3     record.

4  BY MR. SCHWARTZ:

5     Q    Do you -- do -- these Internet postings and

6  phone calls, does that affect your personal life in any

7  way once you go home?

8          MR. WRUBEL:  Objection to the form.

9     A    Well, it does in that I've had a server come to

10 the door.  I walk out the building looking around to see

11 if somebody is lurking in the parking lot.  I'm

12 screening my phone calls.  It's upsetting that my name

13 is on the Internet like this.  Having -- I did my job.

14 I followed the procedures.  And this kind of stuff on

15 the Internet is very disturbing.

16    Q    Do you sometimes take it out on your husband?

17         MR. WRUBEL:  Objection to the form.

18    Q    Go ahead.  Go ahead.

19    A    My husband -- I certainly have said things

20 like, Can you believe this?  And so I have had

21 discussions with him about -- I called him the other day

22 and said, Somebody called and asked for my address.

23    Q    So you share your angst with him?

24    A    I do, absolutely.

25    Q    Oh, have you had borrowers' lawyers call you at

Page 90

1    work?

2           MR. WRUBEL:  Objection to the form.

3       A    I had a law office -- I had a phone call.

4    They -- the number popped up.  They hung up.  I said,

5    What is this about?  I called them back, and it turned

6    out to be a law office.

7       Q    Did they tell you what the call was about?

8       A    They called a second time --

9           MR. WRUBEL:  Wait a minute.  Let her finish.

10      A    They called a second time on a number that

11   wasn't recognized then, and I called them back.  And I

12   said, Did you just call me?  And it was in fact a law

13   office, yes.

14      Q    And you recognized that as being one of the

15   borrower's counsel?  Not in this case but --

16      A    Not in this.  Yeah, I -- I don't remember now

17   whose counsel it was, but it was a law office related

18   to --

19      Q    Did they give you a reason as to why they

20   called --

21          MR. WRUBEL:  Objection to form.

22      Q    -- when you called them back?

23      A    No.  They wouldn't talk to me.

24          MR. SCHWARTZ:  No more questions.

25          (Break taken.)

Page 91

1        MR. WRUBEL:  We've got no questions.

2        Ms. Riley, you're allowed to read this

3    deposition.

4        MR. SCHWARTZ:  We'll read.

5        MR. WRUBEL:  Pardon me?

6        MR. SCHWARTZ:  We'll read it.

7        MR. WRUBEL:  Okay.  We're done.

8        (Witness excused.)

9        (Deposition concluded at 12:23 p.m.)

10                       - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 92

1                    CERTIFICATE OF OATH

2

3    STATE OF FLORIDA)

4    COUNTY OF DUVAL )

5

6                                            I,

7    Samantha Cordova, FPR, and a Notary Public, State of

8    Florida, certify that CYNTHIA RILEY personally appeared

9    before me on January 15, 2013, and was duly sworn.

10                                          WITNESS

11   my hand and official seal on this 18th of January 2013.

12

13

14

15

     Samantha Cordova, FPR

16

17

18

19

20

21

22

23

24

25

Page 93

REPORTER'S CERTIFICATE

1

2

STATE OF FLORIDA)

3

COUNTY OF DUVAL )

4

5

                                        I,

6

Samantha Cordova, FPR, certify that I was authorized to

7

and did stenographically report the deposition of

8

CYNTHIA RILEY; that a review of the transcript was

9

requested; and that the foregoing transcript, pages 1

10

through 92, is a true record of my stenographic notes.

11

                                    I further

12

certify that I am not a relative, employee, attorney, or

13

counsel of any of the parties, nor am I a relative or

14

employee of any of the parties' attorney or counsel

15

connected with the action, nor am I financially

16

interested in the action.

17

18

                                    DATED on

19

this 18th of January, 2013, Jacksonville, Duval County,

20

Florida.

21

22

23

24

                                        Samantha

25

Cordova, FPR

Page 94

1    In re:  JP MORGAN CHASE BANK, N.A. vs. EDUARDO OROZCO,
     et al, 09-29997 CA (11)

2

     DEPOSITION OF CYNTHIA RILEY

3

     TAKEN - 01/15/2013

4

     DATE SENT TO WITNESS:  January 18, 2013

5

6    TO:  CYNTHIA RILEY
          c/o Mr. Jonathan Weiss
7           Simpson, Thacher & Bartlett, LLP
          1999 Avenue of the Stars
8         29th Floor
          Los Angeles, California  900067

9

     Dear Mr. Weiss:

10

          The referenced transcript has been completed and
11   awaits reading and signing.
12        Please arrange to have Ms. Riley read and sign the
     transcript.  The transcript is 92 pages long, and you
13   should allow her sufficient time.
14        Please complete by February 18, 2013.
15        The original of this deposition has been forwarded
     to the ordering party, and your Errata Sheet, once
16   received, will be forwarded to all ordering parties as
     listed below.

17

          Thank you.

18

19

20

21
22                                            Samantha

     Cordova, FPR

23

24

25   cc:  ROLAND E. SCHWARTZ, Esquire
          MICHAEL J. WRUBEL, Esquire

Page 95

1

2

E R R A T A   S H E E T

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES

3

4   In Re:  JP MORGAN CHASE BANK, N.A. vs. EDUARDO OROZCO, et al, 09-29997 CA (11)

5

DEPOSITION OF CYNTHIA RILEY

6

TAKEN - 01/15/2013

7

PAGE NUMBER                                      LINE

8   NUMBER

CHANGE/REASON

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it

24   are true.

25

_____

Page 96

1  Date

   CYNTHIA RILEY

2

   cc: SAMANTHA CORDOVA

3       ROLAND E. SCHWARTZ, Esquire

        MICHAEL J. WRUBEL, Esquire

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| & |
| --- |
| **&**   1:21,25 2:17 8:8 |
| 10:24 94:7 |

| 0 |
| --- |
| **01/15/2013**   94:3 |
| 95:6 |
| **09-29997**   1:3 94:1 |
| 95:4 |

| 1 |
| --- |
| **1**   3:9,10 69:19,20,24 |
| 82:5 83:16,19,23,23 |
| 87:23 93:10 |
| **10**   31:22,24 48:24 |
| 49:2 58:8 |
| **10:00**   1:14 |
| **10th**   84:10 |
| **11**   1:3 38:16 65:9 |
| 94:1 95:4 |
| **11th**   1:1 |
| **12**   31:22,24 48:24 |
| 49:2 58:8 61:20 |
| 62:20 68:6,20,22 |
| **12:23**   1:14 91:9 |
| **12:56**   84:13 |
| **15**   1:13 92:9 |
| **18**   94:4,14 |
| **1850**   2:5 |
| **18th**   92:11 93:20 |
| **1987**   15:16 |
| **1988**   15:17 |
| **1990s**   54:4,8,9 |
| **1999**   2:18 94:7 |

| 2 |
| --- |
| **2**   58:7,18 85:19 |
| **20**   21:16 22:2 |
| **200**   58:10 |
| **2000**   54:5 61:17 |
| **2002**   29:17,22 30:2 |
| 30:4 32:2,6 |
| **2004**   29:1,2 32:6 |
| 33:7,10,19,23 35:6 |
| 35:9 36:17,18,19 |
| 38:18 39:17 42:19 |

46:10 49:20,22 52:5
62:1,12 64:7,8
70:20 78:19 79:24
80:2 82:21
**2005**   54:5
**2006**   22:22,25 38:16
38:19 39:17 42:19
46:10 52:5 57:16
61:1,15,18 62:13,18
63:9,17,17,25 64:4
64:6,16,23 68:7
70:20 78:19 79:24
82:21
**2008**   37:2,6 54:6,6,7
**2009**   65:7,10 67:23
**2010**   84:11
**2013**   1:13 92:9,11
93:20 94:4,14
**25**   4:22 9:5 11:24
15:16 21:17
**251**   2:12
**29th**   2:18 94:8

| 3 |
| --- |
| **3,000**   58:7 |
| **30**   31:17 38:22 40:8 |
| 40:10 |
| **300**   58:11,18 |
| **32202**   1:16,22 |
| **33301**   2:5 |
| **33328**   2:12 |
| **345**   1:15,21 |

| 4 |
| --- |
| **4**   3:3,4 |
| **40**   38:22 40:1,8,10 |
| **401**   2:4 |
| **4801**   2:11 |

| 5 |
| --- |
| **50**   43:13,13 |

| 6 |
| --- |
| **6**   84:9 |
| **60**   86:17 |
| **69**   3:9 |

| 6:24   85:20 |
| --- |

| 7 |
| --- |
| **77**   3:5 |
| **7757**   76:11,12 86:13 |

| 8 |
| --- |
| **83**   3:10 |
| **89**   27:12 |

| 9 |
| --- |
| **900067**   2:19 94:8 |
| **92**   93:11 94:12 |

| a |
| --- |
| **a.m.**   1:14 |
| **ability**   5:18 |
| **able**   39:21 74:5 |
| **absolutely**   40:13 |
| 45:21 46:5 82:3 |
| 84:8 85:1,16 86:8 |
| 87:24 89:24 |
| **absorbed**   22:16 |
| **accept**   74:10 75:16 |
| **access**   50:10,21 |
| 51:19 |
| **account**   10:13,17 |
| 17:13 |
| **accounting**   7:20 8:1 |
| **accuracy**   46:16 |
| 47:17 48:2 |
| **accurate**   13:17 |
| 79:14 |
| **acknowledged**   4:9 |
| **acquire**   48:21 |
| **acquired**   4:24 5:2 |
| 17:5 26:17 27:5 |
| **action**   93:16,17 |
| **activities**   63:2 |
| **activity**   18:24 |
| **actual**   41:19 |
| **address**   28:13 74:25 |
| 74:25 75:9 76:9 |
| 89:22 |
| **addressed**   76:5 |
| **administration**   7:7 |
| 7:9 |

**advise**   23:18
**affect**   89:6
**affiliates**   4:21,23
**agencies**   65:22
**agency**   34:23
**ago**   5:21 9:3 21:17
76:20
**ahead**   13:8,9 20:4
22:3 24:18 27:9
30:21 33:23 36:7
41:8 43:16,22 45:9
46:7 47:24 57:5
58:12 62:15 70:14
78:5 82:9 86:7 88:6
89:18,18
**al**   1:7 94:1 95:4
**alamanza**   30:14
31:2 32:9 33:2,11
33:14
**allow**   81:5 94:13
**allowed**   91:2
**ambiguous**   23:14
27:19 33:21 37:11
38:6 41:17 43:22
45:18 49:5 61:3
67:4
**american**   12:1 15:8
15:12 16:4 17:2,5,9
18:2,11,13,14,15
20:12,19 21:23
24:21,23 26:1,6,13
26:16,17,22 27:5,23
28:4,5,9 39:9 40:18
**angeles**   2:19 94:8
**angst**   89:23
**answer**   20:10 21:25
26:12 31:20 32:25
37:14 39:11,22,23
39:24 47:16 55:1
56:14 57:11 64:19
64:21
**answered**   27:9
43:16 45:1 47:22
57:4

**answers** 79:2
**anybody** 11:7,10
   17:6 28:5 32:8 88:7
**anymore** 9:9
**apologies** 6:22
**apologize** 15:2
**appear** 70:5,8,18
**appearances** 2:1,8
   2:14
**appeared** 92:8
**appears** 70:18 84:8
**applicable** 74:12
**application** 14:20
**applied** 69:2
**appropriate** 74:12
**approximately** 9:4
   9:20 11:15 15:16
   16:25 28:24,25
   31:12 38:3,18,22
   43:9 54:1,15 58:6
   58:10,18 64:5,6
**area** 8:2 12:6 13:3
   15:3,17 17:25 33:11
   33:17 41:6 51:17,17
   58:6 61:14,14 87:17
**arrange** 94:12
**arranged** 19:3
**ascertain** 29:8
**asked** 27:9 43:3,15
   44:16 45:6,15,18
   47:22 57:4 72:18
   73:22,22 86:15
   89:22
**asking** 21:4 29:4,6
   29:12 39:19 42:17
   73:6,8,10,19,20
   82:11 86:13 88:23
**assigned** 79:20
**assist** 8:19
**assistance** 67:12
**associates** 1:21,25
   8:8 10:24
**association** 84:4
**assuming** 58:8

**assure** 72:12
**assuring** 73:18
**attorney** 93:13,15
**attorneys** 71:14
   74:9
**audio** 4:5
**auditing** 65:22,23
   65:23 66:9,16 67:2
**authority** 37:8
   48:25 69:6 88:4,8
**authorization** 80:25
   81:13
**authorize** 81:1,5
**authorized** 75:16
   80:22 88:10,12 93:7
**avenue** 2:18 94:7
**awaits** 94:11
**aware** 71:13 72:10
   72:24

**b**

**b** 3:7
**back** 9:5 11:23,24
   15:15 25:25 28:25
   29:22 36:17 44:17
   44:25 45:14 50:19
   50:19 53:8 54:10,17
   61:13 62:10 65:4,10
   67:14,23 80:2 86:24
   86:25 90:5,11,22
**background** 40:14
   40:15,15,16,22
**bank** 1:4 4:4 12:1
   13:19 16:4 18:24
   21:24 34:23 36:21
   36:23 37:1 42:6,7
   94:1 95:4
**banking** 9:5,12,24
   10:8,10
**banks** 4:24
**bartlett** 2:17 94:7
**basement** 20:16
**basically** 59:18
**bayberry** 76:11,13

**bayview** 42:5
**began** 29:8
**beginning** 45:2,3
**believe** 70:3 88:7
   89:20
**best** 5:18 54:14
**beyond** 40:22 72:3
**bigger** 27:1
**bit** 54:11 61:25
**blank** 30:17,22
   51:20,22
**blog** 85:19
**board** 18:8,17,20
   19:8,20,23 20:6
   67:14
**borrower** 4:4,6
   13:24 14:22 28:13
   47:6 85:23
**borrower's** 90:15
**borrowers** 16:20
   67:8,10 89:25
**boss** 31:3
**bought** 18:13
**boulevard** 2:4
**box** 13:11
**boxed** 14:3
**boxes** 12:21
**break** 57:17,20,22
   71:9,11 82:15,18
   90:25
**breath** 72:5 84:23
**brenda** 34:7,9
**brendle** 34:7,9,25
   35:11
**brief** 6:16
**briefly** 37:17
**bringing** 18:7
**broad** 38:7
**brought** 19:8,20,22
   20:6 27:17
**building** 28:22 63:3
   89:10
**built** 53:23,24 57:10
   63:3

**bulk** 41:19,22 42:12
   42:20 43:5,8,12
**bus** 10:3
**business** 7:7,8 82:21
   83:4
**buying** 41:24

**c**

**c** 94:6
**ca** 1:3 94:1 95:4
**cabinet** 50:14,20
**cabinets** 50:15
**california** 2:19 11:3
   12:3 15:11 26:2,7
   26:17,23 27:1,23
   28:2 36:15 94:8
**call** 16:20 67:12
   68:11 83:14,15
   86:11,12,19 87:5
   89:25 90:3,7,12
**called** 8:10 86:24
   89:21,22 90:5,8,10
   90:11,20,22
**calling** 86:12,15,20
   86:24
**calls** 6:25 16:20
   24:17 70:12,24 86:9
   86:10,23 87:4,15
   89:6,12
**capacities** 16:2
**capacity** 7:15 8:9
   9:18 12:4
**captured** 55:7
**card** 50:10 51:19
**care** 6:20 13:5 19:16
   40:3,8 74:14 75:2
**career** 87:1
**career's** 86:21
**carolina** 53:23 57:9
   61:5,9,24 62:22,25
   63:12,16 64:3,12
   68:4 69:4,11 77:6,9
   77:22 78:1,8,13,16
**case** 1:3 6:3,10
   21:24 40:19 60:14

80:15,16 85:23
90:15
**cases** 80:17
**cc** 94:25 96:2
**cease** 36:25
**center** 16:20 17:10
**centers** 25:24
**central** 20:7
**certain** 30:4 53:20
58:19
**certainly** 49:6 71:5
89:19
**certificate** 92:1 93:1
**certify** 92:8 93:7,13
**chain** 85:18,19,21
**chance** 83:10
**change** 22:14 83:17
95:8
**changed** 22:16 61:1
67:21
**changes** 68:18 71:6
95:3
**chase** 1:4 4:3,18,21
4:21,23 94:1 95:4
**check** 13:16 60:4,5
**checked** 12:16 48:2
50:16,19
**checking** 15:21
58:14,17
**checks** 59:22,23
**chronological** 23:19
**chronologically**
23:18
**cindy** 1:11 2:14
80:15
**circuit** 1:1,1 82:16
**city** 10:22
**claim** 86:16
**clarify** 55:15,16
73:6 74:24
**clarity** 11:5
**clear** 14:4 19:13
21:9 42:23 46:2
54:7 64:14 72:21
73:11

**close** 35:5 62:5
**closed** 35:4 61:4
62:1 64:16
**closing** 35:3 82:22
82:24 83:4
**coach** 55:9
**coaching** 55:11,13
55:19
**code** 87:17
**collateral** 20:1,2
24:11 50:10
**collected** 24:10,11
**collections** 19:10
**college** 6:15,15 7:2
7:11 10:7,14
**colorado** 7:5,14
10:20,21,23 11:1
**combination** 24:22
**come** 19:6 28:2 57:8
59:8 61:13 62:18
74:5 81:10 89:9
**comes** 42:4,4 46:15
85:12
**coming** 20:23 43:21
47:12 58:5
**comment** 84:10
**communication**
81:20
**companies** 21:7
**company** 10:13
34:24
**compared** 58:19
**comparing** 58:21
**complete** 94:14
**completed** 94:10
**compound** 62:14
**computer** 44:2
**concerned** 71:16
73:16
**concerns** 71:18,21
72:1,6,8,14,25 73:3
73:8,9,12,20 85:5
**concluded** 91:9
**conclusion** 24:18

**confidential** 35:16
36:7 71:17
**confused** 21:8 44:13
44:19,21 61:25
**connected** 93:16
**connection** 45:16
**consider** 22:3
**contemporaneously**
44:11 45:22
**context** 45:25
**continue** 22:1 53:4
**continued** 52:24
62:3,9 63:14 65:1
**contractor** 8:17
**control** 60:9
**coordinated** 18:7
63:1
**coordination** 19:4
**copies** 12:22,23
**copy** 60:7 69:25
**cordova** 1:20 92:7
92:15 93:7,25 94:22
96:2
**corporate** 84:16
**correct** 5:3 6:12
14:24 19:17 23:1
28:13 30:7,9 32:13
32:16 36:22 38:20
42:13 44:5 48:6
51:13 54:12,13,24
56:4 58:9 59:6
60:10 63:18 64:24
65:2,16,17 75:18,23
77:23 79:15 85:11
85:14
**corrected** 47:8
**correction** 60:6
**correctly** 18:23
**correspondence**
17:15
**counsel** 90:15,17
93:14,15
**counterparts** 78:2
**county** 1:1 76:17
92:4 93:4,20

**couple** 7:12,13 17:1
18:1 36:19 71:10
**course** 87:20
**courses** 7:24,25 8:2
**court** 1:1 75:5
**creator** 50:4
**credit** 13:10 14:2,12
14:12,16 15:1,20,21
19:24 34:23
**cross** 3:5 77:2
**cure** 47:3,4
**cured** 46:25 47:1
**curious** 59:4,11
**custodial** 52:21
61:23 62:7,17
**custodian** 28:20,21
32:12,14,17 46:16
46:17 47:18 48:3
52:14,15 56:23,25
83:1
**custodians** 57:2
**customer** 16:18 17:9
19:11
**customers** 16:22
67:12
**cut** 12:19 13:24
**cynthia** 3:3 4:8,16
80:16 92:8 93:9
94:2,6 95:5 96:1

**d**

**d** 3:1 60:20,20
**dade** 1:1
**data** 19:18 25:10,12
25:13,18,19,23
28:12 29:23 30:5
58:15,17,19,21
58:22,24 60:5 66:15
**date** 1:13 28:12
36:13 94:4 96:1
**dated** 84:10 93:19
**dates** 72:17
**davie** 2:12
**day** 21:20 40:10,11
50:18 58:5,11,18

89:21
**days** 83:2,4
**deal** 19:3 20:1
**dealing** 17:14
**deals** 39:4,7
**dealt** 14:12
**dear** 94:9
**december** 63:17
**declare** 95:23
**decreased** 87:10
**deed** 82:22
**deeds** 20:5
**default** 65:13 67:15
   67:15,17
**defaults** 65:18 67:14
**defendant** 2:22
**defendants** 1:8 2:8
   3:9 69:20
**defense** 69:19,24
**degree** 7:8,22
**delivered** 39:4,6
**delivery** 23:22 31:5
   35:25 36:9 38:12,15
   38:18,24,25 42:12
   42:18 46:18 61:8
   63:7,8,10,13,16
   64:15,22 70:10
**denver** 11:1,1
**department** 19:9,11
   22:21 23:5,21,24
   36:9 37:15,20,22,23
   38:3 39:1,4 42:18
   42:21 47:20 48:5
   57:14,15 61:4,6,7
   65:1 88:15
**departments** 19:5,7
   22:16,17 38:11
   66:25 67:24 68:17
**deposition** 1:10 4:5
   4:7 5:5,7,11 6:7,11
   11:7,13,14 40:5,7
   43:21 44:5,14,24
   45:11,19,25 71:15
   73:9 82:6 83:16
   85:6 91:3,9 93:8

94:2,15 95:5
**deutsche** 42:6,7
**developed** 77:18
**developing** 77:15,20
**difference** 37:18
**differences** 56:10
**different** 37:16 47:7
   52:21 54:23 56:3
   80:14
**diligence** 19:4
**direct** 3:4 4:12
**direction** 69:11
**directly** 77:5
**discussions** 89:21
**disseminated** 73:21
**disturbing** 89:15
**division** 65:13
**document** 69:25
   83:9 95:23
**documents** 11:18
   14:10,19,25
**doing** 15:8 17:18
   18:15 31:24 49:6
   60:12 62:19 67:8
   83:15
**door** 46:15 89:10
**doors** 51:18
**drive** 2:11
**dual** 78:7,16
**due** 19:4
**duly** 4:9 92:9
**duties** 10:18 35:20
**duval** 92:4 93:4,20

**e**

**e** 2:3 3:1,2,7 10:15
   51:4,4 94:25 95:2,2
   95:2 96:3
**earlier** 56:1
**east** 1:15,21 2:4
**eduardo** 1:7 2:22
   85:20 94:1 95:4
**education** 6:14
**effect** 78:17

effective 36:12,13
effectively 19:16
   29:15
**efficiently** 59:19
**either** 5:8 33:3
**elaborate** 47:4
   50:13 51:15 71:25
**electronic** 25:19,22
**electronically** 25:17
**element** 60:5
**employed** 4:17,19
**employee** 4:3 16:4
   93:13,15
**employees** 16:8 38:4
   38:22 69:4,10 77:5
**employer** 80:22
   81:5
**employers** 81:20
**encompassed** 37:23
**ended** 62:12 86:19
**endorse** 33:3 58:1
   79:25 80:3 83:1
**endorsed** 28:19,24
   29:5 30:2,6,10,11
   32:12 46:17 48:3,4
   48:7 52:13 82:22
**endorsement** 30:11
   30:13,22 31:16,23
   33:10 51:21,22 58:4
   70:4 77:16,20 78:10
   83:3
**endorsements** 30:17
   30:18 31:25 41:5
   48:9 54:10 57:25
   80:8
**endorsing** 29:8,14
   29:21,23 32:22 33:1
   48:14,18 77:25
   79:13
**ends** 71:22 72:7
**ensure** 25:10 56:15
**ensured** 47:17
**entail** 16:19 17:12
   68:15

**enter** 95:3
**entered** 9:11
**entities** 18:22 20:19
   21:3,10 28:1 39:9
   42:2,2 65:23
**entry** 85:19
**errata** 94:15
**escrow** 17:13
**esquire** 2:3,10,16
   94:25,25 96:3,3
**et** 1:7 94:1 95:4
**evolve** 22:9
**evolved** 22:13 23:19
**exactly** 35:18 49:18
   53:25 55:3 56:5,16
   62:11,19
**examination** 1:19
   3:4,5 4:12 77:2
**example** 47:1,10
**examples** 47:11
**excuse** 10:12 52:11
**excused** 91:8
**executive** 10:13,17
**executives** 84:16
**exhibit** 3:9,10 69:19
   69:20,24 82:5 83:16
   83:19,23 84:9 85:18
   87:22,23
**existence** 64:4,7
**expert** 15:2
**explore** 41:6
**extent** 74:19 75:9
**eyles** 51:2 59:6
   60:15

**f**

**facility** 29:9
**facsimile** 48:8,11
   49:3 51:25 52:7,9
   70:9,18
**fact** 39:8 77:5 78:9
   85:25 90:12
**facts** 73:15 95:23
**fair** 78:21

[fannie - help]                                                                            Page 101

**fannie**  39:14,16,20
  41:14,18,20,23,24
  42:12,21 43:6
**far**  5:12 6:14 9:6
  13:5 34:1 41:22
  51:25 56:9 64:15
  81:21,23 87:8 88:25
**fashion**  85:14
**february**  94:14
**fed**  25:14,17
**feel**  85:2
**feeling**  84:24
**female**  51:5,6
**file**  14:3,12,13,16
  15:1 19:24 24:9
**files**  12:6,11,16,21
  12:22 13:5,10,14,22
  15:21,21 19:18,19
  19:22 20:1,2 24:10
**filled**  14:22
**film**  13:23
**filmed**  14:11
**films**  13:23 14:5
**finally**  86:25
**financially**  93:16
**find**  47:3 59:24
  86:17
**fine**  13:21 31:18
  79:2 83:12 88:25
**finish**  90:9
**firm**  4:2
**first**  11:11,14,24
  25:25 34:11 36:20
  53:7 70:2 85:19
**fitch**  65:25 66:2
**five**  76:25
**floor**  2:18 94:8
**florence**  53:23 57:9
  61:5,9,24 62:22,25
  63:11,16 64:2,11
  68:3 69:4,10 77:12
**florida**  1:1,16,22 2:5
  2:12 33:24 36:10
  52:21 74:12 92:3,8
  93:3,21

**follow**  45:18 81:24
  88:13
**followed**  77:18 82:1
  88:15 89:14
**following**  59:21
**follows**  4:10
**forced**  17:14,15
**foreclosure**  83:24
  84:1
**foreclosures**  19:10
**foregoing**  93:10
  95:23
**form**  20:8 23:13
  27:18 28:7 29:4
  30:19 32:24 33:13
  33:20 35:14 36:4
  37:10 38:5 39:10,18
  41:16 42:15,16
  43:15,20 45:17
  46:13 47:22 49:4
  52:1 54:25 55:9,22
  56:12 57:4 58:12
  59:20 61:2 62:14
  64:10,17 65:3 66:20
  66:21 67:3 69:7
  70:11 71:1,4 73:2,5
  74:19 77:24 78:4,14
  78:24 79:6,11,21
  80:24 81:4,7,11,16
  81:18,22 82:4,23
  83:7 85:9,15 86:6
  86:22 87:7,11,16,21
  88:1,5,14 89:8,17
  90:2,21
**formality**  75:7
**forms**  14:20,22
**forsyth**  1:15,21
**fort**  2:5
**forth**  36:18
**forty**  38:9
**forwarded**  94:15,16
**foundation**  70:13
  71:3
**fpr**  1:20 92:7,15
  93:7,25 94:22

**frame**  44:15
**frames**  56:25 57:6
**frankly**  72:3
**fraud**  81:14
**freddie**  39:14,16,21
  41:14,18,20,22,24
  42:13,21 43:5
**frequency**  87:10
**freshly**  21:11
**front**  85:25
**full**  50:8,12
**function**  22:21 53:4
  66:2
**functions**  23:25 24:3
  26:10 66:24 78:6
**further**  55:10 93:12

**g**

**gas**  8:11,16,18
**generally**  15:1 19:12
  43:1 63:2 87:15
**gentleman**  85:25
**getting**  11:5 14:23
  21:1,7,9 40:14 55:4
  87:12
**girl**  10:3
**give**  90:19
**given**  5:5,7,11
**glad**  70:17
**gmc**  42:7
**go**  6:14 7:4 9:5 10:4
  11:24 13:8,9 15:5
  15:15 18:21 20:4,11
  20:13 22:3 24:18
  27:9 30:20 33:23
  36:7 41:8 43:16,22
  45:9 46:7 47:24
  52:13,24 54:10 57:4
  58:12,22 61:13,14
  62:14 70:14 72:23
  75:14 78:5 80:2
  82:9,25 84:9 86:7
  86:21 87:18 88:6
  89:7,18,18

**goes**  41:21 74:4
**going**  10:4 15:5
  18:14 21:15,19
  28:24,25 35:7 39:21
  40:5,11 41:22 61:13
  64:22 71:22 72:4
  73:17 82:11 86:21
  87:1,2
**goldman**  42:6
**good**  16:13
**graduate**  7:15
**grayrobinson**  2:4
  4:2 74:10
**greater**  37:7
**grew**  22:16 23:7
**grounds**  35:17 36:5
**group**  15:22
**groups**  67:9,11
**growing**  9:25
**guess**  9:8 27:7,13
  32:19 37:4,5 54:3
  66:5
**guessing**  6:8 30:3
**guys**  40:9 44:23
  45:8

**h**

**h**  3:7 95:2
**half**  15:9,20 16:15
**hamlet**  83:24 84:1
**hand**  8:8 10:24
  79:25 80:8,19,21,23
  92:11
**happen**  6:23 19:6
  87:1
**happened**  33:19,22
  61:1 87:2
**harassed**  74:6
**head**  6:2 16:9
**headquarters**  15:12
**health**  10:13,14
**heard**  84:1
**hedquist**  1:21,25
**help**  62:24 86:18

[helped - knowledge]                                                    Page 102

helped  63:4 68:16
  78:15
helping  61:23 68:3
hi  4:1
hide  84:22
hills  53:12,13,16,19
  53:22 56:19 57:1,3
  62:10
history  5:5 10:11
  11:23 23:4,10
home  24:5 89:7
homes  84:20
hours  11:17
house  75:15
huh  10:16 19:18
  33:15
hung  90:4
hunted  85:2
husband  89:16,19

              i

idea  27:8
identification  3:8
  69:21 83:20
identify  86:16
illinois  53:14,16
imaged  13:22 14:13
images  12:15 13:12
  13:13,15
immediately  61:16
implement  68:16
implementing  77:16
implying  66:17
improper  74:20
improprieties  74:16
  74:18
impropriety  75:10
improvement  68:12
  68:14
improvements
  68:17,19
included  41:14
indicate  74:9
indicated  25:2 27:4
  30:24 32:11 34:25

41:14 44:4 51:11
  54:11,22 56:1,17
  57:24 59:5 63:6
individual  58:16
  59:16 60:11
individuals  15:25
  18:6 60:12
industries  8:18
industry  8:11,16 9:5
  9:12,24 10:8
information  19:5
  28:16 35:13 36:7
  45:24 46:1 58:25
  59:2 65:12,19,21,22
  66:1,4,8,18 67:1
  72:7
initially  28:6 53:8
  56:18 86:16
input  25:12
inputted  25:13,22
inspected  56:15
institutions  5:2
instruct  21:25
instructing  55:12
insurance  10:12,13
  17:11,14,15,25
intend  41:5
interested  10:1
  93:17
internet  72:2,9,11
  72:23 73:18 84:4
  89:5,13,15
interrupt  13:20
interrupting  40:9
  44:23 45:9,13
interruption  6:16
investors  41:23
involved  13:3 22:22
  24:2 25:2 61:23
  62:18 67:14 77:15
  77:19 79:6 88:25
irrelevant  22:2
  30:20
issue  40:1 74:2
  75:12

issued  21:11

              j

j  2:10 94:25 96:3
jacketed  12:17
  13:12,24
jackets  12:19
jacksonville  1:16,22
  33:24 34:18 35:25
  36:10,15 46:10 51:9
  52:20 53:7 57:25
  58:6 60:23 61:12
  62:8 63:10,11,14,19
  64:22 76:14,17
  77:11,13 78:7,19
  79:24 82:20 93:20
jacksonville's  64:14
january  1:13 35:6
  36:16 37:4,6 65:5,6
  65:10 92:9,11 93:20
  94:4
jay  2:11
jc  9:13
jcpenny  9:21 11:2
jcpenny's  9:14,17
jess  30:14 31:2 32:9
  33:2,11,14
job  7:17 8:5,7,22
  11:25 13:11 16:19
  18:19 19:4 21:16,17
  22:9,13 26:9 36:17
  49:6 59:17 65:4
  68:24 69:2 85:7,10
  89:13
jobs  9:11,23
join  21:21 30:20
  33:22 35:18 37:12
  52:2 69:8 70:12
jonathan  2:16 11:8
  88:17 94:6
jp  1:4 4:18 5:8 9:13
  11:2 34:15 51:7
  60:21 65:2,5 94:1
  95:4

judge  88:20
judicial  1:1
june  33:9,10,19
  36:17,18,19 38:18
  39:17 42:18 46:10
  49:20,22 52:5,5
  61:15,17 62:12
  70:19 84:10

              k

k  10:15
karen  16:12 60:18
keep  40:9,23 44:23
  45:8
kept  86:24
kind  59:11 72:6
  89:14
knew  42:19 88:9
know  6:3,8 9:4,8,9
  9:20,25 10:5 14:9
  14:18 20:21,23,25
  20:25 21:4,5,5 22:1
  23:10 25:12,22 26:4
  26:5,12,20,22,25
  27:4,12 28:8,25
  29:2 30:1 31:9
  32:20 33:8 34:10,14
  34:17,19 36:13,14
  37:3 39:15,23,25
  41:19 42:8,10 43:10
  43:12,17 49:17,21
  50:4,6 52:6,15
  53:16,17,24 54:6,7
  54:20 55:3,6 56:5,8
  56:9 57:6,10,12,13
  58:6 59:11 63:1
  64:5 66:7 67:19
  69:16 71:13 72:20
  75:4 76:20 77:8
  78:9 79:9,16,18,22
  87:8 88:3,18,23
knowing  9:10
knowledge  31:22
  32:18 51:24 54:14
  54:18 60:21 62:9

**known**  21:6

**l**

**l**  30:16 51:4
**lack**  71:2,2
**lacks**  70:13,13
**laid**  64:18,25 65:1,4
 65:8 68:23,24
**laman**  8:12
**landman**  8:10,13,14
**language**  7:21
**las**  2:4
**lauderdale**  2:5
**law**  4:2 74:12 90:3,6
 90:12,17
**lawyer**  73:12
**lawyers**  89:25
**lead**  50:15,22,25
 60:13,16,17
**leader**  38:1 59:6
**leading**  33:13 37:16
 37:18,20
**learn**  40:21
**leave**  57:15
**left**  7:16 8:4 52:13
 53:5 57:14 86:25
**legal**  8:20,25 24:17
 73:12 75:12
**lehman**  42:4
**letter**  14:17
**letters**  83:15
**level**  84:19
**life**  89:6
**line**  95:7
**list**  11:4
**listed**  94:16
**litigation**  69:18
 82:13 88:22 89:1
**little**  9:17 54:11
 61:25
**live**  60:6
**llp**  2:17 94:7
**loan**  12:24 13:14
 14:10,19,23 19:11
 23:23 24:5,6,7,7,9

42:24 43:19 44:11
 45:23 47:14
**loans**  18:10,12,20,22
 18:25 20:24 21:1,4
 21:6,11 24:13,14,20
 28:11 39:14,16,20
 41:13,17,18,24
 42:11,20 43:5,8
 46:12,23,25 58:15
 58:18
**located**  10:25 12:2
 20:15 26:1 28:21
 86:13
**location**  20:7 50:9
 53:12 63:14 86:18
**locations**  53:10 57:3
 62:17 63:13
**locked**  50:14
**log**  50:16
**logged**  50:19
**long**  4:19 8:22 9:3
 9:20 15:7 16:14,24
 17:24 21:13 22:6
 29:2 33:6 38:14
 45:12 64:5 67:1
 84:22 94:12
**longer**  65:14
**looked**  12:15 68:16
**looking**  67:12 86:17
 89:10
**los**  2:19 94:8
**lot**  89:11
**low**  84:19
**lurking**  89:11

**m**

**m**  3:2 30:16
**major**  7:6
**making**  17:13,13
 28:16 36:16 86:4
**male**  51:5
**manage**  38:11,14
 47:15
**managed**  38:17
 46:14 59:14 62:20

70:10
**management**  61:19
 61:21 63:4 65:12,18
 65:21 66:8,18
**manager**  34:5,6
 36:9 50:15,22,24
 51:1 59:5 60:13
**managing**  37:15,18
 37:20 38:3 59:12
**manner**  88:12
**manufacturing**  79:7
**march**  74:4
**mark**  19:1 69:19
 83:18
**marked**  69:20,23
 83:19,22
**market**  41:13,25
 46:12,24 47:15
**marketing**  39:5,7
**master's**  7:16,19,22
 7:25 8:2
**matched**  25:11
 28:16
**matching**  28:13
**material**  16:6
**materially**  70:22
**matter**  6:11 74:3
 82:21 83:2,4 86:4
**maturity**  28:12
**mean**  21:22 24:8
 25:16 36:2 44:22
 47:5 54:4 59:11
 66:7 82:16 85:6
**meaning**  12:19
**meet**  11:10
**meeting**  11:9 63:2
**meetings**  63:1,1
**memory**  16:13
**mentioned**  15:15
 67:13
**mentioning**  7:2
**message**  86:25
 87:18
**met**  11:8,14

**miami**  1:1
**michael**  2:10,11
 94:25 96:3
**microfilm**  14:5,7
**middle**  84:10,15
**mike**  21:15 45:10
**miller**  8:8 10:24
**mind**  42:4,4 47:12
 57:20
**mine**  78:6
**mineral**  8:21
**minute**  66:10 82:15
 90:9
**minutes**  21:16 22:2
 31:15,17 40:1,8,10
 71:10 76:25 86:17
**mis**  65:12 66:1,11
 66:22 67:5,15,22
 68:1,25 69:2
**misconstruing**
 85:13 86:4
**misstated**  26:19
**misstates**  56:20
**modifications**  19:10
**money**  36:3
**month**  33:8 37:3
 68:6,20,22
**months**  36:19 61:20
 62:20 84:21
**moody's**  65:25 66:2
**moran**  16:12
**morgan**  1:4 4:18 5:8
 34:15 51:7 60:21
 65:2,5 94:1 95:4
**morning**  50:16
**mortgage**  34:24
 58:25
**move**  34:2 61:9,23
 62:24 78:15
**moved**  12:7 15:22
 18:17,25 33:24
 36:18 46:16,17 48:3
 61:4 62:7 71:14
 78:12

**movement** 23:23
24:5 62:21
**moving** 34:1 61:22
**multi** 26:18
**multiple** 49:13 50:4
**mutual** 17:7 24:25
26:8,13,25 27:5
42:10 85:8,11
**mutual's** 39:16

**n**

**n** 3:1,2,2 30:16
**n.a.** 1:4 94:1 95:4
**name** 4:1,14 6:3
28:13 34:22 38:25
39:3 46:19 47:7
48:20,20 49:15 51:3
66:8 80:3,5 81:2,6,6
81:9 84:5 85:20
89:12
**names** 32:8 48:16,21
**nature** 12:23
**necessary** 88:20
**need** 10:5 14:18
55:16 57:17 75:14
75:19 79:1
**needed** 50:17 60:6
63:3 68:17
**needs** 50:5
**never** 56:9,15 58:3,4
**new** 5:25 6:1 16:7
69:2
**nice** 57:18
**night** 50:18
**nine** 49:13 54:11
**nods** 6:2
**normal** 9:25
**normally** 14:16
**notary** 1:20 92:7
**note** 11:20 14:7,9
24:1 25:3,6,7,9,11
25:21 29:13 37:25
40:2,4 41:4,5 44:6,8
44:9 45:3,16,24
46:2,20 47:1,7,7,17

48:9,23,25 49:9,10
50:10,20 51:12
58:20,22 59:1,3,9
60:7,14 69:15 77:16
82:7,25 85:3
**notes** 12:23 13:1
20:5,6 24:14 27:16
27:22 28:1,11,12,19
28:23 29:5,9,14,21
29:24 30:1,5,10
32:11,15,23 33:1,3
39:8 46:15,15 47:19
48:14,18 52:12,16
52:20,24 53:8,11
56:18,22 58:1,4,5
58:11,14,17 59:1
62:10 77:25 79:13
79:25 80:3,23 81:6
81:10 82:22,24
93:11
**notified** 35:7
**november** 22:22,24
38:19 39:17 42:19
46:10 52:5 57:16
61:1,18 62:13,18
63:9,17,24 64:4,6
64:16 65:9 68:7
70:20
**number** 22:8 86:23
87:18 90:4,10 95:7
95:8
**numbers** 83:15

**o**

**o** 3:2 60:20,20 94:6
**oath** 4:10 92:1
**object** 13:7 20:3
21:15 23:13 24:17
27:18 28:7 29:4
30:19 31:14 32:24
33:20 35:12,14,15
36:4 37:10 38:5
39:10,18 40:16,24
41:2,16 42:14 46:13
49:4 52:1 54:25

55:8 56:12 59:20
61:2 64:17 66:21
67:3 69:7 70:11
74:16,21 75:11,21
79:1 82:11
**objected** 46:7
**objection** 13:18 20:8
21:21,22 26:19 36:5
39:18 41:7 44:10
55:2,22,23 56:12,20
70:24 73:5 77:24
78:4,11,14,24 79:11
79:21 80:24 81:4,7
81:11,16,18,22 82:4
82:23 83:7 85:9,15
86:6,22 87:7,11
88:1,5,11,17,19
89:8,17 90:2,21
**objections** 45:17
**obligations** 19:16
**obviously** 6:17
21:25 75:12,13
**occasions** 80:20
**occurred** 23:24
50:21 82:24
**ocwen** 42:4
**offer** 35:10
**offered** 35:2 36:17
**office** 61:5 63:12,14
82:25 90:3,6,13,17
**official** 92:11
**oh** 8:14 23:21 45:1
89:25
**oil** 8:10
**okay** 4:14,19,23 5:7
5:20,24 6:3,6,10,25
7:2,18 8:1,24 9:2,4
9:10,16,23 10:6,10
11:18,21,23 12:13
13:5,13 14:4,18,21
15:2,10,19 16:16,24
17:5,16 18:9 19:2,7
19:13,25 20:12 21:2
21:8,13 22:10,13,18
22:23 23:2,6,15,16

24:4,13,24 25:16,20
25:25 26:11,15,24
27:3,11,14,21 28:5
28:10,15,21 29:20
30:4,10,12,17,24
31:2,4,12 32:1,22
33:2,5,16 34:1,14
34:23,25 35:3,5,8
35:23 36:14 37:17
37:24 38:2,11,14
39:2,6 41:9,21 42:2
42:9 43:18 44:4,8
45:6 46:21 47:2,9
47:19 48:4,7,10,20
48:24 49:8,23 51:1
52:11,18,25 53:3,10
53:21 54:8,17,22
56:9,17,24 57:2,8
57:15 58:5 59:4,8
59:15,18,24 60:8,11
60:14,25 61:13 62:5
63:5,15,20,22 64:5
64:8,14,19 65:10
66:12,15,17,24 67:6
67:13,20 68:10,15
68:22 69:1,3 70:4,8
70:22 71:8,23,25
72:8,14 73:4 74:14
74:22 75:20 76:7
77:8 78:9,23 82:10
82:14 83:13,14 91:7
**olas** 2:4
**old** 10:3
**once** 8:4 14:2 32:11
50:4 52:12 75:21,21
78:12 89:7 94:15
**ones** 9:25 48:10
**open** 81:17,19
**operate** 62:3
**operation** 64:15
**operations** 23:22
31:5 35:25 36:9
38:25 42:18 46:18
61:8 63:7,8,10,13
63:16 64:15,22 77:9

78:7,12,16
**order**  9:9,10 17:14
  17:15 19:6 46:12,23
  47:13 71:15,20
  72:22
**ordering**  94:15,16
**original**  94:15
**originally**  67:15,20
**originate**  28:1
**originated**  24:20,22
  24:23 27:17,22
  39:20 42:24
**origination**  25:24
  44:11 45:22
**originations**  25:14
**orozco**  1:7 2:22
  11:19 76:24 85:20
  94:1 95:4
**orozco's**  43:19
**outside**  24:3
**overly**  38:7
**oversaw**  59:21 77:9
  77:25
**oversee**  62:24
**overseeing**  77:21
**owned**  21:4
**ownership**  8:21

**p**

**p**  10:15
**p.a.**  2:11
**p.m.**  1:14 84:13
  85:20 91:9
**pace**  21:19
**package**  35:2
**page**  3:2,8 70:5
  83:23 84:9,10 85:19
  95:7
**pages**  93:10 94:12
**paid**  17:14
**paper**  25:18
**paragraph**  84:15
**parallel**  63:18
**pardon**  17:21 91:5

**parking**  89:11
**part**  20:1 36:2 63:12
  76:14
**particular**  26:14
**particularly**  48:18
**parties**  93:14,15
  94:16
**partitioned**  51:17
**party**  82:12 88:21
  94:15
**passing**  41:13,17
**pat**  51:2,5 59:6
  60:15,16
**payments**  19:10
**peak**  10:14,15
**penalties**  95:23
**penny's**  9:15
**people**  12:11 29:13
  31:9,13 38:9 48:13
  48:17,22,24 49:2
  50:11 81:1 85:12
  86:3,20
**percent**  43:13,14
**percentage**  39:15,19
  39:25 41:19 43:9,10
**period**  23:14 29:5
  32:5 38:21 52:2
  53:5,15 59:13 62:11
  62:12,24 63:5 68:6
  68:20,22
**perjury**  95:23
**personal**  73:17 89:6
**personally**  33:3
  43:23 44:4,6 92:8
**personnel**  59:23
**phone**  6:17 87:17,18
  89:6,12 90:3
**phrases**  72:3
**physical**  17:18
  19:19,22
**picked**  63:17 79:9
  79:17
**piece**  37:22
**place**  1:15 32:15
  51:12 57:7 72:22

74:8
**placed**  30:24 83:3
**placement**  17:17
**plaintiff**  1:5 2:1
**plaintiff's**  3:10
  83:16,19,23 87:23
**plant**  62:5
**pleasant**  87:14
**please**  4:15 8:12
  23:18 27:25 30:15
  37:21 38:24 44:18
  51:3 55:21 60:19
  70:15 94:12,14
**point**  17:3 22:1,1
  29:8 57:8
**policies**  20:5 81:21
  81:23 82:1
**popped**  90:4
**position**  18:2 31:4
  74:7
**possibly**  39:21
**post**  7:11,15 10:7
**postings**  89:5
**power**  75:5
**practice**  82:21 83:5
**precollege**  10:4
**predecessors**  5:9
**predicate**  70:13
  71:2
**preparation**  11:13
  11:19 44:14 45:19
**prepare**  11:7
**preparing**  11:16
  45:25
**present**  2:21
**presented**  82:5
**preserve**  88:19
**president**  34:11,11
  36:8,21,23,25 37:7
  37:9,15 65:15
**presume**  24:14
  34:12 74:5
**pretty**  23:4 72:5
**printout**  84:6

**prior**  26:19 29:1
  33:15 56:20 63:23
  64:7
**privacy**  35:17 36:5,6
**private**  41:23
**probably**  18:1 22:11
**problem**  82:17
**problems**  59:9,10,25
  60:3
**procedures**  16:7
  50:8,13,14 59:22
  77:16,17,20,21,25
  78:10,15 81:12,21
  81:23 82:2 88:15
  89:14
**process**  14:23 46:23
  47:13 49:10 50:3
  55:3,7 56:6,8 68:12
  68:13 81:9 83:1
  88:13
**productivity**  59:14
**program**  7:16,25
**progress**  63:3
**project**  61:19,21,22
  62:19,20 63:4 68:19
**projects**  24:2 62:21
  68:2,8,10,16,19
**promoted**  35:22
  36:1,8
**promotion**  36:2,12
**proper**  76:15,17
**properly**  60:5
**proprietary**  35:12
  36:6
**protect**  88:23
**protective**  71:14,20
  72:22
**provide**  49:24 50:1
  66:1,25 67:1 78:18
  84:24
**provided**  14:22 55:5
  65:21 66:15 71:17
  78:19
**providing**  8:17

**public** 1:20 86:5
  92:7
**publicly** 73:21
**purchase** 18:4,5,19
  18:22,25 19:12
  22:20 23:22
**purchasers** 24:12
**purchasing** 20:20
  21:13 22:6,18
**purposes** 66:4,6,9
  66:19 67:2 74:25
  75:8
**purview** 73:13
**put** 12:19 44:14
  52:17,19 58:4 77:18
**putting** 85:13

**q**

**qc** 60:4,8
**quality** 12:16 59:22
  59:23,25 60:9
**question** 20:9 23:13
  27:21,24 30:19
  32:24 33:20 35:14
  36:4 37:10 38:5
  39:10,19,22 41:10
  41:12,16,21 42:9,16
  43:4 44:17,20,22,23
  45:18 46:13 47:16
  49:4 52:1 54:25
  55:15 56:13 58:9
  59:20 61:2 62:14
  64:17 66:5,13,21
  69:7 70:11,15 73:6
  78:25 79:2,3 81:8
**questions** 16:21
  77:1 82:12 83:18
  88:23,24 90:24 91:1
**quietly** 84:20

**r**

**r** 60:20 95:2,2
**range** 27:8 49:21
**read** 44:16,24 45:14
  91:2,4,6 94:12
  95:23

**reading** 94:11
**really** 6:8 13:4 20:21
  22:21 27:10 72:25
**reason** 52:8 54:23
  56:2,3 71:16 88:22
  89:1 90:19 95:8
**reasonable** 58:13
**recall** 6:5,6 11:25
  16:11 31:12 32:8
**received** 81:20
  94:16
**recognize** 38:2 84:6
  87:17
**recognized** 90:11,14
**record** 4:5,5,15
  45:14 46:3 55:24,24
  76:9 88:19 89:3
  93:11
**recording** 4:6
**records** 8:20,25 12:6
  12:7,9 13:1 14:21
  19:15,17,18
**reference** 5:8 6:11
  6:13 11:19 27:16
  70:4 83:24
**referenced** 94:10
**referred** 68:6
**referring** 4:24 13:13
  14:15 22:15 24:25
  60:9 64:2,11 67:10
**reflected** 45:24 46:1
**refused** 4:6
**regard** 25:5 71:18
**regarding** 17:15
**regardless** 16:5
**regards** 12:8 24:5
  25:9 28:11 42:10
  43:18 46:9 49:23
  51:21 52:12 56:10
  58:17 59:9,13,25
  65:18 88:24
**related** 23:25 46:14
  74:16 90:17
**relative** 93:13,14

**relevance** 13:7 20:3
  21:23 31:14 40:18
**relevant** 21:18
  69:17
**relocation** 35:2,10
  35:21
**remained** 22:24
**remember** 26:7,8
  31:11,24 42:7 48:16
  50:3 53:2 76:20
  77:6 90:16
**rephrase** 27:21
  41:12
**report** 86:5 93:8
**reporter** 55:21
**reporter's** 93:1
**reporters** 1:21,25
**reporting** 66:25
  67:8
**represent** 4:2,3
**representative**
  50:17
**request** 4:4
**requested** 34:1 35:1
  93:10
**requiring** 50:10
**research** 8:25
**researched** 8:20
**reservation** 85:12
**reservations** 85:7,10
  86:3
**reserve** 74:15,20
  75:11,20
**respect** 35:21 55:4
  60:25 75:10
**respects** 41:17
**respond** 16:21
**responding** 73:7
**responsibilities** 16:5
  19:2,14 21:17 22:14
  22:24 23:2,8,10,19
  24:4 25:5,8 26:1
  32:18,20 35:24
  37:16,23 59:18
  60:25 61:15 65:19

66:11,13,15 67:5,6
**responsibility** 37:25
  66:19
**responsible** 12:11
  16:3
**results** 59:23
**review** 11:18 24:1
  25:3,6,7,9 28:3,10
  29:13 37:25 43:18
  44:6,9 45:4 46:20
  47:17 48:23,25
  49:10 50:10,20
  51:12 59:3,9 60:12
  60:14 82:25 83:10
  93:9
**reviewed** 13:24 28:9
  30:5 44:8 46:16
  48:1,1
**reviewer** 49:9
**reviewing** 15:20
  29:23 58:10
**right** 5:1,4 6:13 8:4
  8:16 10:6,13 11:9
  11:15,23 12:18
  13:15 14:1,15 15:4
  15:15,24 16:6 18:18
  18:21 19:19 23:12
  27:16 28:23 29:22
  30:1 32:14 34:22
  40:4,6,13,22 41:2
  42:9 43:12 44:1
  46:5,9 48:13 49:7
  49:11 52:5,23 54:14
  56:17 63:24 66:14
  72:16,19 73:16,24
  73:25 74:20 75:3,11
  75:25 76:2 79:4
  88:10
**rights** 18:22 20:20
  21:10 24:15 74:15
  75:20
**riley** 1:11 2:14 3:3
  4:3,8,16 69:23
  71:13 74:13 77:4
  80:15,16 82:20 83:8

[riley - special]

83:22 84:16 91:2
92:8 93:9 94:2,6,12
95:5 96:1
**riley's** 31:16
**road** 76:13
**roland** 2:3 4:1 11:8
75:2 94:25 96:3
**rolled** 13:23
**rolls** 13:23
**room** 50:20 51:12
52:13
**run** 72:4,4 84:22,23
84:23

**s**

**s** 3:2,7 51:4 95:2
**s&p** 65:25 66:2
**sachs** 42:6,8
**safety** 84:24
**sales** 9:19 10:19
23:23 24:5,6,8
**samantha** 1:20 92:7
92:15 93:7,24 94:22
96:2
**sample** 55:4 78:20
79:9,16,20
**savings** 12:1 15:8,12
16:4 17:2,5,9 18:3
18:11,13,14,15 19:1
20:12,19 21:23
24:21,23 26:1,6,13
26:16,17,23 27:5,23
28:4,5,9 39:9 40:18
**saw** 11:20 45:3 56:9
68:17
**saying** 22:23 24:13
24:14 26:15 29:22
32:6 38:17 49:11
56:1 63:15 66:7
72:11,24 74:24
**says** 72:22 83:16
84:21
**schwartz** 2:3 3:5 4:1
4:1 9:8 13:7,18 20:3
21:21 24:17 26:4

27:9,13 30:20 31:14
32:19 33:13,22
35:12,16,18 36:6
37:5,12 38:7 40:1
40:12,15,25 41:2,7
42:15 43:15,20,22
44:13,18 45:1 46:7
47:22,24 52:2 54:3
57:4,12,17,20 58:12
62:14 64:10 65:3
66:20 67:18 69:8,16
70:12,24 71:2 73:2
73:11,15,24 74:11
74:15,19,23 75:2,6
75:8,14,18,20,23,25
76:2,5,25 77:3 79:1
79:5 82:9,15,19
83:8,12,14,21 88:16
89:2,4 90:24 91:4,6
94:25 96:3
**screen** 44:2,7 45:7
46:1 87:15
**screening** 89:12
**screens** 43:18 44:2
45:6,16,23
**seal** 92:11
**seamless** 26:9
**sec** 52:11
**second** 90:8,10
**secondary** 23:22
31:5 35:25 36:9
38:12,14,18,24,25
39:3,5,7 41:13,25
42:11,18 46:12,18
46:24 47:14 61:8
63:6,8,10,13,16
64:15,21 70:10
**secrecy** 81:14
**secretary** 84:19
**secure** 12:21 51:11
**secured** 50:6,9,19
50:21 51:18
**security** 50:8,12
84:25

**see** 60:4 84:11,17
85:19,20 89:1,10
**seen** 45:15 69:15,25
72:2
**send** 13:11 83:1
**sent** 32:12 47:17
94:4
**serve** 74:7,8,21 75:9
75:15
**served** 74:13 75:21
**server** 89:9
**service** 16:18 17:10
18:7,9,14 19:11
21:5 74:25 76:1
**serviced** 18:11,12
**servicer** 18:19 21:1
**servicers** 21:10
24:11
**services** 8:17
**servicing** 18:4,5,8
18:13,15,22,25 19:1
19:11,16 20:20 21:9
22:6,19,20,24 23:1
23:3,11,18,23 24:9
24:15 25:11,14
**set** 51:15 74:4
**seven** 84:21
**shape** 79:6
**share** 89:23
**she'd** 45:15
**sheet** 94:15
**ship** 12:21 57:2 62:9
**shipped** 12:12,12
14:3 24:11 28:19
53:1,8,11,16,18
56:18,22 57:9 82:24
**shipping** 12:20
13:11 57:7 62:16
**short** 53:4 82:16
**show** 83:8,11
**showing** 69:23
**shut** 35:8 63:9,11,14
**shutting** 35:7
**side** 63:4

**sides** 77:17
**sight** 87:6
**sign** 80:7,9,19,22
94:12
**signature** 30:12
31:16 48:8 49:16,24
50:1 51:25 52:7,9
55:4 60:7,7 70:6,7
70:17,21,22 79:16
79:20,23 80:6 82:6
**signature's** 71:5
**signatures** 54:23
55:5 56:3,8,10,16
78:20 79:9
**signed** 47:6,6 50:3
56:7 80:21
**signing** 94:11
**similar** 70:8,18
**simply** 10:7 13:10
**simpson** 2:17 94:7
**sitting** 85:25
**sixteen** 10:3
**sold** 24:9,14,15 39:8
39:14,16,20 41:18
41:20 42:11 43:5
46:12,24 47:14
**somebody** 18:13
86:12 87:23 89:11
89:22
**soon** 82:21
**sorry** 6:17 24:7 34:8
39:3 61:18
**sounds** 58:13 72:5
**south** 2:11 53:23
57:9 61:5,9,24
62:22,25 63:11,16
64:3,11 68:4 69:4
69:10 77:6,9,21
78:1,7,12,15
**speak** 13:4 20:21
43:10 57:1 72:17
**speaking** 66:10
**speaks** 46:3
**special** 24:2 51:19

Veritext Florida Reporting Co.

| | | | |
|---|---|---|---|
| **specific** 30:18 62:6 72:17 | **stating** 89:2 | **supervision** 38:4,22 69:13 | 52:4 54:4 61:6 65:24 71:21 73:15 |
| **specifically** 13:19 31:11 40:17 | **stay** 61:11 | **supervisor** 12:10,13 16:18 17:11 29:17 30:8 59:4 81:10 | **tasked** 77:21 78:3 |
| **speculating** 58:12 | **stayed** 23:21 78:10 | | **tavares** 5:22 |
| | **stenographic** 93:11 | | **tax** 14:20 17:11,13 17:24 |
| **speculation** 70:13 70:25 | **stenographically** 93:8 | **supervisors** 77:8,15 77:19 81:21 | **taxes** 17:14 |
| **speculative** 43:15 | **stipulating** 75:22 88:17 | **sure** 5:17 6:9 12:16 13:16 17:13,13 19:14 26:21,22,25 28:8,16 59:19 62:11 66:3 67:11 71:20 79:16,19,22,23 | **team** 12:10,13 13:6 15:20 16:9,21 18:6 24:2 28:15 29:11,23 31:13 32:8 37:16,18 37:19,20,22 38:1 50:23,24 57:24 58:10,16 59:6 |
| **spell** 8:12 30:15 51:3 60:19 | **stockton** 11:3 12:3 15:11 20:17,18 24:1 25:3 27:17,23 28:2 28:17 29:9 33:5,6 33:11,14,17 35:3,4 35:5 36:15 52:24 53:1,4,8,19,22 56:18 57:1,3 61:24 61:25 62:5,10,22,25 80:2,4,8,11,13 | | |
| **spend** 11:16 | | | |
| **spent** 21:16 | | | |
| **spoken** 40:2,4 | | | |
| **springs** 10:23 | | | |
| **staff** 48:12,14 | | **sworn** 4:9 92:9 | **teams** 15:7 |
| **stamp** 30:11,13,25 31:6,10,23 32:9 33:3,10,12,14,16 48:8,11 49:3,7,10 49:11,12,23 51:21 52:9 55:5 58:4 79:10,14 80:3,5,10 80:13,16 81:6 88:3 88:7 | | **system** 28:14 48:2 58:20,22,23 66:18 | **tell** 4:9 9:10 10:2 15:5 36:1 37:17 38:24 90:7 |
| | | **systems** 18:8 25:11 25:14,15 65:13,19 65:21 66:8 67:8,10 | **telling** 11:6 53:3 55:14 86:20 |
| | **stop** 87:19 | | **ten** 31:21 48:15 49:13 54:11 |
| | **storage** 12:21 | | |
| | **stored** 20:7 | | |
| | **street** 1:15,21 | | **tenders** 83:9 |
| | | **t** | **tenure** 70:19 |
| **stamping** 81:9 | **strictly** 66:9 | **t** 3:2,7 95:2,2 | **term** 28:12 67:11 |
| **stamps** 49:13,14,15 49:17,24 50:2,5,6,9 50:16 51:24 52:6 54:12,24 56:4,6,11 56:15 57:25 70:9,19 78:20 79:7,17,19 81:1 | **strike** 48:25 51:20 58:15 64:20 65:17 | **take** 4:24 5:20 6:19 7:21 19:16 22:23 23:15,17 26:15 32:14 38:17 40:4,5 40:6,11 45:11 49:19 51:12 60:8 61:15 63:15 65:14 66:17 69:15 71:9 76:6,14 76:25 82:15 84:20 89:16 | **terms** 12:20 |
| | **struggling** 40:19 | | **testified** 4:10 42:22 55:2,6,10 73:8 78:18 79:13 |
| | **stuff** 22:2 89:14 | | |
| | **subject** 6:11 | | **testify** 88:18 |
| | **subpoena** 74:5,6,8 74:10,19 75:5,11 | | **testimony** 26:20 55:18 56:21 71:16 71:19 77:4,6 |
| | **subpoenaed** 74:3 | | |
| | **subpoenas** 74:11,17 75:9 | **taken** 1:13,19 26:8 57:22 71:11 82:18 90:25 94:3 95:6 | |
| **standing** 13:18 21:22 | | | **thacher** 2:17 94:7 |
| **standpoint** 23:20 73:17 | **subsequently** 65:4 | **takes** 40:10 57:20 74:14 | **thank** 6:20 27:14 63:8 94:17 |
| | **substance** 74:20 | | |
| **stars** 2:18 94:7 | **sufficient** 94:13 | **talk** 90:23 | **thanks** 89:2 |
| **start** 12:4 29:13 | **suite** 2:5,12 | **talked** 23:3 31:15 | **thing** 17:8 40:16 |
| **started** 7:16 40:17 63:24 | **supervise** 15:7 17:24 46:11 47:15 69:3 77:5 | **talking** 14:5 15:16 18:9,10,12 19:8 21:16,23 32:1 38:8 39:8 40:17,23 42:24 43:2,9,13 44:2,10 44:12,14 45:22 52:3 | **things** 6:23 12:14,23 16:7 22:17 28:10 33:22 39:13 46:11 46:21 47:13 59:12 62:23 67:21 72:2 89:19 |
| **starts** 84:15 | | | |
| **state** 4:14 53:13 68:11 92:3,7 93:3 | **supervised** 12:10 17:9 25:7 31:13 32:3,4 | | |
| **stated** 55:24 95:23 | **supervising** 15:20 17:19,20 | | |

**think** 5:15 9:7 10:9
  24:24 26:20 29:16
  34:22 52:8 53:3
  54:23 56:3 57:18
  76:19 82:9
**third** 6:10 11:4
**thirty** 31:15 38:9,9
**thoroughly** 41:6
**thought** 61:25 67:20
**threatening** 72:4,5
  85:14,17 87:5
**till** 33:6 38:16
**time** 1:14 6:19,24
  8:10 9:3 11:11,14
  11:15 15:10,13
  20:14,25 21:6 23:14
  23:15,17 26:14 29:5
  29:8,21 31:25 32:1
  32:4,5 34:12,17
  36:20 38:7,21 40:24
  44:15 52:2,22 53:5
  53:15 54:15,18
  55:21 56:25 57:6,8
  60:1,1 61:22 62:24
  63:5 70:2,9,23 71:5
  77:10 87:10 90:8,10
  94:13
**times** 5:11 50:4 56:7
  86:25
**title** 20:5 22:20
  34:10 36:2 65:14
**today** 72:15 73:3
  74:3 85:6 86:1,9
**toilet** 86:21 87:2
**told** 9:6 35:20 41:7
  72:14,20
**top** 83:22,23
**tracked** 59:16
**tracking** 12:11
  17:17
**trained** 15:24 16:7
**trainer** 15:23
**trainers** 15:22
**training** 16:3,6,14
  16:17

**transcript** 93:9,10
  94:10,12,12 95:3
**transfer** 19:6 21:5
  68:3
**transferred** 19:15
  35:1
**transfers** 18:7,10
**transition** 36:16
**transmittals** 12:20
**travelled** 36:17
**trial** 74:4,5
**true** 77:14 93:11
  95:24
**truth** 4:9
**try** 48:21
**trying** 7:18 23:9
  25:16 29:7,7 40:21
  55:15 84:22
**turned** 90:5
**twelve** 31:21 48:15
**twice** 5:13,14,15
**two** 5:21 8:23 11:17
  57:7 59:13 62:17
  63:13 82:15
**type** 59:12 61:21
**typed** 47:7
**types** 12:14 14:25
  19:7,22 20:19 46:11
  60:3 62:23 65:23
  67:6 68:10

**u**

**uh** 10:16 19:18
  33:15
**umbrella** 67:16,17
**unanimous** 86:9,10
  87:5
**unclear** 45:15,21
  46:6
**understand** 14:10
  17:23,23 23:9 24:24
  25:17 27:24 44:1
  67:11 73:14 76:4
  81:8

**understanding**
  18:23
**underwriting** 14:19
**unh** 68:21,21
**unit** 24:2 25:7 28:8
  29:17 30:6 32:3,4
  46:14,19,20 47:3,20
  48:21,22,23,25 49:2
  50:15 59:5,9,13,19
  59:21 60:1,13,14
  66:8 70:10
**units** 46:14,18 67:22
**university** 2:11 7:5
  7:14
**unlock** 50:15
**upsetting** 89:12
**use** 49:7,9 81:1

**v**

**vague** 23:14 27:18
  33:21 37:11 38:6
  41:17 43:22 45:17
  49:5 61:3 67:3
**vary** 38:2 70:22
**vault** 20:11,13,15
  32:15 52:17,18
  53:23 57:10 61:24
  62:7,17,21,25 64:8
  68:4,20
**vaults** 52:22 53:21
**verified** 13:12
**vernon** 53:12,13,16
  53:18,22 56:19 57:1
  57:3 62:10
**version** 80:10
**versions** 80:12,13,14
**versus** 37:16 60:7
**vice** 34:11,11 36:8
  36:20,23,25 37:7,8
  37:15 65:15
**viewed** 45:23,25
**vp** 31:5
**vs** 1:6 94:1 95:4

**w**

**w** 60:20,20
**wait** 66:10 90:9
**waiving** 75:7
**walk** 89:10
**wamu** 5:8 24:21,25
  26:17 34:12 39:20
  42:24 53:21 54:18
**want** 5:19 21:18
  22:8,11 27:7 40:9
  40:23 42:23 44:16
  44:24 45:8,12,14
  55:19 68:11 72:23
  74:6,7 83:18 87:19
**wants** 88:23
**washington** 17:7
  24:25 26:7,13,25
  27:5 39:15 42:10
  85:8,11
**wasting** 40:23
**watched** 85:3
**watching** 84:20
**way** 33:6 43:3 72:5
  76:21 79:6 88:16
  89:7
**we've** 21:15 46:7
  72:20 91:1
**website** 84:7
**week** 86:12
**weekly** 63:2
**weiss** 2:16 20:8
  21:15 23:13 26:19
  27:18 28:7 29:4,10
  29:12 30:19 32:24
  33:20 35:14,17 36:4
  37:10 38:5 39:10,18
  40:6 41:16 42:14,16
  42:23 43:1,3 44:10
  45:10,13,21 46:5,13
  49:4 52:1 54:25
  55:2,8,11,13,15,17
  55:18,23 56:12,20
  59:20 61:2 64:17
  66:21 67:3 69:7

[weiss - z]

70:11 73:5,19,25
74:24 75:2,4,7,22
75:24 76:1,3 82:10
82:12,14 94:6,9
**went**   6:15 7:2 8:8,20
9:7 16:18 42:12,21
52:24 65:12 68:24
**whatsoever**   21:24
**where'd**   7:4
**willing**   74:9
**wish**   87:22
**witness**   1:19 3:2
4:11 6:17,20,22,25
27:14 44:21 55:9,11
55:13,20 57:18 91:8
92:10 94:4
**woodward**   60:18,19
60:20
**word**   8:15
**words**   14:21 56:2
**work**   5:4,8 7:11 8:8
9:2,7 11:23 15:8
17:18,20,22 18:16
41:20,22 46:9 51:17
59:25 60:12 61:19
65:1,12 76:10 90:1
**worked**   9:13,17,21
14:13 29:13 55:3
67:22 68:2,8 77:10
**working**   12:4 15:10
34:19,20 42:17
59:19 68:20
**worries**   6:21
**write**   12:20 95:3
**wrong**   46:25 87:25
88:2
**wrote**   16:6
**wrubel**   2:10,11 3:4
4:13 6:19,21,23 7:1
13:21,25 22:4,5
27:15 29:7,11,15,19
30:23 31:18,19
33:25 35:19 36:11
37:13 38:10 39:23
40:3,8,13,21 41:1,4

41:9,11 42:22,25
43:2,7 44:16,20,22
45:5,8,11,20 46:3,8
52:4,10 55:8,12,14
55:16,19,22,25
57:21,23 66:23 69:9
69:15,17,22 70:16
71:1,4,7,9,12 73:10
73:14,16,22 74:1,14
74:18,22 75:1,3,13
75:16,19 76:4,7,8
76:22 77:24 78:4,11
78:14,24 79:4,11,21
80:24 81:4,7,11,16
81:18,22 82:4,11,23
83:7,10,13 85:9,15
86:6,22 87:7,11,16
87:21 88:1,5,11,14
88:21 89:8,17 90:2
90:9,21 91:1,5,7
94:25 96:3

| x |
|---|
| **x**   3:1,2,7 |

| y |
|---|

**y**   51:4
**yeah**   9:9 43:24
44:13,18 45:20 59:3
64:1 90:16
**year**   5:19 8:23 9:22
10:3 15:9,9,19
16:15,15 28:24
59:13 64:18 65:6
**years**   4:22 5:21 7:12
7:13 9:5 11:24
15:16 17:1 18:1
21:17 22:8,12 76:20
**yesterday**   11:8,10
45:3 70:1
**york**   5:25 6:1

| z |
|---|

**z**   30:16 68:11